**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, and the States of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA NEVADA,  NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA,  RHODE ISLAND, TENNESSEE, TEXAS,  VIRGINIA, WASHINGTON, WISCONSIN, and THE DISTRICT OF COLUMBIA and the CITIES of CHICAGO and NEW YORK NEW YORK | No. 1:11-cv-00074 Judge Reggie B. Walton |
| *ex rel.* LESLEY FERRARA, Relator and SHELLY KELLING, Relator, | **THIRD AMENDED COMPLAINT AND JURY DEMAND** |
| Plaintiffs, | Filed Under Seal pursuant to 31 U.S.C. § 3730(b)(2) and Court Order |
| v. | |
| NOVO NORDISK, INC. and NOVO NORDISK A/S | JURY TRIAL DEMANDED |
| Defendants. | |

Ann Lugbill
Murphy Anderson PLLC
2406 Auburn Avenue
Cincinnati, OH 45219
Phone: (513) 784-1280
Fax: (877) 784-1449
*alugbill@murphypllc.com*

Mark Hanna
Lorrie E. Bradley
Murphy Anderson PLLC
1701 K Street NW, Suite 210
Washington, DC 20006
Phone: (202) 223-2620
Fax: (202) 223-8651
*mhanna@murphypllc.com*
*lbradley@murphypllc.com*

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   JURISDICTION AND VENUE ......................................................................... 5

III.  PARTIES ........................................................................................................... 7

IV.   REGULATORY FRAMEWORK ..................................................................... 8

      A.    Federal Government Health Programs ................................................... 8
      B.    The False Claims Act ........................................................................... 10
      C.    FDA Regulations ................................................................................. 11
      D.    The Medicare Fraud & Abuse/Anti-Kickback Statute ....................... 13
      E.    The Medicaid Rebate Statute ............................................................... 14
      F.    Stark Law - The Medicare/Medicaid Self-Referral Statute ................ 16
      G.    State False Claims Acts ....................................................................... 17

V.    SPECIFIC ALLEGATIONS OF DEFENDANTS' VIOLATIONS OF LAW ............... 17

      A.    Victoza ................................................................................................. 18

            1.    Off-Label and False Marketing of Victoza for Weight Loss ................... 20
                  a.    Targeting Doctors Who Treat Obesity and Overweight
                        Patients ........................................................................... 22
                  b.    Targeting the Company's Own Employees ................................. 26
                  c.    Educational Presentations to Physicians About Weight ............. 27
                  d.    Use of EPIR System for Marketing Purposes - Creating a
                        "Buzz" ............................................................................. 28
                  e.    Seeking Ohio Medicaid Approval with Weight Claims ............. 30

            2.    FDA January 25, 2010 Approval of Victoza Conditioned on Novo
                  Nordisk Safety Warnings and Marketing Restrictions ........................... 32
                  a.    Novo Nordisk Management Employs Marketing Tactics
                        That Avoid Compliance with Serious FDA Drug Risk
                        Warnings - "REMS" and "HIP-D" ...................................... 35
                  b.    Novo Nordisk's Off-Label and False Marketing of Victoza
                        to Avoid the FDA REMS Safety Directives and Minimize
                        Thyroid Cancer Risks ...................................................... 38
                  c.    Novo Nordisk's Off-Label and False Marketing of Victoza
                        to Avoid the FDA REMS Safety Directives and Minimize
                        Pancreatitis Risk ............................................................ 42
                  d.    Novo Nordisk's Off-Label and False Marketing of Victoza
                        to Minimize Warnings That Victoza Not be a First-Line
                        Therapy and That Victoza Use With Insulin Was Not Safety
                        Tested, in Violation of FDA Directives ................................ 46

i

3.      Off-Label and False Marketing of Victoza for Beta Cell Preservation ... 46
4.      Off-Label and False Marketing of Victoza for Cardiovascular Health ... 48
5.      Off-Label and False Marketing of Victoza for Renal Safety .................. 51
6.      Off-Label and False Marketing of Victoza for First-Line Therapy ........ 52
7.      Misuse of Clinical Trial Information to Promote Off-Label Uses ........... 54

B.      Degludec ......................................................................................... 55

C.      Levemir ........................................................................................... 57

1.      Off-Label and False Marketing of Levemir for Weight Benefit .............. 57
2.      Off-Label and False Marketing of Levemir for Allegedly Superior
        Cancer Safety ......................................................................... 60
3.      Off-Label and False Marketing of Levemir for Allegedly Superior
        Renal Safety ........................................................................... 64
4.      Off-Label and False Marketing of Levemir for Patient Self-Dosing ....... 65
5.      Off-Label and False Marketing of Levemir for Superior Efficacy
        and Less Hypoglycemia ........................................................... 67
6.      Off-Label and False Marketing of Levemir for Lower Within-Subject
        Variability .............................................................................. 69
7.      Off-Label and False Marketing of Levemir Regarding Dose
        Frequency and Unit-for-Unit Dose Equivalency ..................... 71
8.      Off-Label and False Marketing of Levemir as Superior to Human
        Insulin ................................................................................... 74
9.      Influencing the Ohio Medicaid Pharmacy &Therapeutics Committee
        Regarding Levemir ................................................................. 75

D.      Novolog and Novolog Mix 70/30 ....................................................... 77

1.      Off-Label and False Marketing of Novolog for Superior Safety
        and Efficacy in IV Drip Administration .................................. 77
2.      Off-Label and False Marketing of Novolog Mix 70/30 for
        Prevention of Cardiovascular Death ....................................... 78
3.      Off-Label and False Marketing of Novolog and Levemir
        "Basal-Bolus" Administration in Long-Term Care Facilities ................. 80

E.      Illegal Kickbacks in Long-Term Care Sales ...................................... 81

1.      Omnicare/PharMerica Pharmacy Kickbacks ........................... 82
2.      Misleading Pricing Scheme for Long Term Care Sales .......................... 83

F.      Kickback Schemes Involving Physicians ........................................... 84

1.      Sharukh Mehta and Dr. Adi Mehta ....................................... 84
2.      Novo Representative Williams and Dr. Williams .................... 85

3.      Houston, Texas Sales Representative and Houston St. Luke's
        Episcopal Hospital Emergency Physician ........................................... 86
4.      Family: Cincinnati Sales Representative and Lancaster Surgeon ........... 86
5.      Distribution of Victoza Samples in Cleveland Clinic ............................ 87
6.      Use of Speakers Bureau to Increase Prescribing .................................... 88
7.      Use of Research Grants to Increase Prescribing .................................... 91
8.      Use of Certified Diabetes Educators to Increase Prescribing ................. 93
9.      Use of Sales Representative to Submit Prior Authorizations ................. 97
10.     Other Kickback Schemes ........................................................................ 97

G.      Submission of Fraudulent Prior Authorizations .................................................. 98
H.      Dissemination of Unapproved Research Studies ................................................ 99

VI.     CLAIMS FOR RELIEF ........................................................................................... 101

COUNT I
False Claims Act - Presentation of False Claims
31 U.S.C. § 3729(a)(1), 31 U.S.C. § 3729(a)(1)(A) as amended in 2009 ................................ 101

COUNT II
False Claims Act - Making or Using False Record or Statement to Cause Claim to be Paid
31 U.S.C. § 3729(a)(2), 31 U.S.C. § 3729(a)(1)(B) as amended in 2009 ................................ 101

COUNT III
False Claims Act - Making or Using False Record or Statement to Conceal, Avoid and/or
Decrease Obligation to Repay Money
31 U.S.C. § 3729(a)(7), 31 U.S.C. § 3729(a)(1)(G) as amended in 2009 ................................ 102

COUNT IV
California False Claims Act
Cal. Gov't Code § 12651 *et seq.* ............................................................................. 102

COUNT V
Colorado Medicaid False Claims Act
Colo. Rev. Stat. § 25.5-4-303.5 *et seq.* .................................................................. 103

COUNT VI
Connecticut False Claims Act
Conn. Gen. Stat. § 17b-301a *et seq.* ...................................................................... 103

COUNT VII
Delaware False Claims Act
Del. Code Ann. tit. 6, § 1201 *et seq.* ..................................................................... 104

COUNT VIII
Florida False Claims Act
Fla. Stat. Ann. § 68.081 *et seq.* ........................................................................... 105

COUNT IX
Georgia False Medicaid Claims Act
Ga. Code Ann. § 49-4-168 *et seq.* ........................................................................ 106

COUNT X
Hawaii False Claims Act
Haw. Rev. Stat. § 661-22 *et seq.* ......................................................................... 107

COUNT XI
Illinois Whistleblower Reward and Protection Act
740 Ill. Comp. Stat. 175/1 *et seq.* ....................................................................... 107

COUNT XII
Indiana False Claims and Whistleblower Protection
Burns Ind. Code Ann. § 5-11-5.5-1 *et seq.* .......................................................... 108

COUNT XIII
Iowa False Claims Act
Iowa Code § 685.1 *et seq* .................................................................................... 109

COUNT XIV
Louisiana Medical Assistance Programs Integrity Law
La. Rev. Stat. Ann. § 46:439.1 *et seq.* ................................................................. 110

COUNT XV
Maryland False Health Claims Act
Md. Code Ann., Health-Gen. § 2-601 *et seq.* ....................................................... 110

COUNT XVI
Massachusetts False Claims Act
Mass. Ann. Laws ch. 12, § 5(A) *et seq.* ............................................................... 111

COUNT XVII
Michigan Medicaid False Claim Act
Michigan Compiled Law § 400.601 *et seq.* ........................................................... 112

COUNT XVIII
Minnesota False Claims Act
Minn. Stat. §15C.01 *et seq.* ................................................................................. 113

COUNT XIX
Montana False Claims Act
Mont. Code Ann. § 17-8-401 *et seq.* ..................................................................... 113

COUNT XX
Nevada False Claims Act
Nev. Rev. Stat. § 357.010 *et seq.* ........................................................................ 114

COUNT XXI
New Hampshire Medicaid Fraud and False Claims
N.H. Rev. Stat. Ann. § 167:61-b *et seq.* ............................................................... 115

COUNT XXII
New Jersey False Claims Act
N.J. Stat. § 2A:32C-1 *et seq.* .............................................................................. 116

COUNT XXIII
New Mexico Medicaid False Claims Act
N.M. Stat. Ann. § 27-14-1 *et seq.* ....................................................................... 116

COUNT XXIV
New York False Claims Act
N.Y. State Fin. Law § 187 *et seq.* ........................................................................ 117

COUNT XXV
North Carolina False Claims Act
N.C. Gen. Stat. § 1-607 *et seq.* ........................................................................... 118

COUNT XXVI
Oklahoma Medicaid False Claims Act
Okla. Stat. tit. 63 § 5053 *et seq.* ........................................................................ 119

COUNT XXVII
Rhode Island False Claims Act
R.I. Gen. Laws § 9-1.1-1 *et seq.* ......................................................................... 120

COUNT XXVIII
Tennessee Medicaid False Claims Act and Tennessee False Claims Act
Tenn. Code Ann. § 71-5-181 *et seq.* and Tenn. Code Ann. § 4-18-101 *et seq.* ........................ 121

COUNT XXIX
Texas Medicaid Fraud Prevention Act
Tex. Hum. Res. Code Ann. § 36.001 *et seq.* ............................................................ 122

COUNT XXX
Virginia Fraud Against Taxpayers Act
Va. Code Ann. § 8.01-216 *et seq.* .......................................................................... 122

COUNT XXXI
Washington State Medicaid Fraud False Claims Act
Wash. Rev. Code § 74.66.005 *et seq* ..................................................................... 123

COUNT XXXII
Wisconsin False Claims For Medical Assistance Law
Wis. Stat. § 20.931 *et seq.* .................................................................................... 124

COUNT XXXIII
District of Columbia False Claims Act
D.C. Code § 2-308.13 *et seq.* ................................................................................ 124

COUNT XXXIV
The City of Chicago False Claims Act
Chicago Municipal Code, § 1-22-010 *et seq.* ........................................................ 125

COUNT XXXV
New York City False Claims Act
New York Municipal Code, § 7-801 *et seq.* ........................................................... 126

COUNT XXXVI
False Claims Act Retaliation Violation and Civil Rights Retaliation
31 U.S.C. § 3730(h) and 42. U.S.C. § 1985 and § 12203
(Relator Lesley Ferrara) ......................................................................................... 127

COUNT XXXVII
Violation of Civil Rights Act - Sex Discrimination, 42 U.S.C. § 2000e *et seq.* and
Ohio Rev. Code § 4112.02 *et seq.*
(Relator Lesley Ferrara) ......................................................................................... 130

COUNT XXXVIII
Violation of Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* and
Ohio Rev. Code § 4112.02 *et seq.*
(Relator Lesley Ferrara) ......................................................................................... 133

COUNT XXXIX
False Claims Act Retaliation Violation and Civil Rights Retaliation
31 U.S.C. § 3730(h) and 42 U.S.C. § 1985
(Relator Shelly Kelling) .......................................................................................... 134

COUNT XL
Violation of Civil Rights Act - Religious Discrimination, 42 U.S.C. § 2000e *et seq.* and
Ohio Rev. Code § 4112.02 *et seq.*
Violation of Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* and Ohio Rev. Code
§ 4112.02 *et seq.*
(Relator Shelly Kelling) ....................................................................................... 138

COUNT XLI
Ohio State Public Policy Tort: Greeley Claim
(Lesley Ferrara and Shelly Kelling) ...................................................................... 141

COUNT XLII
Violation of Ohio Rev. Code § 4113.52, Ohio Whistleblower Act
(Lesley Ferrara and Shelly Kelling) ...................................................................... 142

## TABLE OF EXHIBITS

Exhibit A     Novo Sales Aid, "Victoza helped take my blood sugar and even my
              weight down" (SK210106 - SK10108) ................................................. 24

Exhibit B     Novo Sales Aid, "Help your patients Start and stay on track with Victoza"
              (SK210069 - SK210076) ..................................................................... 24

Exhibit C     Novo Sales Aid (excerpt), "Your guide to once-daily Victoza" (SK210144) ..... 25

Exhibit D     Novo Sales Aid (excerpt), "The LEAD Trial & Competitor Refresher"
              (SK210077 - SK210080) ..................................................................... 25

## I.      INTRODUCTION

1.      *Qui Tam* Relators Lesley Ferrara and Shelly Kelling bring this action in the name of the United States Government, the State Governments of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, Washington, Wisconsin, and the District of Columbia, and the Cities of Chicago and New York ("States"), for false claims that were submitted or caused to be submitted to the United States Government and the Individual States by Defendants Novo Nordisk A/S and Novo Nordisk, Inc. (collectively referred to as "Novo Nordisk").

2.      This case is brought pursuant to the *qui tam* provisions of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq*., and pursuant to analogous provisions of state and local law, to recover treble damages and civil penalties on behalf of the United States of America and the Individual States, arising from false or fraudulent claims for reimbursements for prescription drugs that were submitted or caused to be submitted by Novo Nordisk to federal government-funded programs including, without limitation, Medicaid, Medicare, the Federal Employees Health Benefits Program, Affordable Care Act, and TRICARE/CHAMPUS, in violation of the False Claims Act. The False Claims Act specifically proscribes Novo Nordisk's conduct involving unlawful marketing of prescription drugs, illegal kickbacks, and thus the submission of false or non-reimbursable claims to Medicaid and other government-funded health programs. The drugs encompassed by this complaint include Victoza, Levemir, Novolog, and Novolog Mix 70/30.

3.      Relators Lesley Ferrara and Shelly Kelling, former sales representatives for Novo Nordisk, became aware of Novo Nordisk's False Claims Act violations and other illegal practices in the course of their work promoting the company's products in institutions and physicians' offices.

4.      Defendants' False Claims Act violations and its various marketing schemes corrupted the independent medical judgment of physicians, unlawfully increased costs to the United States, the States and Cities for prescription drugs, and risked patients' health by improperly influencing physicians' decisions about whether to prescribe drugs and include the items listed below.

    a.      Novo Nordisk's off-label and other illegal marketing activities for the company's drugs, Victoza, Levemir, Novolog, and Novolog Mix 70/30, violated the False Claims Act and United States Food and Drug Administration (FDA) laws by illegally:

        i.      Falsely making and promoting claims of superior efficacy and safety;

        ii.     Utilizing physician speakers for off-label sales promotion and to influence off-label prescribing with Novo-provided slide decks and presentations;

        iii.    Using lucrative contracts for speaking engagements and research grants and providing in-office Certified Diabetic Educators for patients to reward high prescribers, induce them to prescribe more Novo Nordisk products, and reward them for off-label prescribing;

        iv.     Using the Novo Nordisk Electronic Pharmaceutical Information Request ("EPIR") system and meetings between physicians and Novo Nordisk medical science liaisons in order to convey off-label marketing messages to physicians that were not bona fide physician-initiated requests;

        v.      Hiring relatives of influential physicians as sales representatives to influence the prescribing activities of those physicians, a form of illegal kickback;

        vi.     Engaging in prohibited dissemination of and promotion with off-label studies that were not the result of physician-initiated inquiries and not addressed by qualified medical liaisons who were not sales representatives; and

2

vii.    Misrepresenting published data and studies to market Novo drugs.

b.    By its off-label and illegal marketing of Victoza, approved by the FDA only for treatment of Type 2 diabetes, Novo Nordisk unlawfully, and in contravention of Victoza's FDA-approved label:

i.    Claimed that Victoza provided, among other things, weight loss benefits for patients, including patients who were not diabetic;

ii.    Marketed Victoza for weight control to physicians who were not engaged in diabetes treatment and to physicians at obesity and weight loss clinics;

iii.    Minimized the significance of the FDA-required black box warnings ("REMS") about thyroid cancer and pancreatitis and failing to adequately warn prescribers of these life-threatening risks; and

iv.    Claimed that Victoza provided beta cell preservation, provided cardiovascular and blood pressure protection, would be beneficial to patients with renal impairment, and was suitable for first line therapy and for use in combination with insulin.

c.    By its off-label and illegal marketing of its drug, Levemir, a long-acting insulin analog, approved by the FDA for Type 1 and Type 2 diabetes, Novo Nordisk unlawfully claimed that Levemir:

i.    Promoted less weight gain or was "weight neutral" as compared to competitors' products such as Lantus, despite pre-marketing studies submitted to the FDA that did not substantiate these claims;

ii.    Provided a decreased risk of breast and prostate cancer in comparison with a competitor's product, Lantus, without clinical evidence to substantiate such a claim, and despite statements from the FDA and major professional organizations that patients should not discontinue insulin use based on such cancer concerns; and

iii.    Was more effective than competitor products at lowering A1c levels, reducing the incidence of hypoglycemia, maintaining less variable blood sugar levels, and promoting less weight gain.

d.    By its off-label and illegal marketing of Novolog, a short-acting insulin analog approved by the FDA for the treatment of Type 1 and Type 2 diabetes, Novo Nordisk unlawfully claimed that Novolog was a superior product for administration via intravenous fluids ("IV drip"), since Novolog's fast-acting advantages are eliminated when intravenous administration methods are used.

e.   Novo Nordisk unlawfully claimed that Novolog Mix 70/30, a pre-mixed analog insulin, provided a reduced risk of death from cardiovascular disease for frail elderly patients; and

f.   Novo Nordisk's kickback scheme with long-term care pharmacy providers PharMerica and Omnicare, Inc. to increase Novo Nordisk products' market share in long-term care facilities served by PharMerica and Omnicare, whereby Novo Nordisk gave these pharmacy providers rebates and other cost savings that were retained by the pharmacy providers and not passed on to patients or third party payors.  Novo Nordisk marketing also urged hospitals and long-term care facilities to divide packages of insulin pens to share among multiple patients as a way of lowering cost.

g.   Novo Nordisk engaged in unlawful pre-approval marketing of its drug Degludec and promoted the drug for use with Victoza, without FDA approval for such use.

5.   Defendants knew or should have known that its unlawful activities would cause physicians and other healthcare professionals to routinely file false claims for reimbursement from the Federal and state governments in violation of the False Claims Act, and involved violations of the Food, Drug and Cosmetics Act, 21 U.S.C. § 301 *et seq.*, the Food and Drug Administration and Modernization Act of 1997, 21 U.S.C. § 351 *et seq.* and 21 U.S.C. § 360aaa *et seq.*, the Medicare/Medicaid Fraud & Abuse Anti-Kickback Statute, 42 U.S.C. § 1320a *et seq.*, the Medicaid Rebate Statute, 42 U.S.C. § 1396r-8, and similar State laws.

6.   Because of Novo Nordisk's unlawful promotion scheme, patients receiving Novo Nordisk prescription drugs for unapproved and unproven uses received no assurance that their medical providers were exercising their independent and fully-informed medical judgment.

7.   Defendants' scheme illegally increased the market share for its products by inducing physicians to prescribe medications they would not otherwise have prescribed but for the receipt of the kickbacks and/or other illegal marketing efforts. The Federal and State governments consequently paid enormous sums for reimbursement claims that they would have rejected had they been aware of Novo Nordisk's illegal actions. Moreover, as a result of Novo

4

Nordisk's illegal promotions, the public over-utilized the Novo Nordisk drugs at issue here and prescription drug costs to the Federal, State and City governments increased, while Novo Nordisk reaped illegal profits.

8.      Novo Nordisk chose to promote off-label uses of its drugs, despite Novo Nordisk's awareness of the FDA's prohibition on off-label marketing. Novo Nordisk's fraudulent marketing scheme involved promoting unproven claims of efficacy, weight loss "benefits," cancer safety, and kidney safety for patients with renal disease.  Novo Nordisk misrepresented scientific research, misused the Electronic Pharmaceutical Information Request ("EPIR") system intended for bona fide physician medical information requests, and used unreliable, misleading, and irrelevant data to advance claims of superior efficacy and safety. Novo Nordisk minimized Victoza's risks of cancer and pancreatitis and failed to adequately notify prescribers of Victoza's risks, even though distribution of REMS Safety Warnings were a condition of FDA approval of the drug.

9.      Relators have direct and independent personal knowledge of the Defendants' illegal marketing practices as a result of their extensive experience with the company during and after their employment and their contacts with physicians, hospitals, and other health care institutions.  Relators bring this action on behalf of themselves, the United States of America, and the States for violations of the United States and State False Claims Acts.

## II.      JURISDICTION AND VENUE

10.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which specifically confers jurisdiction to this Court over actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. This Court also has subject matter jurisdiction over the counts relating to the State False Claims Acts pursuant to 31 U.S.C.

§ 3732(b), as well as supplemental jurisdiction over the counts relating to the State False Claims

Acts pursuant to 28 U.S.C. § 1367.

11.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C.

§ 3732(a) because acts prohibited by 31 U.S.C. § 3729 occurred in the District of Columbia and

this judicial district. Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because at

least one act proscribed by 31 U.S.C. § 3729 occurred in this district.

12.     In accordance with 31 U.S.C. § 3730(b)(2), this Complaint is filed under seal and

will remain under seal for a period of at least 60 days from its filing date or such other date as is

required by law or the Court so orders, and shall not be served upon the Defendant unless the

Court so orders.

13.     This suit is not based upon prior public disclosure of allegations or transactions in

a criminal, civil, or administrative hearing, lawsuit or investigation, in a Government

Accountability Office or Auditor General's report, hearing, audit, or investigation, from the

news media, or in any other location as the term "publicly disclosed" is defined in 31 U.S.C.

§ 3730 (e)(4)(A), amended by the Patient Protection and Affordable Care Act, Pub. L. No.

111-148, § 1313(j)(2), 124 Stat. 901-902 (2010). Relators have, however, affirmatively

disclosed the allegations herein to the United States Government and the *Qui Tam* States,

including prior to filing this Complaint.

14.     To the extent that there has been a public disclosure of the information upon

which the allegations of this Complaint are based that is unknown to Relators, Relators are an

original source of this information as defined in 31 U.S.C. § 3730(e)(4)(B), amended by the

Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 1313(j)(2), 124 Stat.

901-902 (2010) and similar state law provisions. Relators possess direct and independent

knowledge of the information as a result of an extensive independent investigation they personally conducted into Defendant's wrongdoing, which they acquired in the course of their employment with Defendant and thereafter, as a result of their investigation.  Relators voluntarily provided the government with this information prior to filing this action and prior to their amendment of this action.  *See* 31 U.S.C. § 3730(e)(4).

15.     To the best of their knowledge, Relators are the first to file on significant aspects of Novo's fraudulent conduct including Novo's deliberate attempts to evade the FDA required distribution of REMS warnings to prescribing physicians.  To the best of Relators' knowledge, the filing of Relators' Complaint initiated the Government's investigation of Novo.

## III.   PARTIES

16.     Relator Lesley Ferrara was a Senior Diabetes Care Specialist for Novo Nordisk from June 2008 through October 2009.  Ms. Ferrara had 14 years experience in pharmaceutical sales and worked for over 12 years at Pfizer, Inc. before moving to Novo Nordisk.  Novo Nordisk unlawfully terminated Relator Ferrara from her employment on October 28, 2009.

17.     Relator Shelly Kelling was an Institutional Diabetes Care Specialist with Novo Nordisk from March 2008 to October 2010.  Ms. Kelling has 14 years of experience in the pharmaceutical sales industry and previously worked at TAP Pharmaceuticals, Medpointe Pharmaceuticals, and Janssen Pharmaceuticals, Inc. prior to joining Novo Nordisk.  Ms. Kelling also has experience working in a primary care physician office.  Her Novo Nordisk employment ended on October 15, 2010 as a result of her employer's unlawful conduct.

18.     Defendant Novo Nordisk A/S is an international pharmaceutical company with its headquarters in Bagsvaerd, Denmark. Novo Nordisk A/S primarily does business in the United States through its wholly-owned subsidiary, Novo Nordisk, Inc., a Delaware corporation with its

principal place of business located in Princeton, New Jersey.  All references in this Complaint to

"Novo" or "Novo Nordisk" with regard to liability under the False Claims Act and analogous

state or local law are intended to apply to both legal entities and their predecessors, successors,

asset purchasers, and assigns, unless specifically otherwise stated.

19.     Novo Nordisk A/S is engaged in the business of manufacturing, marketing, and

selling prescription drugs and other products for the prevention, diagnosis, and treatment of

diseases throughout the world, with significant sales in the United States. Novo Nordisk

specializes in producing insulin for the treatment of diabetes.  The company promotes itself as a

"world leader in diabetes care" that is "changing diabetes," and sponsors a number of high-

profile events such as annual educational activities on the United Nations-designated World

Diabetes Day.  Novo Nordisk's worldwide 2014 sales totaled approximately $15.8 billion.  The

company and its subsidiaries employ approximately 39,000 employees worldwide, with

approximately 6,400 employees in North America.

## IV.     REGULATORY FRAMEWORK

### A.     Federal Government Health Programs

20.     The Federal and State governments, through their Medicaid and Medicare

programs, are among the principal purchasers of Novo Nordisk products for diabetes treatment.

21.     Medicare is a Federal government program primarily benefitting the elderly that

was created by Congress in 1965 when it adopted Title XVIII of the Social Security Act.

Medicare is administered by the Center for Medicare and Medicaid Services.  Medicare began

paying for over-the-counter drugs or for most self-administered prescription medications when

the Medicare Prescription Drug Improvement and Modernization Act of 2003 was fully

implemented, creating Medicare Part D.  Under certain conditions, however, Medicare Part B

covers self-administered prescription drugs, including insulin pumps and insulin that is used in a pump.

22.     Congress created Medicaid at the same time it created Medicare in 1965 by adding Title XIX to the Social Security Act.  Medicaid is a public assistance program that provides payment of medical expenses to low-income patients.  Funding for Medicaid is shared between the Federal government and the participating State governments.  The Federal government also separately matches certain state expenses incurred in administering the Medicaid program.  While specific Medicaid coverage guidelines vary from state to state, Medicaid's coverage is generally modeled after Medicare's coverage, except that Medicaid often provides more expansive coverage than does Medicare.

23.     Medicaid coverage for prescription drugs is broad.  Nearly every state has opted to include basic prescription drug coverage in its Medicaid plan.

24.     TRICARE is the health care system of the United States military, designed to maintain the health of active duty service personnel, provide health care during military operations, and offer health care to non-active duty beneficiaries, including dependents of active duty personnel and military retirees and their dependents.  The program operates through various military-operated hospitals and clinics worldwide and is supplemented through contracts with civilian health care providers.  TRICARE is a triple-option benefit program designed to give beneficiaries a choice between health maintenance organizations, preferred provider organizations, and fee-for-service benefits.  Five managed care support contractors create networks of civilian health care providers.  Military prescription drug benefits are provided through three programs: military treatment facility outpatient pharmacies, TRICARE contractor retail pharmacies, and a national contractor's mail-order service.

25.     The Federal Employees Health Benefits Program ("FEHBP") provides health insurance coverage for nearly 8.7 million federal employees, retirees, and their dependents. FEHBP is a collection of individual health care plans, including the Blue Cross and Blue Shield Association, Government Employees Hospital Association, and Rural Carrier Benefit Plan. FEHBP plans are managed by the Office of Personnel Management.  The federal government also provides health benefits through other programs, including, but not limited to, those administered by the Department of Labor.

26.     The Affordable Care Act is a federal law that requires individuals to secure health insurance and creates health exchanges through which individuals and small businesses can compare and purchase policies. Qualifying low-income individuals can receive federal subsidies for purchasing insurance through these health exchanges. The subsidies are used to help pay health insurance premium costs.

**B.     The False Claims Act**

27.     Originally enacted in 1863, the False Claims Act was substantially amended in 1986 by the False Claims Amendments Act.  The 1986 Amendments enhanced the federal government's ability to recover losses sustained as a result of fraud against the United States. The Act was again amended in 2009 and 2010, further strengthening the law.

28.     The False Claims Act provides that any person who knowingly presents or causes another to present a false or fraudulent claim to the government for payment or approval is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the government.  31 U.S.C. § 3729(a)(1), (2).  The False Claims Act empowers private persons who have information regarding a false or fraudulent claim against the government to bring an action on behalf of the government and to share in any recovery.  The

10

complaint must be filed under seal without service on any defendant.  The complaint remains under seal while the government conducts an investigation of the allegations in the complaint and determines whether to join the action.

29.     Knowingly paying kickbacks or undisclosed price discounts to physicians to induce them to prescribe a reimbursable drug, and promoting off-label uses of such drugs by a person who seeks reimbursement from a federal government health program for the drug, or who causes another to do so, while certifying compliance with the Medicare Fraud & Abuse/Anti-Kickback Statute, the Medicaid Rebate Statute, and the Food, Drug and Cosmetics Act (or while causing another to so certify), or billing the government as if in compliance with these laws, violates the False Claims Act.

###    C.     FDA Regulations

30.     Pursuant to the Food, Drug and Cosmetics Act (FDCA), 21 U.S.C. §§ 301 *et seq*., the FDA strictly regulates, among other things, the content of direct-to-physician product promotion and drug labeling information used by pharmaceutical companies in promoting and selling FDA-approved prescription drugs.

31.     The FDA regulates drugs based on the "intended uses" for such products.  A manufacturer that wishes to market any new drug must demonstrate to the FDA that the product is safe and effective for each intended use.  21 U.S.C. §§ 331(d), 355(a), 360b(a).

32.     The FDA reviews a pharmaceutical manufacturer's application for approval of a new drug to determine whether the drug is safe and effective for its intended use.  21 U.S.C. § 355.  "Off-label marketing" refers to the marketing of an FDA-approved drug for uses that have not undergone FDA scrutiny and approval, i.e. for purposes not approved by the FDA.

33.     Before a drug is approved by the FDA, the drug's manufacturer or sponsor may not promote the drug as being safe and effective for the purposes for which its approval is pending.  *See* 21 C.F.R. § 312.7(a).  Although FDA regulations allow the dissemination of purely scientific information about a drug that has not yet been approved, the regulations unequivocally forbid "commercialization of the drug before it is approved for commercial distribution. *Id.*

34.     Once a drug is approved for a particular use, doctors may prescribe the drug for medical uses that are different from those approved by the FDA.  The FDA permits doctors to request and receive information from drug manufacturers about off-label uses of FDA-approved drugs.  However, with very few exceptions, the FDA prohibits drug manufacturers from marketing or promoting a drug for a use that the FDA has not yet approved.  Sales representatives like Relators specifically are prohibited by FDA law from marketing or promotion of pharmaceuticals for purposes that do not fall within the FDA-approved labels.

35.     Any failure to fairly and accurately represent the approved uses, safety, and other required information about a prescription drug is considered misbranding, and is, as a matter of law, a false and fraudulent statement.  21 U.S.C. §§ 331(a)-(b), 352(a), (f), (n).

36.     Any presentations, promotions, or marketing to physicians of products for use in a manner other than that approved for labeling purposes by the FDA is considered off-label marketing and is proscribed by the FDA.  21 U.S.C. §§ 331(a)-(b), 352(a), (f).

37.     The Food and Drug Act requires that all "new drugs," as defined in 21 U.S.C. § 321(p), be approved by the FDA as safe and effective prior to marketing.  The marketing of a new drug without pre-approval by the FDA violates the Food, Drug and Cosmetics Act, 21 U.S.C. §§ 355 and 331(d).

12

### D.       The Medicare Fraud & Abuse/Anti-Kickback Statute

38.     The Medicare Anti-Kickback Statute, 42 U.S.C. § 1320a –7b(b), which also

covers Medicaid, provides penalties for individuals or entities that knowingly and willfully offer,

pay, solicit, or receive remuneration to induce the referral of business reimbursable under a

federal health benefits program.  The offense is a felony punishable by fines of up to $25,000

and imprisonment for up to 5 years.

39.     In accordance with the Anti-Kickback Statute, Medicare regulations directly

prohibit any provider from receiving remuneration paid with the intent to induce referrals or

business orders, including the prescription of pharmaceuticals, or from receiving remuneration

that takes into account the volume or value of any referrals or business generated.  42 C.F.R. §

1001.952(f).  Remuneration paid to providers is an illegal kickback when it is paid to induce or

reward the drug prescriptions written by physicians.  Kickbacks are harmful to public policy

because they increase the expenditures paid by government-funded health benefit programs by

inducing medically unnecessary use of prescription drugs and excessive reimbursements.  Such

kickbacks reduce a patient's health care choices because they can cause physicians to prescribe

drugs based on the physician's own financial interests rather than the best interests of the patient.

40.     The Medicare Anti-Kickback Statute provides eight statutory exceptions from its

statutory prohibition, and certain regulatory "safe harbors" have been promulgated to exclude

certain types of conduct from the reach of the statute.  42 U.S.C. § 1320a-7(b)(3).  None of the

available statutory exceptions or regulatory safe harbors protect the Defendant's conduct in this

case.

41.     The Medicare and Medicaid Patient and Program Protection Act of 1987

authorizes the exclusion of any individual or entity from participation in the Medicare and

Medicaid programs if it is determined that the party violated the Medicare Anti-Kickback

Statute.  In addition, the Balanced Budget Act of 1997 amended the Act to include

administrative civil penalties of $50,000 for each act violating the Anti-Kickback Statute, as well

as an assessment of not more than three times the amount of remuneration, offered, paid,

solicited, or received, without regard to whether a portion of that amount was offered, paid,

solicited, or received for a lawful purpose.  42 § U.S.C. 1320a-7a(a)(7).

42.     As detailed below, Novo Nordisk's marketing of Victoza, Levemir, Novolog, and

Novolog Mix 70/30 repeatedly violated the Anti-Kickback Statute and the False Claims Act

because Novo Nordisk's improper kickbacks and incentives induced physicians to prescribe

Victoza, Levemir, Novolog, and Novolog Mix 70/30 when they otherwise would not have and

many of those prescriptions were paid for by Medicare, Medicaid and other government funded

health insurance programs.

**E.     The Medicaid Rebate Statute**

43.     The Medicaid Rebate Statute, 42 U.S.C. § 1396r-8, is designed to return money to

the Medicaid program in the form of rebates from drug manufacturers.  Federal law provides that

drug manufacturers must pay rebates to the states to ensure that the Medicaid program is paying

the lowest price at which the manufacturer sells a covered outpatient drug to any purchaser in the

United States, inclusive of cash discounts, free goods, kickbacks, volume discounts, and rebates.

The "best price" provision is intended to ensure that the government is being provided the lowest

price on drugs.

44.     To be eligible for Medicaid payment for their drugs, all manufacturers must

provide "best price" information to the Centers for Medicare and Medicaid Services ("CMS").

CMS uses this "best price" information to calculate the rebates payable to the Medicaid program.

45.     Drug manufacturers provide both "best price" information and Average Manufacturer Price information to CMS.  CMS then calculates a unit rebate amount, and provides that information to state Medicaid agencies.  The States then consider utilization data provided by pharmacies and the unit rebate amount to calculate the rebates owed to them by the manufacturers.  The entire system, however, relies upon manufacturers honestly conveying to CMS correct "best price" information and Average Manufacturer Price information.  Any overstatement of the best price, whether intentional or unintentional, will cause an underpayment in rebate amounts.

46.     The Medicaid Rebate Statute states, in part, that the term "best price" shall be inclusive of cash discounts, free goods that are contingent on any purchase requirement, volume discounts, and rebates (other than rebates under this section).  42 U.S.C. § 1396r-8(c)(1)(C)(ii).

47.     The Federal government has great financial interest in the program.  The Medicaid Rebate Statute provides that amounts received by the States under the "best prices program" shall be considered to be a reduction in the amount expended under the State Medicaid Plan for purposes of calculating the federal contributions to State Medicaid programs.  42 U.S.C. § 1369r-8(b)(1)(B).

48.     As a result of pervasive "best price" fraud, the Office of the Inspector General of the United States Department of Health and Human Services promulgated compliance materials on May 5, 2003, which observed that manufacturers have "a strong financial incentive to hide *de facto* pricing concessions" (in particular, kickbacks and price discounts) that could affect "best price" calculations and trigger increased Medicaid rebates.  OIG Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23731, 23735 (May 5, 2003).  The Office of the Inspector General instructed manufacturers to report "best prices" which "accurately take into

15

account price reductions, cash discounts, free goods contingent on a purchase agreement,

rebates, up-front payments, coupons, goods in kind, free or reduced-price services, grants, or

other price concessions or similar benefits offered to all purchasers." *Id.* at 23733-23734.

According to the Office of the Inspector General, "pharmaceutical manufacturers are responsible

for ensuring the integrity of data they generate that is used for government reimbursement

purposes." *Id.*

49.     The Medicaid program reimburses doctors only for "covered outpatient drugs" for

which a rebate is paid by the drug's manufacturer.  42 U.S.C. § 1396b(i)(10).  Each state

Medicaid program has the power to exclude any drug from coverage if the prescription is not

issued for a "medically accepted indication."  42 U.S.C. § 1396r-8(d)(1)(B).  A "medically

accepted indication" includes only those indications approved by the FDA and those off-label

uses that are "supported by one or more citations included, or approved for inclusion, in any of

the compendia" listed in the statute.  42 U.S.C. § 1396r-8(k)(6).

### F.     Stark Law - The Medicare/Medicaid Self-Referral Statute

50.     The Medicare-Medicaid Self-Referral Statute, 42 U.S.C. § 1395nn *et seq.*, known

as the "Stark Law," prohibits a pharmaceutical manufacturer from paying remuneration to

physicians for referring Medicaid patients to the manufacturer for certain "designated health

services," including drug prescriptions, where the referring physician has a nonexempt "financial

relationship" with that manufacturer.  42 U.S.C. § 1395nn(a)(1), (h)(6).  The Stark Law provides

that the manufacturer shall not cause to be presented a Medicaid claim for such prescriptions.

The Stark Law prohibits payment of Medicaid claims for prescriptions rendered in violation of

its provisions.  42 U.S.C. § 1395nn(a)(1), (g)(1).  Novo Nordisk's marketing of Victoza and

other drugs violated the Stark Law and the False Claims Act because Novo Nordisk's unlawful

16

payments and services to prescribing physicians induced those physicians to prescribe Victoza

and other Novo drugs when they would otherwise not have and many of those prescriptions were

paid for by Medicaid and other government-funded health programs.

**G.      State False Claims Acts**

51.     Twenty-nine states, the District of Columbia, and the Cities of Chicago and New

York ("the States") have passed False Claims Acts that mirror the language of the Federal False

Claims Act.  Some States' False Claims Acts relate only to the states' Medicaid program, while

other States' statutes cover the presentation of false claims for payment in any context.


**V.      SPECIFIC ALLEGATIONS OF DEFENDANTS' VIOLATIONS OF LAW**

52.     Novo Nordisk markets and sells drugs for treating diabetes. According to the

American Diabetes Association, an estimated 23.6 million Americans have either Type 1 or

Type 2 diabetes, making up 7.8% of the population.  Type 2 diabetes is caused by a combination

of genetic and environmental factors.  Obesity is a serious risk factor for Type 2 diabetes. Many

patients with Type 2 diabetes are counseled to change their diet and lose weight as a part of their

treatment.  Some medications used to treat Type 2 diabetes, such as insulin, may promote weight

gain.

53.     Type 2 diabetes occurs when either the pancreas does not produce enough insulin,

the body's cells become resistant to insulin, or both.  Insulin is the hormone that causes the

body's cells to take up glucose or "blood sugar" from the blood.  In an untreated patient with

Type 2 diabetes, the patient's blood glucose level will rise beyond normal levels.  Elevated blood

glucose levels can cause the many complications of Type 2 diabetes, including microvascular

complications, such as damage to the retinas and kidneys, and macrovascular complications,

such as heart attack and stroke.  An important measure of blood glucose for patients with

diabetes is A1c, which represents an average blood glucose level over the past 2 to 3 months.

A1c is an important measure for a physician to review to ensure diabetes treatment is effective.

### A.    Victoza

54.    Novo Nordisk actively promoted Victoza, a drug indicated for the treatment of

Type 2 diabetes, to increase sales of the drug.  The FDA approved Victoza on January 25, 2010

for the treatment of Type 2 diabetes, conditioned upon certain adequate safety notices to

prescribers and patients about Victoza's thyroid cancer and pancreatitis risks.  The FDA-

approved package insert states that Victoza is indicated to "improve glycemic control in adults

with Type 2 diabetes mellitus."

55.    Victoza (generic name liraglutide) is a GLP-1 analog, or synthetic glucagon-like

peptide, which mimics GLP-1, a peptide produced by the body that operates to lower blood

glucose levels by stimulating insulin production in the pancreas' beta cells.  Victoza is delivered

via an injection pen once daily.  Victoza also works to inhibit the pancreas's secretion of

glucagon, a hormone that increases blood glucose by causing the liver to release additional

glucose into the bloodstream.  GLP-1 is also associated with "delayed gastric emptying," or the

slower passage of digested food from the stomach to the small intestine.  Because Victoza is

97% homologous to GLP-1 produced by the body, Victoza has the side effect of delayed gastric

emptying.  Because it lowers blood sugar and stimulates the production of insulin by the beta

cells of the pancreas, the FDA approved Victoza for Type 2 diabetes.

56.    The FDA approved Victoza despite laboratory studies that showed that the drug

"cause[d] thyroid C-cell tumors at clinically relevant exposures in rodents."  The FDA's

approval decisions always involve an assessment of the benefits and the risks for a particular

product.  When the benefits of a drug are thought to outweigh the risks and if the labeling

18

instructions allow for safe and effective use, the FDA considers a drug safe for approval and marketing.  The FDA, in exercising its judgment, determined that the advantage of treating Type 2 diabetes in patients without adequate diabetes control on other therapies and, thus, preventing the serious complications that can result from the disease outweighed the potential risks and approved Victoza for the treatment of Type 2 diabetes.

57.     In an article published in the *New England Journal of Medicine*, two FDA officials explained: "We granted the approval on the basis of careful consideration of the drug's benefits, weighed against several complex safety-related concerns."  Those safety concerns included rodent studies that "suggested that liraglutide was associated with an increased risk of thyroid C-cell focal hyperplasia and C-cell tumors," as well as "a possible increased risk of pancreatitis attributable to drugs that act through the GLP-1 pathway."  The agency concluded that Victoza "may benefit patients who have inadequate diabetes control despite their use of another antidiabetic therapy," and that improved control of blood sugar "significantly reduces the risk of microvascular complications from diabetes."

58.     However, the FDA's approval of Victoza required Novo Nordisk to display a "black box warning" as part of the prescribing information in the package insert that described the risk of thyroid C-cell tumors and pancreatitis associated with the drug, as well as engage in post-marketing studies regarding this risk.  As part of its approval of Victoza the FDA mandated that Novo Nordisk engage in a REMS (Risk Evaluation and Mitigation Strategy) which required Novo Nordisk to mail letters to health care providers likely to prescribe the drug and distribute copies of Victoza's prescribing information with information about the black box warning highlighted during the first six months of the drug's U.S. marketing to insure safe use of the drug.

19

59.     Novo Nordisk initially intended to seek an indication for Victoza for weight loss along with the indication for Type 2 diabetes, but later withdrew its application for the weight loss indication.  Not until December 23, 2014 did the FDA approve Novo's new drug, Saxenda, for weight loss.  Saxenda is a 3 mg dose of liraglutide, the same chemical that is contained in Victoza.

60.     Although the pre-marketing studies submitted for Victoza's FDA approval did show that patients taking the drug experienced modest weight loss, the FDA never approved Victoza for a weight loss indication, either for diabetics or non-diabetic patients.  Moreover, most FDA-approved weight-loss medications are approved for short-term use for several weeks.  Victoza is designed to be a long-term medication.  Novo Nordisk was not legally permitted to market Victoza for weight loss.

### 1.     Off-Label and False Marketing of Victoza for Weight Loss

61.     The FDA did not approve Victoza for weight loss, either for diabetics or non-diabetic patients.  Pre-approval clinical studies of Victoza showed that adult patients with Type 2 diabetes lost weight while taking the drug, with an average weight loss of just over 6 pounds.  One study showed that this weight loss was maintained over a 52 week period while the drug was administered to Type 2 diabetic patients, but did not study whether this weight loss was maintained if the drug was discontinued.

62.     Despite the lack of an FDA-approved indication for weight loss, Novo Nordisk intentionally chose to promote Victoza for weight loss, notwithstanding the FDA's prohibition against off-label marketing.

63.     In marketing Victoza for weight loss, Novo Nordisk marketed the drug in contradiction to its approved indications and limits on use, by marketing it for the treatment of

obesity in diabetic patients and obese patients who were not diabetic.  Novo also promoted the drug for weight loss in non-diabetic patients who were not obese.

64.     Novo Nordisk promoted Victoza to physicians treating patients with diabetes by claiming, off-label, that its "weight benefit" made it superior to competitors' diabetes drugs.  An email from a Novo Nordisk sales representative on April 2, 2010, endorsed by management and widely circulated by Novo management to sales representatives in the East Area (a territory covering 17 states in the Eastern and Central United States), describes the Novo sales technique of referring to a hypothetical patient with Type 2 diabetes who "has always struggled with her weight" and "noticed that she gained more weight after adding an SU [sulfonylurea drug] which demotivated her even more."  This Novo sales representative's sales talk that he routinely used with physicians and that was approved by Novo sales managers as a "best practice," described Victoza's effects on the hypothetical patient as ". . . causing [the patient] to loose [sic] a significant amount of weight quickly and sustainably."

65.     Novo Nordisk continued to promote Victoza for the treatment of obesity in its advertisements, both to physicians and consumers.  Throughout 2012, Novo promoted Victoza through its "Diabetes in a New Light" campaign featuring celebrity chef Paula Deen.  For example, a consumer-directed magazine ad featuring Ms. Deen stated "While not a weight-loss product, Victoza may help me lose some weight."  Novo acknowledged that it marketed Victoza for weight loss to the media and investors.  A November 18, 2012 article in the *Financial Times* stated that Novo is "also profiting from a range of innovative types of insulin and other drugs. For example liraglutide, a medicine that Novo Nordisk markets as Victoza for boosting blood sugar and as a weight-loss treatment for people suffering from diabetes resulting from obesity."

Richard Milne, "Novo Nordisk Becomes Largest Nordic Group," *Financial Times*, Nov. 18, 2012.

66.     Novo continued to instruct its sales representatives to unlawfully market Victoza for the treatment of obesity and for patients with "prediabetes," or the risk of developing type 2 diabetes due to elevated blood sugar and weight.  In the fall of 2013, Novo instructed sales representatives in the New York and New Jersey areas to market Victoza to physicians by discussing Novo's clinical trials for Victoza as a treatment for obesity and its application for an indication to treat obesity.  By mentioning these trials and the pending application, physicians are more comfortable prescribing Victoza off-label or believe that Victoza is approved for indications other than type 2 diabetes treatment.  Relators believe that Novo used this marketing strategy nationwide.

67.     Novo continued to market Victoza off-label for obesity at least until the FDA approved its application of liraglutide at the 3 mg dose under the trade name Saxenda.  Saxenda's approval occurred on December 23, 2014.

68.     Beginning in 2009 and continuing into 2014, Novo marketed Victoza for weight loss.  Patients taking Victoza for weight loss typically are prescribed a higher dose than patients taking Victoza for diabetes, 3 mg for weight loss and 1.6 to 1.8 mg for diabetes.  The 1.8 mg dose is the highest Victoza dose approved by the FDA for the treatment of type 2 diabetes.  Patients prescribed Victoza for weight loss off-label use more than 3 Victoza pens per month, resulting in increased expense to Federal and State government health programs.

> **a.     Targeting Doctors Who Treat Obesity and Overweight Patients**

69.     As far back as 2009, prior to Victoza's approval for diabetes and many years before its approval for weight loss at the 3 mg dose under the trade name Saxenda on December

23, 2014, Novo Nordisk unlawfully promoted Victoza for weight loss to physicians whose primary practice was obesity or weight management and sent sales representatives to detail at bariatric or weight loss clinics.

70.     In an email dated May 7, 2009, many months prior to Victoza's FDA approval, a female Novo sales representative in Relator's territory, notified Relator Kelling that a "target" physician was leaving his position and was officially moving to the Cleveland Clinic main campus "to work full time in the bariatric clinic there next month."  The email noted that "he could be a future target for our GLP1," referring to the drug that would eventually be named Victoza.  Two months later and still prior to the Victoza approval, Relator Kelling's direct supervisor, Shereen Gerrasch, emailed Ms. Kelling to ask if she had met with this physician in the bariatric center.

71.     Novo Nordisk directed Relator Kelling to target a primary care physician at the Cleveland Clinic bariatric surgery center.  Her online profile described this physician's practice as a "medical weight management specialist" who "evaluates the patients both pre-operatively and post-operatively" as well as "attends to patients who are overweight or obese, but who do not wish to have the surgery or do not qualify for the surgical procedure."  Relator Kelling received an email on February 8, 2010, from the Cleveland business manager for the company's NovoSeven hormone replacement drugs division.  He instructed her to contact this bariatric center primary care physician with Victoza information.

72.     On March 2, 2010, Relator Kelling's supervisor, Shereen Gerrasch, met with a Cleveland Clinic Bariatric Surgery Center staff nurse for the purpose of promoting Victoza for weight loss for both diabetic and non-diabetic patients.

73.     At the time of Victoza's 2010 launch, Novo Nordisk promoted Victoza to physicians who did not focus primarily on the treatment or care of diabetes, such as family practice or internal medicine physicians.  These physicians treat a wide range of patients, not just patients with diabetes.  Targeting them allowed Novo Nordisk to market Victoza for patients who were obese or overweight, but not diabetic. At the direction of Novo management, Relator Kelling made sales calls detailing primary care and internal medicine doctors, residents, and nurse practitioners at Cleveland area hospitals, including St. John West Shore, Fairview, Marymount, Lakewood, and Lake Hospital Systems.  At the direction of Novo management, Relator Kelling attended events and promoted Victoza where those attending were physicians with a general practice, such as the Family Medicine Symposium at Fairview Hospital and the Internal Medicine Board Review and the Obesity Summit at the Cleveland Clinic.

74.     Novo's own sales materials promoted Victoza by emphasizing the drug's "weight benefit."  For example, a company-produced sales aid, distributed in August 2010 and directed to patients, featured an overweight woman with the heading "Victoza helped take my blood sugar and even my weight down."  The woman is depicted holding a Victoza pen like a magic wand and drawing a large "V" over her stomach.  *See* Exhibit A, page SK210106, of Document No. SK210106-108.  The same image was featured in a sales aid directed at physicians.  That ad stated that the drug "can provide the added benefit of weight loss."  *See* Exhibit B, page SK210070, of Document No. SK210069-76.

75.     A Novo sales aid read, "Victoza has been shown to help lower A1c with the added benefit of weight loss," and said that the drug "helps lower weight," qualifying that claim by saying "Medical studies showed that most people taking Victoza lost weight.  However, not all people who took Victoza lost weight.  Individual results may vary."  These statements were

illustrated by a graphic of a scale and a downward-pointing arrow.  *See* Exhibit C, page SK210144 of Document No. SK210141-163.

76.     Novo Nordisk instructed its sales representatives to emphasize research studies that included weight loss as an outcome, even though such off-label studies and messages never were within the FDA-approved label.

77.     Novo management trained its sales representatives to promote Victoza as being appropriate for marketing as a weight loss drug, including training just before Victoza was launched and available to the public.  Novo provided all of its sales force selling Victoza with a document entitled "The LEAD Trial & Competitor Refresher" in October 2009, before the drug's approval. The LEAD Refresher contained highlights and summaries of pre-approval studies on Victoza.  Body weight outcomes were highlighted and marked by a graphic of a scale. An overview page noted that Victoza "has shown significant and sustained weight loss," and then a downward-pointing arrow, "with the 1.8 mg dose *[except for LEAD-1]*" (emphasis and brackets in original).  This statement was highlighted by a graphic of a scale in front of a downward-pointing arrow.  *See* Exhibit D, page SK210080 of Document No. SK210077-85.

78.     At the  February 1, 2010 Launch Meeting for Victoza, when Novo Nordisk trained its sales representatives across the country on the new drug, Novo tested the representatives on what the company called the "Core Message for Victoza."  The core message was:  "Once daily Victoza provides significant and sustained A1C reduction with an additional weight benefit for Type 2 patients who need more than Metformin."  The company expected representatives to recite this message verbatim in all sales calls with physicians and nurse practitioners.  When managers accompanied representatives on field rides, they held representatives accountable for repeating the core message verbatim.

25

### b. Targeting the Company's Own Employees

79.     Novo Nordisk promoted off-label use of Victoza to its own employees for weight

loss, regardless of whether they were diabetic, obese, or overweight.  At an April 19, 2010

district breakfast meeting at Yours Truly in Valley View, Ohio, the area Novo District Business

Manager explained that in a call with a Regional Business Manager and the Novo Regional

Support Manager, he was told that "every script counts" towards incentive compensation.  Slides

presented during this conference call said that representatives would receive incentive

compensation for all prescriptions written, regardless of the diagnostic code used or the

provider's speciality.  This Ohio Novo District Business Manager told sales representatives that

this meant they would receive a bonus of $460 for each Victoza prescription written, regardless

of whether the prescription was written for diabetes or an off-label use.  He encouraged sales

representatives to ask their personal physicians for Victoza prescriptions for themselves and their

spouses.  Novo sales representatives were told to tell their doctors, "if their wife is fat they can

make them skinny."

80.     At this 2010 meeting, a Novo sales representative asked if receiving a Victoza

prescription could cause an insurance company to label her as diabetic.  Her District Manager

replied that without a diagnostic test for diabetes, this would not occur, and that physicians are

legally allowed to prescribe drugs for off-label uses.  As a result of this exchange, another sales

representative present asked her personal physician to write her a Victoza prescription.  The

physician refused.  The Novo sales representative was upset because she felt that this placed her

at a disadvantage compared to other Novo sales representatives who obtained off-label

prescriptions written for personal weight loss use.

26

81.     Relator Kelling reported her District Manager's Victoza off-label sales directives to her Regional Support Manager, who was formerly an institutional sales representative with the company.  The Regional Support Manager confirmed that he had a conference call with the District Manager and other managers in which he stated that representatives would be compensated for off-label prescriptions.  The Regional Support Manager told Relator Kelling that this gave Ohio sales representatives an advantage over Michigan representatives because Ohio Medicaid was reviewing Victoza for inclusion on its approved drug list before Michigan was doing so.  He predicted Ohio would soon add Victoza its Medicaid formulary.

82.     On October 2, 2010, Relator Kelling saw her District Manager at the American Diabetes Association walk in the Cleveland, Ohio area and noticed that he had lost weight.  Her District Manager said that he had lost 30 pounds since obtaining a Victoza prescription and was a "walking advertisement for Victoza."  When Relator Kelling asked if this was an off-label use, a sales representative who worked under his supervision, responded and said that at Novo's recent Plan of Action meeting, sales representatives were told that 40% of Victoza prescriptions were for off-label weight loss.  Relator Kelling asked another sales representative if her District Manager's use of Victoza was off-label.  She responded, "Does it matter?  We are still getting paid regardless."

c.     **Educational Presentations to Physicians About Weight**

83.     Novo Nordisk conducted many Victoza educational programs and presentations for physicians that emphasized weight loss as a topic.  The company selected speakers who were well known as weight loss specialists, such as Dr. Osama Hamdy, affiliated with the Joslin Diabetes Center at Harvard Medical School.  An internal company document shows Dr. Hamdy scheduled to speak about Victoza 15 times between June and October 2010.

84.     In August and September 2010, Novo Nordisk began publicizing its fall webcast series.  Included in the series was a topic called "The Value of Weight Loss in Achieving Glycemic Control," for which interested physicians could sign up by using the invitation code "WEIGHT."  One presenter for this topic was Dr. Terry Meriden, an endocrinologist who has given more than 95 talks on obesity and published more than 10 journal articles on obesity and weight loss.  Novo Nordisk sponsored over 30 presentations on "The Value of Weight Loss in Achieving Glycemic Control" via the website Medical Education Registration.  An email sent on August 31, 2010 by Novo Nordisk Marketing Manager Christina Jones notes that the previous Spring webcast presentations were "huge successes . . . in helping the reps get the Victoza messages into the offices."

85.     On one company-sponsored national teleconference, "The Value of Weight Loss in Achieving Glycemic Control," conducted by Dr. James Snyder in October 2010, when there were no questions from the audience, the teleconference moderator asked her own question related to weight loss and blood glucose levels, claiming that this question was from a prior teleconference audience.  The speaker answered this question and mentioned additional information that was "certainly off-label" and described how "Novo Nordisk has conducted a preliminary trial looking at liraglutide [Victoza] in doses up to 3 milligrams per day and seen greater weight loss."   This is a significantly higher dose than indicated in the approved package insert.  The teleconference moderator asked this same question in several other teleconferences.

> d.     **Use of EPIR System for Marketing Purposes - Creating a "Buzz"**

86.     As part of its effort to market Victoza for weight loss, Novo Nordisk encouraged sales representatives to solicit physicians to submit Electronic Pharmaceutical Information Requests ("EPIRs"), electronic requests that allow a physician to communicate directly via email

28

or mail with a Medical Science Liaison ("MSL") in the company's medical department.  With an

EPIR, MSLs, who have advanced degrees, usually an M.D. or PharmD., are then authorized to

contact the physician about research or clinical trials, as well as physician-initiated inquiries

about off-label uses.  Because physicians may lawfully prescribe drugs for indications other than

those for which the drug is FDA approved, EPIRs increase the potential for physicians to

prescribe a drug for off-label uses.

87.     In marketing Victoza for off-label use, Novo Nordisk prompted its sales

representatives to submit EPIRs regarding Victoza that were not actually initiated by the

physicians and that were done even before the drug had received FDA approval.  Novo called

this process an effort to "create a buzz" for the drug.  Managers frequently stressed,  in

conference calls and field rides, the importance of increasing the number of EPIRs submitted.

88.     Novo Nordisk used MSLs to gain access to influential physicians it called "key

opinion leaders" and encouraged Institutional Diabetes Care Specialists (sales representatives

assigned to institutions), including Relator Kelling, to set up meetings between MSLs and key

opinion leaders.  Sales representatives on the institutional side, like Relator Kelling, were paid an

extra bonus for each meeting arranged between a key opinion leader and a company MSL.

Supervisors tracked the number of these meetings the representatives arranged.

89.     Novo Nordisk training materials reinforced the expectation that sales

representatives submit EPIRs and arrange meetings with MSLs whenever possible.  In a series of

videos created to train sales representatives to respond to potential physician objections and

showing a sample sales call, the representative addresses a physician's objective and then

follows with, "If you'd like additional information, I can fill out an EPIR request or help you

schedule a meeting with our local medical science liaison."

90.     By law, Novo sales representatives are prohibited from initiating EPIRs.  At
Novo, they are instructed to input the physician's specific question about a drug into the
computer system as an EPIR.  A computer screen where sales staff enter an EPIR requires the
representative to check a box next to the statement "By submitting this ePIR, I confirm that this
is an unsolicited request for information as asked by the HCP [health care provider]."  However,
a March 8, 2010, email sent by Mike Jaffe, Senior Manager for Medical Information Operations,
notes the increase in EPIR submissions following the Victoza launch.   Relators' Novo Regional
Support Manager forwarded this email and noted that the number of EPIRs submitted by the
East I Area, a territory covering states from the Northeast Coast to Indiana, rose from 25 in 2009
to 86 in 2010.  In the email he acknowledged the role of sales representatives in "driving" the
increase in EPIR submissions, noting, "Nice job in driving over a 200% increase!"

### e.      Seeking Ohio Medicaid Approval with Weight Claims

91.     In advance of the Ohio Medicaid Pharmacy and Therapeutics Committee meeting
to consider adding the drug to its formulary, Novo Nordisk instructed sales representatives to
attempt to influence the Committee members.  In an email describing the methods used, Relator
Kelling's Regional Account Executive explained that "Ohio Medicaid is more restrictive than
most states.  It is prohibited for you to make contact with the P&T Committee members to
discuss the formulary."   Because direct contact was not allowed, Relators' Regional Account
Executive researched on each committee member and then she met with Novo sales
representatives who had a committee member or that committee member's practice or institution
on their target list and informed them:

> Lunch and sit down appointments were set up to give the Victoza
> clinical overview prior to the P&T Committee meeting.  In
> addition, I met with a KOL [key opinion leader] (Endocrinologist)

that is associated with a P&T Committee member and he agreed to
consult with that member concerning Victoza.

92.     A Novo Nordisk MSL ("Medical Science Liaison") presented to the Ohio
Medicaid Pharmacy and Therapeutics Committee on April 21, 2010 in support of Victoza's
application to be covered on Ohio's Medicaid formulary.  His slides included information on
weight loss.  Ohio Medicaid  approved addition of Victoza to its formulary with a co-pay of $2
for a box of 2 pens.  There was no prior authorization required and no restriction on the drug,
meaning that Victoza prescriptions were covered by Medicaid even if they were written for off-
label uses, such as weight loss.  Minutes from the Ohio Committee meeting stated that:

>    Committee members discussed the cost as compared to Byetta,
>    possible improvement in compliance due to once daily dosing,
>    efficacy, and effects on measures other than blood glucose. The
>    Committee unanimously recommended that Victoza be preferred.

These Committee minutes indicate that "measures other than blood glucose," such as weight
loss, as presented by Novo Nordisk, played an important role in the Committee's drug approval
decision.

93.     Ohio Novo Nordisk sales representatives were directed to "follow every script"
and promote Victoza to physicians based on the Ohio Medicaid approval and low co-pay.
Novo's MSL presenting to the Ohio Medicaid Formulary Committee told Relator Kelling that the
company wanted to get as much Medicaid utilization as possible by July 1, 2010, because the
company feared that if Victoza was not used it could be removed from the formulary.

94.     Once Ohio Medicaid approval was secured, Novo Nordisk sales representatives
began an aggressive strategy to target endocrinologists who treated Medicaid patients and to
advocate that all Medicaid patients with Type 2 diabetes be prescribed Victoza.  A May 20, 2010
email from a sales representative detailed this strategy:

OBJECTIVE:  Maximize Ohio Medicaid Victoza Status of "COVERED $2.00 Co-Pay with NO Prior Auth" to Attain a Medicaid Market-Share in Incretin Marketplace of 25% by August 31, 2010 by utilizing Focused Messaging to all Medicaid Targets in Collaboration with I/DCS Partners.  Messaging to include Medicaid Landscape information, Victoza Clinical Benefits, and a Close for All Type II Diabetes on OHIO Medicaid to be Prescribed Victoza.  In the words of the Unanimous Decision from the P&T Ohio Medicaid Committee, Approval of Victoza was a "no-brainer"!

### 2.      FDA January 25, 2010 Approval of Victoza Conditioned on Novo Nordisk Safety Warnings and Marketing Restrictions

95.     On May 30, 2008, Novo Nordisk filed for regulatory approval of liraglutide in both the United States and Europe.  The FDA held a public advisory committee meeting on April 2, 2009, on whether the risk of thyroid C-cell tumors permitted marketing liraglutide for the treatment of type 2 diabetes.

96.     On January 25, 2010, the FDA approved liraglutide, under the trade name Victoza, for the treatment of Victoza, at the 1.2 and 1.8 mg doses.

97.     As a condition for approving Victoza, the FDA required Novo Nordisk to give prescribers information describing the FDA-mandated black box warning on Victoza's label regarding the risk of thyroid C-cell (medullary thyroid carcinoma) tumors and acute pancreatitis. The black box warning states:

**WARNING: RISK OF THYROID C-CELL TUMORS**

See full prescribing information for complete boxed warning.

• Liraglutide causes thyroid C-cell tumors at clinically relevant exposures in rodents. It is unknown whether Victoza causes thyroid C-cell tumors, including medullary thyroid carcinoma (MTC), in humans, as human relevance could not be determined by clinical or nonclinical studies.

• Victoza is contraindicated in patients with a personal or family history of MTC or in patients with Multiple Endocrine Neoplasia syndrome type 2 (MEN 2).

32

98.     The Black Box Victoza warning was not the only safety concern associated with the FDA's Victoza approval.  The FDA required safety information and labeling warnings relating to patient suitability:

> [T]hat Victoza was not recommended for monotherapy for patients whose diabetes was not controlled with diet and exercise; and
>
> [T]hat Victoza was not studied in combination with insulin.

99.     Victoza's FDA approval on January 25, 2010 was accompanied by a legal requirement that Novo engage in a Risk Evaluation and Mitigation Strategy ("REMS"). The FDA REMS listed as its two goals:

> (a)    "[t]o inform providers about the risk of acute pancreatitis (including necrotizing pancreatitis) and the potential risk of medullary thyroid carcinoma associated with Victoza," and
>
> (b)    "[t]o inform patients about the serious risks associated with Victoza."

100.     The FDA's REMS required Novo to do the following:

> 1.     Prepare a **Medications Guide** for patients, to be inserted in each Victoza package;
>
> 2.     Prepare and mail to certain physicians likely to prescribe Victoza a **Dear Healthcare Provider letter** warning of the thyroid cancer and pancreatitis risk, as well as appropriate patient selection;
>
> 3.     Send a **Direct Mail Letter** annually to all prescribers likely to prescribe Victoza for three years following the launch of the drug and containing all the information in the Dear Healthcare Provider letter and in a "**Highlighted Information for Prescribers**" notice; and
>
> 4.     Provide, in the first visit involving Victoza, a "**Highlighted Information for Prescribers**" to all Healthcare Professionals visited by Novo sales representatives in the first 6 months following Victoza's launch.

101.     The FDA-mandated requirement for a "Dear Health Care Professional" Letter was to be mailed to all likely prescribers of Victoza within 60 days of Victoza's approval, which would have been on or before March 26, 2010.  The Dear Health Care Provider Letter addressed

the potential risk of medullary thyroid tumors, the risk of acute pancreatitis, and the importance of appropriate patient selection for Victoza.

102.    In addition to the initial Dear Health Care Provider letter in early 2010, the FDA required Novo to directly mail the Dear Health Care Provider Letter to all likely Victoza prescribers annually, for three years after Victoza was approved and made commercially available.

103.    In addition to the "Dear Health Care Provider" letter to prescribers, the REMS required that Novo sales representatives distribute the FDA-approved Highlighted Information for Prescribers (HIP-D) during their first Victoza discussion with a health care professional in the first six months after Victoza's launch.  The HIP-D had a copy of the black box warning about the risks of pancreatitis and thyroid cancer. The HIP-D contained a statement informing prescribers about the potential risk of medullary thyroid cancer and the risk of acute pancreatitis with Victoza.

104.    In addition, the 2010 HIP-D required Novo to provide the following guidance to prescribers regarding appropriate patient selection:

> • VICTOZA is contraindicated in patients with a personal or family history of medullary thyroid carcinoma or in patients with Multiple Endocrine Neoplasia syndrome type 2 (MEN 2).
> • VICTOZA is not recommended as first-line therapy for patients who have inadequate glycemic control on diet and exercise.
> • VICTOZA has not been studied sufficiently in patients with a history of pancreatitis to determine whether these patients are at increased risk for pancreatitis while using Victoza. Use with caution in patients with a history of pancreatitis
> • VICTOZA should not be used in patients with type 1 diabetes mellitus or for the treatment of diabetic ketoacidosis.
> • VICTOZA has not been studied in combination with insulin.

a.      **Novo Nordisk Management Employs Marketing Tactics That Avoid Compliance with Serious FDA Drug Risk Warnings - "REMS" and "HIP-D"**

105.      As of April 28, 2010, Novo had failed to distribute the required Risk Evaluation and Mitigation Strategy (REMS) and HIP-D information to a large number of health care providers who Novo sales representatives detailed about Victoza in February, March and April 2010.  In an email, sent by Novo management on February 18, 2010, sales representatives discussed simply leaving the required REMS letter with physicians or their staff during a sales call, but not "verbaliz[ing] the safety message."  Novo Nordisk failed and refused to set up its computerized marketing systems to comply with the FDA REMS requirement.

106.      On June 13, 2011, the FDA issued a safety alert regarding Victoza and the risk of Thyroid C-cell Tumors and Acute Pancreatitis, directed to Endocrinologists and Family Practice physicians. The Safety Alert states:

ISSUE: Novo Nordisk reminded healthcare professionals of important safety information about Victoza (liraglutide [rDNA origin]) injection required in a Risk Evaluation and Mitigation Strategy (REMS). The letter is being sent because a recent assessment of healthcare providers showed that some primary care providers are not fully aware of the serious risks associated with the use of Victoza.

Liraglutide causes dose-dependent and treatment-duration-dependent thyroid C-cell tumors at clinically relevant exposures in both genders of rats and mice. It is unknown whether Victoza causes thyroid C-cell tumors, including medullary thyroid carcinoma (MTC), in humans, as human relevance could not be ruled out by clinical or nonclinical studies. Additionally, in clinical trials studying Victoza, there were more cases of pancreatitis in patients treated with Victoza than in patients treated with comparators.

BACKGROUND: FDA may require a REMS for newly or already approved prescription drug product when FDA determines that a REMS is necessary to ensure the benefits of a drug outweigh the risks of the drug. Victoza is indicated as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus.

RECOMMENDATION: Patients with thyroid nodules noted on physical examination or neck imaging obtained for other reasons should be referred to an endocrinologist for further evaluation. Although routine monitoring of serum calcitonin is of uncertain value in patients treated with Victoza, if serum calcitonin is measured and found to be elevated, the patient should be referred to an endocrinologist for further evaluation.

After initiation of Victoza, and after dose increases, observe patients carefully for signs and symptoms of pancreatitis (including persistent severe abdominal pain, sometimes radiating to the back, and which may or may not be accompanied by vomiting).

107.   Approximately two years after Victoza was approved, the nonprofit consumer advocacy organization Public Citizen filed a petition with the FDA to remove Victoza from the market due to the risks of thyroid cancer, pancreatitis, allergic reactions, and kidney failure that it claimed outweighed Victoza clinical benefits.  In support, Public Citizen cited the FDA database of adverse Victoza events and the statement of an FDA clinical safety reviewer who voted against approving Victoza:  "The need for new therapies for type 2 diabetes is not so urgent that one must tolerate a significant degree of uncertainty regarding serious risk concerns." The FDA denied Public Citizen's petition on March 25, 2014.  However, the FDA committed to monitoring and reviewing safety information regarding Victoza.

108.   Novo Nordisk employed a consulting company to develop training for Novo sales representatives on how to distribute the HIP-D and present the required warnings.  Novo's purpose was not to ensure compliance with the REMS, but was part of sales training at the Victoza launch meeting.  The consultants downplayed the required REMS warnings and encouraged sales representatives to focus on the drug's efficacy: "Move on to efficacy because efficacy sells."  Novo consultants directed sales representatives to state the warnings, address them with physician customers, and move on to other marketing statements about Victoza's efficacy.  By focusing on efficacy statements, Novo believed that physicians would worry less

36

about the thyroid cancer and pancreatitis black box warning and other cautions required by the REMS.  Novo consultants told sales representatives not to "make excuses" about the black box warning or other cautions required by the REMS because it would lead to physicians placing more emphasis on the warnings.

109.    Novo consultants instructed sales representatives not to use the HIP-D as a sales aid, because visually showing the HIP-D while telling physicians the document while discussing the required statements would help physicians remember the specific elements in the document. The consultants instead told Novo sales representatives not to point out specific items in the HIP-D document, but to simply hand it to the physician.

110.    During sales training as part of the Victoza launch, Novo management trained Relator Kelling and other sales representatives on 90-second, 3-minute, and 5-minute Victoza sales calls, as well as specific calls to "resolve objections" that physicians may have regarding Victoza.  As a part of this training, sales representatives, including Relator Kelling, were graded on how well they performed on these mock sales calls, including mock calls to "resolve objections."  Each sales representative's scores from this sales training was listed in a computerized report called a "V report."

111.    As a part of the Victoza launch sales training, Novo made training documents available to sales representatives, including materials to assist with handling prescribers' objections to prescribing Victoza, such as the "Pancreatitis Backgrounder" and information on "Thyroid Abnormalities."  Under the rubric of "Providing Solutions," Novo made available a document called "Important Safety Information" regarding the FDA-required REMS warnings. These training materials minimized the FDA-required REMS and minimized the risks of pancreatitis and medullary thyroid cancer that the REMS was intended to warn physicians about.

Novo Nordisk speakers in teleconferences and video presentations repeatedly downplayed or minimized the thyroid cancer and pancreatitis black box warnings, including when asked questions by potential prescribers.

112.    Relator Kelling expressed concern that residents and non-targeted physicians were likely Victoza prescribers, but not receive the safety message because Novo's computer system did not have a place to add their names and document whether they received the REMS letter.  Her supervisor, Shereen Gerrasch, responded that Novo had a limited number of copies of the REMS letter and it only needed to be given to targeted physicians, not those providers who were not listed in the computer system.

> **b.    Novo Nordisk's Off-Label and False Marketing of Victoza to Avoid the FDA REMS Safety Directives and Minimize Thyroid Cancer Risks**

113.    Novo Nordisk knew that the required REMS safety message and the black box warning had the potential to hurt Victoza sales.  One field sales representative's comments on this subject were reproduced in a Manager Report dated April 15, 2010: "I find that my endo[crinologists] are not concerned about the MTC [medullary thyroid cancer risk] but are not happy to tell the patients about it.  They feel the patients will not want to take anything that has a caution of the word cancer in mice."  Similar discussions took place during weekly Friday conference calls as representatives shared strategies to allay concerns about the black box warning.  Novo Nordisk management sent summaries of these conversations in reports to the home office on a regular basis. These summaries were used by Novo Nordisk management to develop talking points and sample answers to frequent physician questions regarding the black box warning that were then circulated and discussed on the following week's conference call.

38

114.    Novo sales representatives frequently emailed and discussed unapproved research studies that tended to mitigate the serious FDA-required warnings regarding Victoza's potential to cause thyroid tumors.  On February 11, 2010, two sales representatives discussed the possibility of "spontaneous endocrine tumors" in Sprague-Dawley rats, a type of rat used in Victoza clinical pre-approval studies.  One representative claimed that this type of rat was "70 times more sensitive then [sic] the industry standards."  The emails mentioned that this information was "not PRB approved information," but it was forwarded by several sales managers and representatives within the company.  Although the email stated that it was "for your information only," the expectation within the company was that such articles would add to sales representatives' knowledge of the drug and be used in detailing or responding to objections.

115.    Information specific to rodents was discussed during weekly conference calls with Novo representatives and managers.  Representatives were particularly concerned about how to handle objections from primary care and internal medicine physicians who had less experience with thyroid disorders.  One comment repeated many times in conference calls in which Relator Kelling and her supervisor, Shereen Gerrasch, participated was "Doctor, are you treating rats?  No, Doctor, you're treating humans.  So if you're treating rats, don't use Victoza, but, Doctor, you're treating humans."

116.    A Novo Nordisk sales representative engaged in marketing Victoza, Sharukh Mehta, distributed a study conducted on monkeys that was related to the thyroid cancer risk.  By distributing this unapproved study that was not provided to the FDA as sales marketing material, Mr. Mehta was able to downplay the risk of thyroid cancer associated with the drug.  A Cleveland Clinic endocrinologist reported this behavior and provided a copy of this study to

Relator Kelling and the Novo MSL (Medical Science Liaison) accompanying her on the visit. Relator Kelling reported this incident to her supervisor. Novo Nordisk took no action to discipline Mr. Mehta, sending a message that such misconduct, in violation of fundamental FDA safety directives, was acceptable.

117.    On March 4, 2010, Novo Nordisk sales representatives began forwarding and discussing over email an article in the journal *Endocrinology* that suggested that drugs like Victoza were more likely to cause thyroid tumors in rodents than in monkeys, and thus, were more likely to cause cancer in rats than in humans. Those Novo emails described the study as "a compilation of *in vivo* and *in vitro* studies done by NNI [Novo Nordisk] regarding the GLP-1 receptor agonists and thyroid." A "key topic" highlighted from the paper was that "Thyroid C-cell number and GLP-1 receptor expression is species dependent." This study was frequently discussed during Novo weekly "journal club" conference calls.

118.    On March 12, 2010, Dr. Alan Moses, Novo Nordisk Global Chief Medical Officer, sent a widely distributed email about the *Endocrinology* "monkey vs. rats" thyroid cancer article. Dr. Moses' email concluded that "the currently available data support that liraglutide stimulates the rodent, but not the human, C-cell. . . . In my opinion, we cannot completely rule out the relevance of these findings for humans, the risk associated with Victoza in regard to medullary thyroid carcinoma appears to be low." Dr. Moses' statements directly contradict the FDA's mandated black box warning regarding thyroid C-cell tumors.

119.    Although Dr. Moses' email stated that the *Endocrinology* article "should NOT be handed out to your customers" and "should NOT be detailed," he told the sales force that the study could be transmitted to physicians via the company's EPIR ("Electronic Pharmaceutical Information Request") system. Dr. Moses' email stated: ". . . if health care providers ask for

additional data on the C-cell findings in rodents (the boxed warning) or want to know more about how experiments were carried out, then you can request this information through an Epir."

120.    In an October 2010 teleconference, Novo's featured speaker Dr. James Snyder discussed the thyroid C-cell tumors black box warning and diminished its importance by stating "in humans we don't exactly know what they [C-cells] do" and differentiating the function of the human and rodent C-cells.

121.    In an attempt to allay concerns related to the FDA-mandated black box warning about Victoza's potential thyroid cancer risk, Novo Nordisk recruited a Cleveland Clinic thyroid specialist as a paid speaker.  This thyroid specialist is a well-known endocrinologist who has authored several book chapters and two books on  thyroid diseases.  Internal company documents show that Novo scheduled at least 18 paid speaking engagements for the Cleveland Clinic thyroid specialist between June and November 2010.  In a January 24, 2010 email, Novo Sales Representative Sharukh Mehta said "On the speakers front, we have sat down with [the thyroid specialist] and gone through his message.  I can promise he will not disappoint."

122.    Prior to 2010, the Cleveland Clinic thyroid specialist had been a speaker for Levemir, another Novo Nordisk drug.  On April 26, 2010, the thyroid specialist had a lunch meeting with Relator Kelling and a Novo Medical Sales Liaison.  The Novo Medical Sales Liaison asked the thyroid specialist how he would verbalize Victoza's risk of thyroid cancer to an audience.  After the physician responded, the Medical Sales Liaison then gave him another proposed phrasing, saying, "I can't tell you what to say but this is the way I would say it to primary care physicians."  He then explained to the thyroid specialist Novo Nordisk's concern that primary care physicians hesitate using Victoza because of the thyroid cancer black box warning and that it was therefore important to convey "the real risk" to these physicians.

41

      **c.**      **Novo Nordisk's Off-Label and False Marketing of Victoza to Avoid the FDA REMS Safety Directives and Minimize Pancreatitis Risk**

123.     Recognizing Victoza users' increased risk of life-threatening pancreatitis, when the FDA approved Victoza in 2010, Novo was required to warn patients and physicians of the risk. The FDA based its safety warnings on Victoza's phase 2 and phase 3 trials, where four times more patients assigned to the Victoza group developed pancreatitis as opposed to the comparator group. Mary Parks and Curtis Rosebraugh, *"Weighing Risks and Benefits of Liraglutide – The FDA's Review of a New Antidiabetic Therapy,"* 362 N. ENGL. J. MED. 774-777 (2010).

124.     Victoza's FDA approval on January 25, 2010 was accompanied by a legal requirement that Novo engage in a Risk Evaluation and Mitigation Strategy ("REMS") to inform physicians regarding Victoza's risks of pancreatitis. The REMS required Novo to distribute a "Highlighted Information to Providers" ("HIP-D")letter that contained information about the risk of acute pancreatitis, including fatal and non-fatal hemorrhagic or necrotizing pancreatitis. The letter described the symptoms of acute pancreatitis and instructed providers to monitor patients for these symptoms and discontinue Victoza if pancreatitis was confirmed.

125.     Novo Nordisk managers were concerned that competitors promoted competing drugs as having a lower pancreatitis risk than Victoza. A Novo sales manager warned other managers in an email dated January 29, 2010 that "Amylin, Lilly and Merck are already telling our customers that Victoza has more pancreatitis that [sic] either of their products."

126.     Novo Nordisk knew that the increased pancreatitis risk and clear warnings about it would deter some physicians from prescribing and some patients from taking Victoza.

127.     Despite the 2010 FDA mandate to distribute pancreatitis safety warnings to all potential prescribers, Novo instructed its sales representatives to downplay the risk of pancreatitis, even though these warnings were prominent on the FDA-approved Victoza label. Novo directed representatives to tell physicians that any increased pancreatitis risk was due to higher pancreatitis rates among diabetics, not because of Victoza.

128.     Novo's training for sales representatives prior to the Victoza launch in December 2009 - January 2010 included a session entitled "Does Victoza Cause Pancreatitis?"  Novo sales representatives were instructed to practice responding to this objection.  In other training materials, Novo sales representatives were instructed that if a physician had concerns about pancreatitis, they could respond that "[t]he incidence rate of pancreatitis in patients with Type 2 diabetes is nearly 3-fold higher" than in nondiabetics.  Shortly after the Victoza launch, in March and April 2010, Novo managers told sales representatives to give physicians the warning on pancreatitis, but also say there was "no conclusive data" on the risk.

129.     On February 10, 2010, the Victoza Launch Team sent a sample script to all Novo sales force members via email with an example of how to explain the safety warnings to physicians.  The script instructed sales representatives to present the required warnings on the pancreatitis risk, while telling physicians "[t]here are no conclusive data establishing a risk of pancreatitis with Victoza treatment" and "the incidence rate of pancreatitis in the general population is 1.5 cases per 1,000 patient years, but is nearly 3-fold higher, 4.2 cases per 1,000 patient years, in patients with type 2 diabetes."

130.     In response to concerns about pancreatitis, Novo managers gave sales representatives email instructions on how to handle physicians' objections regarding the pancreatitis risk, in writing, and verbally.  For instance, when sales representatives expressed

concern about distributing the REMS letter and answering questions from the physicians, managers told them to "Just put the REMS letter in the doctor's hand and just talk about the bullet points once and that's it."  Managers held teleconferences with Novo sales representatives to receive feedback from the field about physicians' objections and how successfully the company's "objection handling" strategies worked.

131.    In a national broadcast to physicians in March 2010, Dr. Alan Moses, Novo Nordisk Global Chief Medical Officer, minimized the label's pancreatitis warning language by saying, "There is no conclusive data establishing a risk of pancreatitis with Victoza treatment," and proposing alternative explanations for the higher incidence of pancreatitis in the treatment group in Victoza's pre-approval studies, such as alcohol use and cholelithiasis (gallstones).

132.    In a weekly feedback summary dated April 2, 2010, Novo sales representatives and managers reported that repeating the required safety information frightened many customers: "The MTC and pancreatitis information on the Teleconferences are scaring customers . . . perception is the drug is bad.  The safety information is covered not only once, but several times. Customers asked reps if we really wanted them listening to this information."

133.    Novo speakers minimized Victoza's pancreatitis risk.  Many Novo speakers reinforced the message that any pancreatitis was a result of diabetes, not Victoza.  In his October 2010 teleconference, Novo speaker Dr. James Snyder downplayed the black box warning for pancreatitis, explaining that the rate of pancreatitis is typically higher in people with diabetes and claiming that "the rates of pancreatitis observed with Victoza . . . have not been higher than what has been reported as background rates."

134.    A 2011 study found an increased risk of pancreatitis among patients who used GLP-1 drugs like Victoza.  Michael Elashoff et al., "Pancreatitis, Pancreatic, and Thyroid Cancer

with Glucagon-Like Peptide-1–Based Therapies," 141 GASTROENTEROLOGY 150-56 (2011). Victoza was not included in the 2011 study, but other drugs that act via a similar mechanism were included.

135.    In a May 11, 2012 web-based panel discussion, Novo's paid speakers minimized the pancreatitis risk and claimed that any increased pancreatitis incidence was due to diabetes, not Victoza.  Novo's Victoza presenters reported that the audience had "a number of questions" regarding Victoza's link to pancreatitis and that the pancreatitis risk "seemed to have been the greatest interest to our audience."

136.    Downplaying Victoza's risk of pancreatitis is a continuing and important Novo sales strategy.  In March 2013, the FDA announced that it was evaluating research findings that Victoza and similar drugs increased the risk of pancreatitis and pre-cancerous pancreas cellular changes.  Food and Drug Administration, Safety Alert: Incretin Mimetic Drugs for Type 2 Diabetes: Early Communication – Reports of Possible Increased Risk of Pancreatitis and Pre-cancerous Findings of the Pancreas (March 14, 2013).

137.    When the FDA announced that it was evaluating the risk of pancreatitis and pancreatic cancer associated with Victoza and similar drugs, many physicians became concerned about prescribing Victoza.  Novo's strategy to address these risks was to advise concerned physicians to test their patients' levels of the enzymes amylase and lipase.  Elevated amylase and lipase levels typically indicated pancreatitis. If a patient showed elevated levels of the two enzymes, Novo instructed physicians to discontinue Victoza in those particular patients only.

138.    Novo maintained a computerized call record which required sales representatives to check a box to indicate that they had given the HIP-D letter to physicians on their target list. The call record, however, did not require sales representatives to verify that they had verbalized

45

specific safety messages.  Novo managers instructed sales representatives to verbalize the safety messages regarding pancreatitis and medullary thyroid carcinoma, but did not require sales representatives to verbalize any appropriate patient selection criteria for Victoza that were part of the HIP-D.

> **d.   Novo Nordisk's Off-Label and False Marketing of Victoza to Minimize Warnings That Victoza Not be a First-Line Therapy and That Victoza Use With Insulin Was Not Safety Tested, in Violation of FDA Directives**

139.    In addition to warning of the risks of medullary thyroid carcinoma and acute pancreatitis, the FDA required HIP-D communications with prescribers and mandated inclusion of important information about appropriate patient selection.  The HIP-D patient selection criteria indicated that Victoza is not recommended as first-line therapy for patients who have inadequate glycemic control on diet and exercise and that Victoza has not been studied in combination with insulin.

140.    Despite the FDA-required cautions in the HIP-D regarding appropriate patient selection for Victoza, Novo promoted Victoza both as first-line therapy for type 2 diabetes and promoted the use of Victoza in combination with insulin and, in particular, its drug Levemir, in direct contradiction to the warnings in the HIP-D required by the FDA's REMS strategy for Victoza.

### 3.   Off-Label and False Marketing of Victoza for Beta Cell Preservation

141.    Novo Nordisk marketing made false claims that Victoza protected beta cells. Beta cells are cells in the pancreas that produce and secrete insulin.  In patients with Type 2 diabetes, the function of the beta cells can become progressively impaired as the cells secrete less insulin and may eventually stop producing insulin.

142.    A Novo sales aid released in July 2010 and targeted to physicians tied GLP-1 function to beta cell decline in patients with Type 2 diabetes: "Type 2 diabetes is often marked by abnormal beta-cell response to glucose. GLP-1 normally helps regulate this function. Unfortunately, some patients with type 2 diabetes have impaired GLP-1 physiology."

143.    Novo trained its sales representatives to promote Victoza by saying that the drug acts in a "glucose-dependent manner" and, therefore, prevents the beta cells from working too hard.  Novo representatives were trained to differentiate Victoza from sulfonylurea ("SU") drugs, a class of commonly used oral antidiabetes medications that increase insulin secretion from the beta cells independently of blood glucose levels.  Novo trained its sales representatives to say that because SU drugs act on the beta cells independently of blood glucose levels, these drugs can cause the beta cells to "burn out," while Victoza does not, thus preserving the beta cells.  Both the claims of "burnout" and beta cell preservation are unproven, theoretical, and not supported by the package insert of either product.

144.    Novo Nordisk used calculations of Homeostatic Model Assessment B ("HOMA-B") on sales aids to suggest falsely that Victoza preserves beta cells.  HOMA-B is a calculation of insulin resistance and beta cell function that does not measure specifically whether beta cells are being preserved, increased, or dying out.

145.    Novo sales information targeted towards patients emphasized the false marketing claim that Victoza can preserve beta cells.  One sales aid claimed "Victoza helps important cells in your pancreas," accompanied by a graphic showing cells and an upward pointing arrow.  Slide decks used in Victoza promotional programs presented a large amount of data on "native" GLP-1, the hormone that is naturally present in the human body.  In one slide presentation, there were five slides about the function of "native" GLP-1 before any information on Victoza was

presented.  This misleading sales tactic implies falsely that Victoza is interchangeable with the

"native" GLP-1 hormone found in the body.  Articles about the GLP-1 suggesting that it had

beta cell protective effects were emailed to Novo sales representatives, made available on Novo's

intranet, and discussed with Novo sales representatives and managers in regular "journal club"

conference calls.

### 4.      Off-Label and False Marketing of Victoza for Cardiovascular Health

146.    Victoza's off-label cardio-protective marketing strategy began before FDA

approval of Victoza.  In March 2009, at a Novo "Training at Sea" aboard a cruise ship, Novo

sales representatives were introduced to Victoza.  Victoza was presented as a drug that would not

only lower blood glucose and reduce weight, but also reduce blood pressure and blood lipids.

Sales representatives on the cruise were asked to draw a picture of the body in a training exercise

and indicate the areas of the body in which Victoza provided important benefits, including the

heart.

147.    The FDA did not approve Victoza for hypertension or lipid lowering.  Despite the

lack of an FDA-approved indication, Novo Nordisk marketed Victoza as "cardio-protective,"

emphasizing the study results of lowered blood pressure and blood lipids.

148.    Because the Victoza pre-approval studies measured the blood pressure of study

participants, it used data obtained to claim falsely that Victoza had cardiovascular benefits for

patients.  All 6 LEAD studies showed that patients taking Victoza had a decrease in systolic

blood pressure, in comparison with a competing drug or a placebo.  Novo Nordisk emphasized

the blood pressure results in a document from October 2009, several months before Victoza was

approved.  In the "LEAD Trial and Competitor Refresher," systolic blood pressure results from

the studies were indicated by a graphic of a heart.  By highlighting the blood pressure results in

this way they were given equal importance to results related to reduction in blood sugar, the

drug's FDA-approved purpose.  A Novo Nordisk regional field trainer summarized the LEAD

Study results in a chart for sales representatives to use, with a row showing results in "SBP" or

systolic blood pressure.

149.    One Victoza pre-approval study, the LEAD-4 trial, measured outcomes related to

blood lipids, including cholesterol and triglycerides.  Three of these blood lipid measures, LDL

cholesterol (known as "bad" cholesterol), triglycerides, and free fatty acids, declined in patients

taking Victoza in a way that was statistically significant.

150.    In February 2010, weeks after Victoza approval, Relator Kelling attended a

"Metro Synergy Meeting" to develop a strategy to promote Victoza in the Cleveland area.  At

this meeting, sales representatives and supervisors discussed targeting cardiologists to promote

Victoza off-label for patients with hypertension and high cholesterol or blood lipids.  Sales

representatives discussed promoting Victoza with cardiothoracic surgeons for non-diabetic

patients who had undergone coronary artery bypass surgery.  Novo managers instructed sales

representatives to target cardiologists and other non-endocrinology specialists prescribing Byetta

(viewed as a competitor drug to Victoza).  This plan was documented in a follow-up e-mail from

Shereen Gerrasch sent out the same day, February 26, 2010, which states, "Opportunity to

pursue prescribers/advocates in Cardiology and Cardio Thoracic Surgery…leading to

Nephrology."

151.    Novo sales representatives marketed Victoza off-label for cardiovascular benefits

by distributing articles on the topic.  Shereen Gerrasch, Novo Institutional Business Manager for

the Cleveland area, asked a subordinate sales representative to forward articles to other sales

representatives and managers because this representative had experience as a trainer in a prior

position with another pharmaceutical company. Articles were sent at Manager Gerrasch's direction to sales representatives and discussed during journal club conference calls in the Cleveland area. Supervisors participated in the journal club conference calls and frequently suggested verbiage for sales representatives to use based on the article discussed, regardless of whether the article discussed off-label information. When the Novo sales representative forwarded a "journal club" article suggesting that GLP-1 drugs have "a protective role in cardiovascular risk factors," and lead to "improved cardiac function," Shereen Gerrasch forwarded the article to the company's entire 17-state East region. The same Novo sales representative circulated another journal article, "Glucagon-like Peptide 1 Can Directly Protect the Heart Against Ischemia/Reperfusion Injury," published in the journal *Diabetes*, to the group.

152.    Novo sales aids targeted to physicians suggested that Victoza could improve measures of cardiovascular health in addition to lowering blood sugar. A series of sales aids released in September 2010 featured sample patients with the patient's medical history. The patient histories featured comorbidities such as obesity as well as cardiovascular risks. For example, in one sales aid, "Bob" is described as a Type 2 diabetic, hospitalized for chest pain, who has hypertension and dyslipidemia (a term for high blood cholesterol and triglycerides). The sales aid states that a physician "could make a difference with Victoza" in treating patients like Bob with both diabetes and cardiovascular health problems.

153.    Novo Nordisk promoted off-label cardiovascular benefits through its physician speakers. One featured speaker in the Fall 2010 National Teleconference Series, Dr. James Snyder, suggests in his presentation that Victoza can have cardio-protective effects because weight loss can have a significant impact on measures that affect cardiovascular disease, such as blood pressure, cholesterol, and triglycerides.

### 5.      Off-Label and False Marketing of Victoza for Renal Safety

154.      Victoza was not approved by the FDA for use in patients with renal impairment.
The package insert for Victoza states that "[t]here is limited experience in patients with mild,
moderate, and severe renal impairment. . . . Therefore, Victoza should be used in caution in this
patient population."  By marketing Victoza as beneficial for patients with kidney disease, Novo
Nordisk minimized potential risks to patients and misrepresented the limited research on the use
of Victoza in patients with renal impairment.

155.      In March 2010, a Novo Nordisk Medical Science Liaison wrote an e-mail that
was forwarded to managers and sales representatives commenting on the review of Victoza in
the *Pharmacist's Letter*, a publication that reviews drugs for pharmacists.  She called upon the
Novo sales force to deliver "the message that . . . traditional agents may not always be the best
options for many patients," including patients with renal impairment who cannot take drugs like
metformin, sulfonylureas, DPP-IV inhibitors, or exenatide, suggesting that Victoza satisfies an
"unmet need" in these patients.   This advice contradicted the Victoza package insert statement
that "[t]here is limited experience in patients with mild, moderate, and severe renal impairment,
including end-stage renal disease.  Therefore, Victoza should be used with caution in this patient
population." The *Pharmacist's Letter* attached to this email also had similar statements of
caution for patients with renal impairment.

156.      Novo Nordisk promoted Victoza as safe for patients with kidney disease or renal
impairment, despite a lack of evidence to support these claims.  In June 2010, Novo Nordisk
sales management forwarded an email as an example of "best practices" used by one of its
leading sales representatives in the nation.  A "best practice" described in this email was to begin
by asking physicians "[in] what percentage of your patients are you worried about kidney

disease?"  After that question, the sales representative would then refer to information in the

package insert stating that "No dose adjustment of Victoza is recommended for patients with

renal impairment."  This sales representative then described how Victoza is metabolized, thereby

allaying concerns about kidney patients.

157.     In the Fall 2010 National Teleconference Series, Novo speaker, Dr. James

Snyder, downplayed the risks of Victoza in patients with renal impairment.  Dr. Snyder

mentioned that the package insert contained a caution regarding use in patients with renal and

hepatic impairment.  He discussed the body's metabolism of the drug and stated that Victoza is

not metabolized by the kidney or liver.  Dr. Snyder mentioned two "very small trials" that had

been conducted in patients with liver and kidney disease taking Victoza and stated that "Victoza

concentrations did not go up but went down slightly" in these patients.  Dr. Snyder said that

"there may be a potential niche" for Victoza as a treatment for patients with renal or hepatic

impairment who cannot tolerate other medications for Type 2 diabetes.

## 6.     Off-Label and False Marketing of Victoza for First-Line Therapy

158.     Victoza is indicated "as an adjunct to diet and exercise to improve glycemic

control in adults with type 2 diabetes mellitus."  The approved package insert lists important

limitations on the use of Victoza.  Because of the risk of thyroid tumors and pancreatitis, the

package insert instructs providers to "prescribe Victoza only to patients for whom the potential

benefits are considered to outweigh the potential risk."  The package insert also says that

"Victoza is not recommended as first-line therapy for patients who have inadequate glycemic

control on diet and exercise."

159.     Novo Nordisk marketed Victoza for monotherapy in a misleading way that

equated the drug's use as monotherapy with its use for first-line therapy. First-line therapy is not

indicated by the approved package insert.  Monotherapy refers to the use of the drug by itself;

first-line therapy means the use of the drug as the first course of treatment before trying

alternatives.  Although physicians and other providers may lawfully prescribe a drug for uses

other than that indicated in the approved package insert, pharmaceutical companies are not

legally permitted to market drugs for these purposes.

160.    A March 2010 "training communication" email sent nationwide by Novo

Nordisk's marketing department discussed the indication for Victoza, but repeatedly stated that

the drug could be used "first-line at the discretion of the Healthcare Professional."

161.    In August and September 2010, Novo Nordisk released two sales aids promoting

Victoza as monotherapy and emphasizing the benefits of it as a first-line treatment.  One sales

aid stated: "Victoza provided powerful reductions in A1c as monotherapy and in combination

with metformin."  The graphic shows arrows pointing down with a 1.1% reduction in A1c with

monotherapy and a 1.0% with combination therapy. The data displayed in this way suggests that

patients would have better results on monotherapy than they would on combination therapy,

leading physicians to think that Victoza should be used as first-line therapy, instead of trying

combination therapy first.  This assertion is also misleading because the data referenced came

from two separate studies with different patient populations.  The sales aid further reinforces this

idea by claiming that "Victoza monotherapy significantly reduced A1c in a subgroup of patients

who were previously treated with diet and exercise."  The accompanying graphic shows a larger

reduction in the first-line therapy patients than with the patients previously treated with oral

medication.  If patients were only counseled on diet and exercise and not treated with other

medication prior to starting Victoza, that would be off-label first-line use.

162.    The Novo September 2010 sales aid, "Dig into the data," presented data from the LEAD-3 trial that used Victoza as monotherapy.  Many patients in this trial were "drug naïve" and had only been treated with diet and exercise when they began treatment of Victoza, meaning that Victoza was being used as first-line therapy in this study.

163.    The slides used in the 2010 Fall Teleconference Series used data from the LEAD-3 trial to promote Victoza as first-line therapy.  For instance, the slides accompanying the presentation "The Importance of GLP-1 in Treating Type 2 Diabetes, The Short Story:  Treat Effectively Now," use data from the LEAD-3 trial which compares Victoza monotherapy with a sulfonylurea drug.  Slides from this presentation note that the patients taking Victoza monotherapy were "drug naïve," meaning that they had not taken other diabetes medication previously and thus Victoza was being used as first-line therapy in these patients.  Another slide states that "Liraglutide can be effectively used as monotherapy as well as combination therapy" and shows Victoza monotherapy as a treatment option after diet and exercise.

164.    One of the main studies used to market Victoza for monotherapy, the LEAD-3 trial, had a patient population that significantly differed from the populations in the other LEAD trials.  The LEAD-3 trial participants were younger, had been diagnosed with Type 2 diabetes for the shortest length of time, and had the lowest fasting plasma glucose (a common measure of blood glucose) levels.  These measures mean that the disease had not progressed in LEAD-3 participants to the same level that it had for those in the other LEAD studies.

### 7.    Misuse of Clinical Trial Information to Promote Off-Label Uses

165.    Novo Nordisk encouraged its sales representatives to disseminate information on ongoing clinical trials to physicians, including trials for indications or conditions that were not part of Victoza's approved indication.  Ongoing trials in 2010 included trials regarding

cardiovascular health, obesity, combination Victoza and insulin therapy, and patients with renal insufficiency. Sales representatives were instructed to tell physicians that these trials were being conducted in order to make physicians more comfortable with prescribing Victoza for these off-label situations. Novo Nordisk distributed news about ongoing clinical trials to its sales representatives through an intranet site and a portal for institutional representatives on the main Novo website. Managers encouraged representatives to be knowledgeable about current clinical trials. Ongoing clinical trials were discussed at the national Plan of Action (POA) sales meetings.

### B. Degludec

166. Novo Nordisk engaged in the unlawful pre-approval marketing of Degludec, a long-acting insulin developed by Novo, before its approval by the Food and Drug Administration. Novo's practice of pre-approval marketing and using medical science liaisons to disseminate marketing information about Degludec was similar to Novo's earlier pre-approval marketing of Victoza, described *supra*.

167. Degludec is an ultra-long acting insulin analog developed by Novo Nordisk and intended to be marketed under the brand name Tresiba. Novo Nordisk has filed a New Drug Application for Degludec, but the application remains under review by the FDA and it has not yet been approved. Novo told its sales force in 2010 that it had expected to seek an indication for Victoza and Degludec together and market them jointly, but could not due to delays in the FDA Degludec approval process. Novo management informed its sales force, including Relator Kelling, that Novo expected Degludec to be a "game changer" and that the company would expand its sales force and shift its marketing efforts to long-term care to capitalize on the new drug.

168.     Similar to its unlawful pre-approval marketing for Victoza, Novo began unlawfully marketing Degludec through its Medical Science Liaisons (MSLs).  MSLs disseminated information regarding Degludec clinical trials, mechanism of action, advantages, side effects, and marketing messages.  Novo told its MSLs to disseminate this information to physicians identified as "key opinion leaders."  Key opinion leaders are physicians who are expected to influence their colleagues or expected to write a large number of prescriptions for the drug.  Novo's dissemination of information before Degludec's approval was intended to "create a buzz" for the drug before the FDA's final approval.

169.     Novo physician advisory boards were utilized to engage in unlawful pre-approval Degludec marketing.  Advisory boards are physicians identified by Novo as key opinion leaders or high volume prescribers.  During Novo's advisory board meetings, these physicians are presented with data from clinical trials for the drug, as well as marketing messages.  Physicians are ostensibly asked to evaluate the data and marketing messages as part of the advisory board, but the advisory board meetings serve as a way for Novo begin disseminating its marketing messages before the drug is officially approved.  Physicians are paid between $2,500 and $5,000 to be part of the advisory boards and receive compensation for travel and lodging in major cities or resort areas where the meetings are held.

170.     Novo engaged in unlawful Degludec pre-approval marketing at the 2012 American Diabetes Association Scientific Sessions.  The ADA Scientific Sessions are a nationwide meeting for the presentation of new research in diabetes. Pharmaceutical company representatives attend the Scientific Sessions to promote drugs and devices.  After the 2012 Scientific Sessions, Relator Kelling heard a presentation from a Cleveland Clinic endocrinologist that included detailed information regarding Degludec, including marketing messages that Novo

was promoting, as well as information that was not strictly related to research studies conducted

on the drug, such as Degludec's anticipated market position.  For example, the physician

repeated Novo's marketing message that Degludec would only have to be injected once every

three days.  This information could have only come from Novo, because the studies submitted to

the FDA for Degludec were based on once-daily dosing, although Novo planned to market the

drug for use once every three days.  The endocrinologist admitted speaking to Novo

representatives regarding Degludec at the Scientific Sessions.

171.    Novo engaged in unlawful pre-approval marketing for Degludec and Victoza in

combination.  In marketing Degludec for use in conjunction with Victoza, Novo falsely

marketed both drugs for weight loss or "less weight gain."  Neither drug has been approved by

the FDA for use in combination with the other for any purpose.

### C.    Levemir

172.    Novo Nordisk promoted Levemir, its brand of long-acting insulin, contrary to its

FDA indications, by promoting it for its alleged "weight benefit" and by making unsupported

and unapproved claims of superior kidney safety and superior breast and prostate cancer safety.

Novo directed its sales force to make unsubstantiated claims that Levemir was more effective

than competitor products, including in some instances "human" or non-analog insulin, at

lowering A1c levels, reducing the incidence of hypoglycemia, maintaining less variable blood

sugar levels, and promoting less weight gain.

### 1.    Off-Label and False Marketing of Levemir for Weight Benefit

173.    Levemir does not have an FDA-approved indication for weight loss.  Novo

Nordisk promoted Levemir for its "weight benefit," even though the FDA-approved package

insert does not indicate such a benefit and the studies submitted for Levemir's approval do not support the claims that the drug inhibits weight gain or promotes weight loss.

174.    It is common for patients to gain weight when they initiate insulin therapy.  The studies referenced on the FDA-approved prescribing information for Levemir show a difference in weight gain of less than two pounds between Levemir and NPH insulin, a non-analog form of insulin.  The package insert states that "The clinical significance of the observed differences has not been established."  No studies referenced in the package insert compare Levemir with its direct insulin analog competitor, Lantus (also known by the generic name of insulin glargine) with respect to weight.

175.    Despite the fact that the prescribing information for Levemir did not support its alleged "weight benefit," Novo Nordisk actively promoted this benefit in comparison to Lantus and non-analog NPH insulin in sales materials and through speaker presentations.  In promoting the alleged "weight benefit" of Levemir, Novo Nordisk used data from observational studies which have several weaknesses in generalizing results to the population at large.  In sales materials, Novo referenced weight results from a study and presented the weight gain differences between Levemir and Lantus (non-analog NPH insulin) of less than two pounds as a percentage, rather than in pounds or fractions of pounds, to make the difference seem more significant.  A training piece instructed sales representatives to communicate "that Levemir has a 26% difference in weight gain in comparison to glargine."

176.    As directed by Novo Nordisk management, sales representatives promoted Levemir as superior to its competitors based on the "weight benefit" and targeted doctors based on this sales message.  In a July 2, 2009 email, Novo Nordisk sales representatives discussed a

physician who had recently joined the practice at a bariatric clinic and noted that "He prescribes Levemir due to the weight benefit."

177.   A sales aid produced in February 2008 featured a large scale on the front cover and said "Weight gain is often a major concern for patients and physicians when initiating insulin therapy."  The publication went on to highlight that "Levemir demonstrated significantly less weight gain than insulin glargine" and describe the drug's "real-world weight benefits."  The sales aid also claimed that Levemir's weight benefit was more pronounced for overweight or obese patients, stating that "the weight benefits of Levemir increased as baseline BMI [body-mass index] increased."

178.   In February 2010, a company-produced sales aid advertised "the proven weight benefits of Levemir" and claimed that:

> Levemir demonstrated significantly less weight gain when compared with insulin glargine [a competitor's product].

Sales representatives promoted Levemir on this basis, despite the company's own acknowledgment that:

> The clinical significance of the observed differences in weight has not been established . . .
>
>                * * * *
>
> [T]rials were not blinded and the protocols . . . were not specifically directed at exploring hypotheses related to weight effects of the treatments compared.

179.   Company managers presented market research in sales meetings showing the effects of Novo Nordisk's weight messaging about Levemir.  The market research revealed that the number one message that doctors associated with Levemir was "less weight gain compared with Lantus."

180.    As of late 2014, Novo was still marketing Levemir for weight loss and its alleged "weight benefit" and instructing its sales representatives to promote Levemir to physicians based on these reasons.

### 2.    Off-Label and False Marketing of Levemir for Allegedly Superior Cancer Safety

181.    Novo Nordisk promoted Levemir as being superior to its competitor, Lantus, because the drug's structure had a lower affinity for IGF receptors.  This conclusion was speculation resulting from a European meta-analysis that reviewed multiple studies and showed that patients taking Lantus, a competitor's product, had a higher rate of breast and prostate cancers.  Levemir was *not* reviewed in this meta-analysis and, thus, no accurate comparison actually could have been made.

182.    On June 26, 2009 the European medical journal *Diabetologia* published a series of articles (Hemkens et al., Currie et al., Scottish Diabetes Research Network, and Jonasson, et al.) showing an increased risk of breast cancer and prostate cancer in patients taking Lantus, a long-acting insulin manufactured by Sanofi-Aventis and a competitor of Levemir.  The research hypothesized that the increased cancer risk was due to Lantus's affinity to IGF receptors.  IGF receptors are areas on cells in the body where hormones produced in the body, known as insulin-like growth factors, can bond with the cell.  The study authors hypothesized that increased levels of IGF receptivity may lead to an increase in cancer and that other chemicals that have an affinity to these IGF receptors may also be implicated.

183.    Following the June 26, 2009 publication of the *Diabetologia* meta-analysis study about Lantus' possible relationship to increased breast cancer and prostate cancer risks, the American Diabetes Association and the American Cancer Society released joint statements cautioning patients not to discontinue insulin based on the study.  The organizations concluded

in a press release that "Cancer risk should not be a major factor when choosing between available diabetes therapies for the average patient." The U.S. Food and Drug Administration issued a communication about the safety of Lantus on July 1, 2009. The FDA recommended that "patients should not stop taking their insulin therapy without consulting a physician" and pointed out several shortcomings of the studies used in the meta-analysis.

184. Despite the American Diabetes Association, American Cancer Society, and FDA cautions against discontinuing insulin, which included Lantus, Novo Nordisk began promoting Levemir as a safer alternative to Lantus, beginning with a press release on June 28, 2009, "Novo Nordisk Insulin Analogs Have Proven Safety Profiles," which discussed Levemir's chemical structure, in addition to its other analog insulin products, Novolog and Novo Mix / Novolog Mix 70/30. The company instructed its sales representatives to "proactively" distribute copies of the press release and sales aids referencing the meta-analysis findings to market Levemir as a safer alternative to Lantus, despite the fact that no research study had compared the two drugs head-to-head. Novo's goal was to capitalize on physicians' fears about potential malpractice liability if they continued to prescribe a drug linked to potential increased cancer risks. Novo sales representatives distributed the press release until July 3, 2009.

185. Novo instructed Relator Ferrara and other specialty sales representatives to deviate from their normal schedule of sales calls to present the cancer study information to all endocrinologists in their assigned territories within 1 to 2 weeks of its release. Novo gave managers a checklist to track sales representatives' progress in disseminating the information to physicians. Many of Relator Ferrara's physician contacts reported hearing of the cancer study for the first time from her or another Novo sales representative.

61

186.   Novo's strategy was to make physicians and patients fear that by continuing with Lantus patients would be at risk of cancer, and by encouraging fears among physicians that they could be held liable if a patient remained on Lantus and eventually developed cancer. Relator Ferrara's supervisors, Rod Schley, told physicians that, had it not been for the media coverage of Michael Jackson's death that same week, the media coverage of the Lantus Study would have been greater and there would be more patients demanding to be switched from Lantus. Novo proceeded with this marketing strategy despite warnings from the American Diabetes Association and other professional organizations advising patients not to discontinue their insulin use on the basis of the study.

187.   The company held a mandatory web conference following the publication of the ADA-ACS consensus statement "to review the publication and the position of Novo Nordisk on the material in the publication." Novo sent a temporary sales aid regarding Levemir and IGF affinity the same day. Sales representatives were instructed to make their own copies of the temporary sales aid and distribute them. This sales aid featured Novo short-acting insulin, Novolog, and Novolog Mix, even though these insulins were not the subject of the study. At the time, Humalog, a short-acting insulin made by Lilly was the market leader and a direct competitor to Novolog. Humalog 75/25 was a direct competitor to Novolog 70/30. The company distributed a script to help sales representatives respond to questions raised by the meta-analysis. The script instructed representatives to say that "patients with diabetes who were treated with Levemir showed no evidence for increased incidence of cancer diagnosis compared to NPH insulin." Novo did not instruct its sales representatives to mention that organizations like the American Association of Clinical Endocrinologists and the American Diabetes Association did not recommend that patients discontinue Lantus. Novo Nordisk management

62

held daily conference calls to get feedback from the field about the company's cancer safety messaging.  The company later reported an increase in sales due to the cancer safety messaging at its Plan of Action sales meeting held in Philadelphia in October 2009.

188.    In July 2009, Novo introduced several training documents instructing sales representatives on how to present to physicians the information regarding Levemir, IGF affinity, and cancer.  The training documents provided suggested wording if a physician asked about switching a patient from Lantus to Levemir.  Although the training document stated that sales representatives "should not be proactively asking physicians to switch patients from existing basal insulin therapy to Levemir," Novo's training department and managers reinforced the goal of obtaining "active switches" which are decisions to change a patient from an established basal insulin, on which the patient was doing well, to Levemir.  The training documents contained information about how to submit an EPIR (electronic pharmaceutical information request) to allow a physician to receive more information from Novo about the IGF affinity of its insulins.

189.    Novo Nordisk created a series of sales aids based on the cancer-safety sales message.  Sales representatives were instructed to distribute these sales aids through July 2010.

190.    Novo Nordisk's sales aids acknowledged the weakness of using the *Diabetologia* studies to promote Levemir for allegedly superior cancer safety.  One sales aid, released in October 2009, notes that "Cancer incidence was not a predefined endpoint of the individual trials" that were included in the meta-analysis.  It also cautioned that "Meta-analyses may produce a stronger conclusion than can be provided by any individual study."  An internal Novo Nordisk training communication also acknowledged that a separate study commissioned by Novo "ha[d] fairly few cases . . . comparing [Levemir] to glargine [Lantus], so even though we can see differences, those differences cannot reach statistical significance in this study."

63

### 3. Off-Label and False Marketing of Levemir for Allegedly Superior Renal Safety

191.    Beginning around January 2009, Novo Nordisk instructed its sales representatives to start calling on nephrologists, who specialize in treating kidney diseases, to promote Levemir as safer for patients with end-stage renal disease.  Novo Nordisk told sales representatives to promote Levemir on this basis despite the lack of evidence to support this claim.  In an email sent February 26, 2010, Shereen Gerrasch, Institutional Diabetes Business Manager and the direct supervisor of Relator Kelling, mentioned an "opportunity to pursue prescribers/advocates in Cardiology and Cardio Thoracic surgery . . . leading to Nephrology" as areas with "possible Victoza and Insulin interest."  The plan was to market Levemir to these physicians and later introduce them to Victoza.

192.    Kidney disease is common in patients with diabetes. As kidney function declines, patients may excrete excess protein, called albumin, in their urine.  In a healthy patient, albumin would remain in the blood after the kidneys filter wastes from the bloodstream.  Novo Nordisk instructed its sales representatives to promote Levemir to nephrologists as superior to other insulins due to its albumin binding aspects.

193.    Novo sales representatives were told to promote Levemir based on the phrasing of the package insert/prescriber information, which says that "[i]ndividuals with renal impairment showed no difference in pharmacokinetic parameters as compared to healthy volunteers," a statement that is not part of the package insert of competitors' products. However, the statement in the package insert is followed by the recommendation that "careful glucose monitoring and dose adjustments of insulin, including Levemir, may be necessary in patients with renal dysfunction."  The "precautions" section of the Levemir package insert also displays dose adjustment for renal impairment.  Knowing that the package insert had similar

recommendations for all insulins regarding renal impairment, Relator Kelling asked Novo

managers and a medical science liaison if a head-to-head study supported these superior safety

claims, i.e. one involving patients with end-stage renal disease.  She was told that there was no

such safety study that directly compared Levemir with a competitor.

194.     A Novo Institutional Diabetes Care Specialist in the Toledo area, later promoted

to sales manager, was able to get Levemir added to hospital formularies in 2009 by promoting

Levemir's alleged renal safety.  He asked a nephrologist to write a letter in support of Levemir

because it could be used in patients with end stage renal disease.  Due to this success, other sales

representatives throughout Novo's 17-state East Area were instructed to market to other

specialists who did not specifically treat diabetes to increase Levemir's market share.

### 4.     Off-Label and False Marketing of Levemir for Patient Self-Dosing

195.     Novo Nordisk promoted sales of Levemir by marketing "self-titration," a self-

dosing algorithm that assists patients in setting their own insulin dose.  Novo's self-dosing

marketing is in contradiction to the FDA-approved prescribing information for Levemir, which

states that "[t]he dosage of Levemir should be individualized based on the physician's advice, in

accordance with the needs of the patient."  In promoting Levemir, Novo Nordisk instructed sales

representatives to use a research study that involved patients starting insulin who self-adjusted

their dosage.  Although most patients with diabetes are instructed to do frequent blood sugar

checks and self-administer corrective medication when their blood sugar becomes too high or

too low, the daily dose of long-acting insulin is typically set by a physician.  Patients who

incorrectly self-dose risk complications from either hyperglycemia (high blood sugar) or

hypoglycemia (low blood sugar).

196.    Novo Nordisk marketed the self-dosing algorithm as a way to make physicians more comfortable prescribing insulin, particularly primary care physicians who were less likely to prescribe insulin due to the complicated and time-consuming process for dosing and titration. To counter this objection, Novo Nordisk sales representatives provided physicians and support staff with "tear-off pads" of the Novo self-titration algorithm, designed to be sent home with patients to assist them in titrating their own dose without the physician present. The suggested algorithm was sold as "insulin dosing made easy" and a way for doctors to "empower your patients."

197.    The self-dosing algorithm had the benefit of retaining prescriptions for patients who did not achieve their goals with the starting dose of Levemir. If a Levemir dose is set by the physician and the patient's blood glucose was not lowered effectively, Novo risked the potential that the physician would view Levemir as ineffective and switch the patient to Lantus. If patients adjust their own doses, however, the physician may not know that the patients are using more Levemir units to achieve blood glucose control and the physician would be less likely to switch  patients from Levemir. Physicians were more likely to change patients' prescriptions when they did not achieve their blood glucose goals on Levemir because of a perception that Levemir was less potent than Lantus. A significant, common, and recurring complaint about Levemir reported by physicians was that patients needed 20-30% more Levemir to achieve the same glucose control effect as Lantus.

198.    Relator Ferrara found that physicians she met with commonly raised the objection that patients needed a higher dose of Levemir to achieve the same effect as Lantus. Many considered Novo Nordisk's sales message that the dosage was equivalent and any issues could be resolved by self-dosing to be misleading. Relator Ferrara reported this objection to her manager

and this fact was well-known within the company.  In sales meetings and conference calls in

which Relator Ferrara participated, sales representatives and managers  discussed this common

problem and ways of handling it.

> **5.     Off-Label and False Marketing of Levemir for Superior Efficacy and Less Hypoglycemia**

199.     Novo Nordisk promoted Levemir as superior to its competitors in maintaining

glycemic control, that is, consistency in lowering blood glucose, but not so low as to result in

hypoglycemia.

200.     Hypoglycemia represents a serious danger to patients taking insulin and severe

cases may result in unconsciousness or seizures if severe.  The risk of hypoglycemia is a serious

concern for both patients and physicians when beginning insulin therapy.

201.     Novo Nordisk claimed that patients who switched from NPH insulin or Lantus

would experience better glycemic control with less hypoglycemia, despite clinical evidence that

did not support this claim or that was inconclusive.  Novo Nordisk's claims about superior

efficacy were made even though the studies referenced in the package insert did not show

Levemir to be superior to its competitors.

202.     A principal study used to promote Levemir was the PREDICTIVE Study by Dr.

Meneghini *et al.*  Figures from the PREDICTIVE Study were used in sales aids targeted to

physicians and in training and conferences for sales representatives.  Novo Nordisk created an

"annotated reprint" of the Meneghini Study, highlighting section  for sales representatives to use

in sales detailing with prescribers and explaining how to link the study to the company's

marketing messages and address potential objections.

203.     Novo Nordisk's relationship with Dr. Meneghini went beyond simply using his

article for marketing purposes.  Phase 2 training for new Novo Nordisk sales representatives was

conducted at Dr. Meneghini's Miami, Florida laboratory and hospital where he works.  Dr. Meneghini and his staff also conducted training sessions for Novo Nordisk sales representatives as part of Phase 2 training.

204.    The Meneghini PREDICTIVE Study was not a randomized, controlled clinical trial.  Instead, it was an observational study, in which the patients are not randomly assigned to treatment or control groups.  Lack of randomization is a weakness because of the potential to introduce bias.  Novo instructed sales representatives to minimize this weakness in a sales training document: "the observational nature of PREDICTIVE adds to its credibility.  By conducting a study in a real world setting, the results will likely be similar to what can be achieved in clinical practice.  This is not always the case with a controlled clinical trial."

205.    In Novo sales training, page 423 of the Meneghini PREDICTIVE Study was referred to as the "money page" because it contained conclusions about efficacy at lowering blood glucose, hypoglycemia, and weight.  Novo sales trainers taught Relator Ferrara to use the figures to show that patients would experience further lowering of blood glucose levels after switching to Levemir and fewer hypoglycemic events.

206.    Novo used data from the "money page" of the Meneghini Study in Levemir marketing materials.  In marketing materials, this data was illustrated with a downward arrow and the words "-2 lbs.," indicating that patients taking Levemir lost weight after switching from other long-acting insulins.  If physicians objected to a loss of 2 pounds as being insignificant, sales representatives were directed to tell physicians that the study was only 12 weeks long and if patients lost 2 pounds in 12 weeks, the weight loss would be even more significant for patients who were on Levemir for over a year. There was no basis for this weight claim.

207.    At the national sales Plan of Action meeting in October 2009, Novo Nordisk released another study from a subgroup of the PREDICTIVE trial, by Yenigun and colleagues. The Yenigun Subgroup Study followed a cohort of patients with Type 1 and Type 2 diabetes who switched from Lantus to Levemir.  The Study reported that patients had better glycemic control with fewer hypoglycemic incidents and less weight gain after switching.  Novo Nordisk's claims that Levemir was superior were misleading because the Yenigun Study was an observational study, not a randomized controlled trial, and it involved switching from one insulin to another, not comparing the two products comparatively, in what is called a "head-to-head" study.

208.    The Yenigun Study was distributed with a warning that "This material contains off-label clinical information about an approved product or device."  Despite this warning, Novo Nordisk instructed sales representatives at the 2009 Plan of Action meeting to use the results of this study to promote Levemir as having superior efficacy and reduced hypoglycemia compared with its competitors.

209.    A sales aid targeted to physicians also made misleading statements regarding Levemir's decrease in hypoglycemia.  The Yenigun Study found that patients taking Levemir reported 1.3 fewer major hypoglycemic events in the 14 week study period.  In the sales aid, however, this figure was stated as a percentage, resulting in a 51% reduction, leading readers to believe that the decrease was far more significant than it was.

### 6.    Off-Label and False Marketing of Levemir for Lower Within-Subject Variability

210.    Novo Nordisk made false and misleading claims that Levemir had lower within-subject variability, that is, that Levemir resulted in less variation in blood sugar levels within a single patient compared with Lantus or NPH insulin.  Novo claimed that the lower

within-subject variability of Levemir was due to its unique "mechanism of action," an unproven

theory that was not supported by the package insert.

211.    Novo Nordisk marketed Levemir for lower within-subject variability by using a

study conducted by Heise et al., "Towards Peakless, Reproducible and Long-Acting Insulins. An

Assessment of the Basal Analogues Based on Isoglycaemic Clamp Studies," in the journal

*Diabetes, Obesity and Metabolism*.  This study was a "clamp study," measuring an insulin

injection's effect  over time.  In a clamp study, patients administer a continuous infusion of

glucose to maintain a steady level of blood glucose.  The amount of insulin required is a measure

of the insulin's effect in the body.

212.    Novo trained sales representatives to use the Heise Study in training documents,

including using an annotated reprint of the study.  Novo reproduced graphs from the Heise Study

in promotional materials that were intended to be shown to or left with physicians.  Novo sales

representatives were told to use these graphs to show the lower within-subject variability from

the Heise Study and then claim that "[t]he distinct pharmacodynamic effects of the MOA

[mechanism of action] may contribute to the low within-subject variability of Levemir."

213.    Because the Heise Clamp Study was conducted under clinical conditions different

from a patient's daily intake of food and use of insulin, its conclusions can not be generalized to

general patient experience.  Despite this limitation, Novo Nordisk instructed its sales

representatives to use the Heise Study as "clinical support for the Levemir consistency platform:

consistent insulin absorption and action.  For patients testing their blood glucose daily, those

taking Levemir will see similar results, day after day, whereas patients taking NPH insulin and

insulin glargine [Lantus] may see less predictable daily results."  Sales representatives were

instructed to use the Heise Study to promote Levemir for consistency, despite Novo's

acknowledgment in sales aids that used this data "that the clinical significance of this difference has not been established."

214.     Novo's message about lower within-subject variability also related to its other false claims regarding lower incidence of hypoglycemia and less weight gain in patients taking Levemir.  Sales representatives were trained to explain to physicians that because Levemir allegedly had less variability, patients experienced fewer "peaks and troughs" in blood glucose levels, resulting in less hypoglycemia and less need for patients to "rescue snack," or eat when their blood sugar was low and thus gain weight.

### 7.     Off-Label and False Marketing of Levemir Regarding Dose Frequency and Unit-for-Unit Dose Equivalency

215.     The FDA approved label indicates that Levemir dosing may be once daily (QD) or twice daily (BID).  The approved label for Lantus, Levemir's competitor, states that dosing is once daily.  Because of this difference in the drugs' labels, many physicians consider Lantus as having an advantage over Levemir because its dosing is exclusively once daily, and did not view the insulins as dose-for-dose equivalent on this basis.

216.     Novo Nordisk realized that the BID dosing on the Levemir label was a weakness and began marketing Levemir by claiming that the two insulins were the same in terms of dosing.  In a March 18, 2009 email, Novo's Cleveland, Ohio area District Manager for Specialties, Rodney Schley, sent a message to his sales team regarding  Levemir and Lantus dosing.  Novo Manager Schley stated in the email that "Levemir is as much a QD insulin as Lantus, and as much a BID as Lantus."  This statement contradicts the approved label information for both products. Mr. Schley's email was sent as a copy to several Novo Nordisk medical team and upper management members, who did not respond to or correct it.

217.    In the same March 18, 2009 email, District Manager Schley claimed that Lantus sales representatives were marketing the drug as a once-daily insulin and were lying by marketing it on this basis.  He encouraged the sales representatives whom he supervised to "counter-detail" on this issue by challenging the information that Sanofi-Aventis sales representatives had given physicians and encouraged sales representatives to practice this technique through "role playing."

218.    Novo managers distributed unapproved articles in order to make Levemir more competitive as a once-daily insulin as compared with Lantus.  In September 2008, Rodney Schley emailed an unapproved article by DeVries et al., "Refining Basal Insulin Therapy: What Have We Learned in the Age of Analogues?" reprinted from *Diabetes/Metabolism Research and Reviews* to the sales representatives he managed, along with a script on how to initiate a discussion with the physician about the article.  The DeVries article suggested that in Type 1 diabetes, both Lantus and Levemir "may not be able to provide QD 24 hour control."  The script suggested that the type of diabetes should determine the dosing, and not the approved information in the package insert.  Relator Ferrara received this email, objected to the dissemination of unapproved articles and off-label dosing as a sales message, and reported this marketing activity internally at Novo.

219.    The DeVries article was later approved by Novo for use in detailing.  However, Novo acknowledged that the article's conclusions  conflicted with the approved Levemir and Lantus labels. A Novo cover page for the article indicated that it "contains information regarding dosing that is not found in the product labeling for Levemir."  Training information for sales representatives on how to use the article also emphasized its off-label nature: "the article reviews

studies that use both Levemir and insulin glargine [Lantus] in manners that are inconsistent with their respective labels."

220.    Despite admissions by Novo that the DeVries article gives off-label dosing information, Novo Nordisk reproduced the article for distribution to physicians and created a training piece to train sales representatives on the article and respond to physician questions on off-label uses.

221.    Novo Nordisk used the sales training information from the DeVries article to respond to a common objection that sales representatives heard from physicians as to the dosage patients required to maintain glycemic control.  Physicians reported that patients needed 20 to 30% more units of Levemir to get the same effect as Lantus.

222.    Although Levemir's package insert described  as being unit-for-unit interchangeable with Lantus, Novo Nordisk never disclosed to the FDA that many health care providers found that patients needed more Levemir to get the same results as with Lantus.  Sales representatives were trained that if the company receives reports of the lack of efficacy of a drug, it is reportable to the FDA.  But, instead of reporting this reduced efficacy, Novo Nordisk engaged in marketing efforts to downplay it.

223.    Novo Nordisk instructed sales representatives to respond to health care provider concerns about the equivalency issue by using the DeVries Study.  Training materials instructed sales representatives to tell physicians that "All basal insulins usually require more units when they are dosed twice daily" and emphasize the DeVries finding that some patients may experience better blood glucose control on a twice daily insulin regimen.  Sales representatives were directed to tell physicians that although Lantus was only indicated for once-daily administration,  Levemir's label allowed for both once daily and twice daily dosing. This sales

73

strategy was misleading because it obscured the fact that Levemir was not unit-for-unit

equivalent to Lantus.  Novo Nordisk did not report this information to the FDA and, through its

marketing efforts, attempted to conceal this information from physicians as well.  Inaccurate

information about dosing is dangerous to patients because they could experience unexpected

high or low blood glucose and resulting complications.

224.    A Sandusky, Ohio diabetes educator explained the misleading nature of Novo

Nordisk's claims regarding Levemir dosing in an email to colleagues.  She relied on information

from Levemir's package insert that showed that in the starting Levemir dose, its duration of

action was closer to 12 hours, with most of the drug's effect taking place in the 3 to 4 hours after

injection.  The diabetes educator pointed out that Novo's promotional materials used graphs

showing duration of action that were based on a higher dosage of the drug, rather than a starting

dose.   By using the higher dose in the graphs, Novo implied that Levemir continued to act in the

body for up to 24 hours, despite statements to the contrary in its label.

**8.    Off-Label and False Marketing for Levemir as Superior to Human Insulin**

225.    Novo Nordisk promoted Levemir as an "upgrade" for patients using human

insulin.  Novo's marketing strategy was to seek patients taking cheaper human insulin and

encourage them to switch to more expensive analog forms, including Levemir, Novolog, and

Novolog Mix 70/30.  In promoting Levemir for patients taking human insulin, Novo Nordisk

made false claims that Levemir was more effective at lowering A1c levels and promoting less

weight gain in comparison with NPH, another longer-acting human insulin.  Novo sales

representatives were encouraged to promote Levemir as superior to NPH insulin (referred to as a

"human to analog switch").  Novo held contests to reward representatives who were able to

obtain the most "conversions" from NPH insulin to Levemir.

226.     Novo Nordisk focused its strategy to market Levemir as superior to human insulin on the long-term care market.  The long-term care market is valuable because if the institution changes the type of insulin it uses, it typically makes this change for all its patients.  Patients who are switched from one medication to another during a stay in a long-term care facility typically remain on the drug that they are switched to once they are discharged, making the long-term care market especially valuable.

227.     In 2012, Novo created a long-term care institutional sales force to work with long-term care facilities supplied by Omnicare, a long-term care pharmacy provider.  Novo instructed sales representatives to work with clinical pharmacists to encourage long-term care facilities to switch from human to analog insulin.  Because long-term care patients typically receive their medication at regularly scheduled times, they do not enjoy any increased health benefits associated with analog insulins such as Levemir. Levemir, however, is more expensive than human insulin.

228.     Novo Nordisk instructed its primary care sales representatives to target physicians who served as nursing home medical directors.  Novo instructed primary care sales representatives to promote Novo analog insulins for use in nursing homes based on Novo's false marketing that analog insulins were superior to human insulin for the nursing home population.

### 9.     Influencing the Ohio Medicaid Pharmacy &Therapeutics Committee Regarding Levemir

229.     Novo Nordisk attempted to influence the Ohio Medicaid Pharmacy and Therapeutics Committee to ensure formulary status was maintained for the drug.  On June 10, 2010, Relators' Regional Account Executive held a conference call with Ohio Valley area Novo sales representatives and called upon representatives to review a list of Ohio Medicaid Pharmacy and Therapeutics Committee members and plan how to contact and influence them.

230.    On June 24, 2010, Relator Kelling and an Ohio Novo Nordisk sales representative met with an internal medicine physician at Lutheran Hospital, associated with the Cleveland Clinic.  The Lutheran Hospital internal medicine physician was a former Novo Nordisk speaker and recently had been offered a lucrative opportunity to conduct research with Novo.  The Lutheran Hospital internal medicine physician served as a gateway to a psychiatrist at the Cleveland Clinic who served on the Ohio Medicaid Pharmacy and Therapeutics Committee, responsible for approving drugs for Ohio's Medicaid formulary.  The Lutheran Hospital internal medicine physician treated the Cleveland Clinic psychiatrist's patients admitted to Lutheran Hospital.  As directed by Novo managers, the two sales representatives asked the Lutheran Hospital internal medicine physician to email the Cleveland Clinic psychiatrist and explain his experiences with Levemir.  That same day Relator Kelling met with a Cleveland Clinic psychiatry department nurse manager.  As directed by Novo management, Relator Kelling asked the Cleveland Clinic nurse manager to provide some research studies related to Levemir to the psychiatrist.

231.    Novo's Regional Account Executive for government sales in Ohio, Michigan, and Indiana, thanked Relator Kelling and her sales representative colleague for "executing on the strategy we set for Ohio Medicaid" and "getting access to" the Lutheran Hospital internal medicine physician.  The Novo Medicaid email continued: "These kinds of collaborate [sic] efforts between MMS and Field Sales that result in access to Key Influencers is essential to NNI's success in the marketplace."

D.       **Novolog and Novolog Mix 70/30**

232.     Novolog is a rapid-acting analog insulin manufactured and sold by Novo Nordisk.

Novo Nordisk promoted Novolog as superior to human insulin for patients receiving insulin

intravenously.

1.       **Off-Label and False Marketing of Novolog for Superior Safety and Efficacy in IV Drip Administration**

233.     Insulin analogs like Novolog are copies of the human insulin molecule made

through genetic engineering techniques in which the chemical structure is altered to make it

either more rapidly absorbable by the body or to slow absorption.  Analog insulin is substantially

more expensive than "human" insulin.  Although analog insulins may offer benefits to patients,

particularly because they are altered to act more quickly or on a delayed basis, these timing

advantages are lost when the insulin is administered slowly via intravenous fluids, a method

known as "IV drip."

234.     Novo Nordisk falsely marketed Novolog as being superior to human insulin for

patients on IV drip, despite the knowledge that any rapid-acting benefits of the analog insulin are

lost through IV drip administration.  This meant that Novo patients needlessly received a high-

priced drug with specific absorption properties and benefits, but which special benefits were

non-existent when utilized with the IV-drip slow administration method.

235.     Novo Nordisk's sales aids used misleading images to promote Novolog.  Rapid-

acting insulin such as Novolog is often administered after meals.  In addition to insulin therapy,

patients with diabetes are instructed to eat a diet low in sugars and carbohydrates.  Sales aids for

Novolog, such as one entitled "Take on the mealtime challenge" featured on the front cover a

photo of a woman running up a giant stack of pancakes covered in maple syrup, wrongly

implying that, with Novolog, patients would not have to limit carbohydrate intake.

### 2. Off-Label and False Marketing of Novolog Mix 70/30 for Prevention of Cardiovascular Death

236.    Novo Nordisk marketed Novolog Mix 70/30 by claiming it reduced the risk of death from cardiovascular disease, even though there is no support for this claim in its label.

237.    Novolog Mix 70/30 is a pre-mixed insulin that contains 30% fast-acting insulin and 70% long-acting insulin.  The mixture is intended to control blood glucose levels both immediately after a meal and throughout the day.  The two different components are intended to reduce two important measures of blood glucose, postprandial glucose (PPG), or blood glucose levels following a meal, and fasting plasma glucose (FPG), a measure of the blood glucose after no food for 8 hours.  The short-acting component lowers PPG and the long-acting component lowers FPG.

238.    Novolog Mix 70/30 was primarily marketed for elderly patients, particularly those in nursing homes and hospitals, because it required administration 3 times a day with meals. Institutionalized elderly patients get regular meals and are in a setting where drug administration and, thus, compliance with such a strict treatment regimen can be maintained.

239.    In order to market Novolog Mix 70/30 to the institutionalized population, Novo Nordisk created a sales aid that showed an increased risk of death from cardiovascular disease with uncontrolled blood glucose levels, as evidenced by FPG levels.  Novo Nordisk sales representatives were instructed to promote Novolog Mix 70/30 as preventing death from heart disease by lowering FPG levels.

240.    Several Cleveland area endocrinologists  strongly objected to Novo's Novolog Mix 70/30 cardiovascular safety sales message as being highly inaccurate and misleading. With frail elderly patients, the risk of hypoglycemia is far more serious and far more likely than the risks associated with long-term elevated blood glucose levels.  Elevated blood glucose levels,

which would be treated with insulin or other drugs in younger patients, do not usually cause any decrease in the quality of a frail elderly patient's life.  Elevated blood glucose levels do not cause cardiovascular events in the short term. The evidence is limited as to the cardiovascular risks associated  with chronic diabetes disease where there have been many years of uncontrolled high levels of blood glucose. Higher than average fasting blood glucose levels are only weakly related to later development of heart attacks or strokes. Thus, elevated glucose levels for a relatively short period of time would not adversely affect a frail elderly patient's  health until years later, that is, well after they had passed away from other causes.

241.    Administration of insulin to control blood sugar levels leads to an increased risk of hypoglycemia, because the blood glucose levels may fall too low. This is particularly a problem with frail elderly patients who may not eat large amounts of food and whose blood sugar levels may be somewhat erratic. Moderate hypoglycemia often makes people feel short-tempered, nervous, afraid, or confused and may blur vision. It can also cause patients to be unsteady, have trouble walking, or fall. Falls create serious risks of broken hips and other bones in older patients, which are very serious injuries for frail elderly patients and could cause their ultimate death. Severe hypoglycemia can cause the patient to become unconscious, have seizures, become comatose, or even die. Despite these objections and the impact that insulin administration could have on elderly patients' quality of life and cognition, Novo Nordisk continued to market Novolog Mix 70/30 for use in elderly patients, with the sales message that its use would prevent death from cardiovascular disease.

242.    Concerned that an absence of insulin might cause a heart attack or stroke, a false concern raised by the Novo marketing, primary care physicians not well-versed in the complexities of endocrinology and diabetes, would frequently initiate insulin therapy in frail

elderly patients not otherwise requiring it and exposing these patients needlessly to the risks presented with hypoglycemia.

### 3. Off-Label and False Marketing of Novolog and Levemir "Basal-Bolus" Administration in Long-Term Care Facilities

243.   Novo discontinued its strategy of promoting Novolog 70/30 in long-term care facilities in early 2014 and instead began promoting the use of Novolog and Levemir pens in "basal-bolus" therapy for long-term care patients.

244.   Basal-bolus describes a regimen of insulin administration where the patient receives two injections of long-acting basal insulin daily and receives a "bolus," or single dose of short-acting insulin administered at each meal.  By adding a bolus of short-acting insulin at mealtimes, a patient may be able to lower blood sugar and maintain tighter control.

245.   Patients on a basal-bolus regimen take up to five insulin injections per day.  The increased number of injections means that a patient on basal-bolus therapy receives more units of insulin per day.  By switching patients to basal-bolus therapy, Novo is able to increase its insulin sales.  Switching patients to the more profitable pens and the Novo needles the pens require also increases Novo's sales and profits.

246.   Novo promoted basal-bolus administration of Levemir and Novolog in long-term care facilities by claiming that it would lead to tighter control of blood sugar and reduce infections, complications, and rehospitalizations in frail elderly patients.

247.   Novo's promotion of basal-bolus insulin therapy in long-term care facilities was false and misleading because Novo minimized the serious risk of hypoglycemia and death from tighter control of blood sugar through basal-bolus administration.  With frail elderly patients, the risk of hypoglycemia is far more serious and far more likely than the risks associated with long-term elevated blood glucose levels. Elevated blood glucose levels, which would be treated with

insulin or other drugs in younger patients, do not usually cause any decrease in the quality of a frail elderly  patient's life.  Hypoglycemia increases the chance that a patient may become disoriented and suffer falls or broken bones, which lead to very serious complications and even death in frail elderly patients.

248.    By promoting Levemir and Novolog for basal-bolus administration in frail elderly patients, Novo minimized the risk of death associated with tighter control of blood sugar. Recent research, including the National Institutes of Health's ACCORD Study (Action to Control Cardiovascular Risk in Diabetes) found that seriously ill or elderly diabetic patients who controlled their blood sugar levels at low levels, levels that are similar to patients without diabetes, have an increased incidence of all-cause mortality.  *See* National Institutes of Health, National Heart, Lung, and Blood Institute, Questions and Answers: Action to Control Cardiovascular Risk in Diabetes (ACCORD) Study, March 15, 2010, http://www.nhlbi.nih.gov/health-pro/resources/heart/accord-trial/questions-answers.htm.

**E.    Illegal Kickbacks in Long-Term Care Sales**

249.    In order to increase the market share for its products in nursing home and long-term care facilities, Novo Nordisk engaged in a kickback scheme with long-term care pharmacy providers Omnicare and PharMerica that increased the price of drugs for patients.  Novo Nordisk instructed its sales representatives to use misleading cost models in promoting its drugs in long-term care facilities and hospitals and to encourage these facilities to submit false claims to Medicare by dividing packages of five insulin pens to share among multiple patients as a way of lowering cost.

### 1.    Omnicare/PharMerica Pharmacy Kickbacks

250.    Omnicare and PharMerica are two leading long-term care pharmacy providers that together account for approximately 60% of the long-term care pharmacy market.  Novo Nordisk began to focus on long-term care sales in 2009 and created a plan to give a rebate of between 5% and 10% to Omnicare and PharMerica if their sales of Novo Nordisk products reached a certain market share.  Novo carefully guarded the specific details on the rebates and market share to avoid broad disclosure of these price concessions.  Novo Nordisk sales representatives were told not to mention the scheme to their long-term care customers and were told not to discuss the rebates via email.

251.    A January 28, 2010 slide presentation by Novo managers Shereen Gerrasch and two other managers explained how long-term care facilities receive payment from Medicare Part A.  The facility receives a lump-sum payment per patient per day, part of which goes to pay for the drugs used for that patient.  Pharmacy providers such as Omnicare and PharMerica are typically paid on a per patient or percentage basis.  The slides said that the payment arrangement was "none of our business" and that "regardless of the arrangement, NNI provides value."  Sales representatives were instructed to use a cost model provided by the company with long-term care customers, but not to disclose the discounted pricing below official wholesale acquisition cost pricing and the rebates paid to pharmacy providers, as they were not passed on to the individual long-term care facilities.

252.    Novo Nordisk paid several hundred dollars in "display fees" to Omnicare for each display at various Omnicare "educational days."  Participating in these educational days gave Novo sales representatives access to Directors of Nursing and Medical Directors at long-term care facilities supplied by Omnicare.

## 2.    Misleading Pricing Scheme for Long Term Care Sales

253.    Novo Nordisk created a "cost model" for use by sales representatives calling on hospitals and long-term care facilities.  Institutional sales representatives were trained during a conference call in June 2008 and at later company-wide "Plan of Action" meetings.  The cost model gave an inaccurate picture of actual costs because it was based on practices forbidden by FDA regulations and state pharmacy codes, such as sharing insulin vials between patients and breaking up boxes of insulin pens to service multiple patients.

254.    Novo Nordisk institutional sales representatives were instructed to use the cost model during sales presentations at hospitals and long-term care facilities.  The model was presented to the Cleveland Clinic in January 2009 and University Hospital in Cleveland in November 2009.  This cost model was used by Novo sales representatives throughout the United States.

255.    Novo Nordisk instructed its sales representatives in early 2009 to promote insulin pens for use in long-term care facilities by splitting up prepackaged boxes of 5 insulin pens among different patients to reduce costs for the institution.

256.    Novo Nordisk used a study in April 2010 conducted in a chain of long-term care centers with Fundamental Clinical Consulting LLC to promote its insulin pens as appropriate and cost effective for use in long-term care facilities.  Novo Nordisk approached the long-term care chain to do a study about switching from insulin vials to pens and provided additional rebates to the long-term care chain for its participation in the study.  The study was later published in the *Annals of Long-Term Care* and copies of the study were reprinted for sales representatives to distribute to customers as "First Report: Changing Diabetes in Long-Term Care Facilities."

257.    The cost savings achieved by the long-term care chain were misleading and did not reflect the price that a new customer could receive because the long-term care chain received rebates and other cost advantages because of its participation in the study.  Novo Nordisk withdrew the misleading article as a sales aid.  A July 28, 2010 email instructed field sales representatives to stop using this sales aid.

**F.     Kickback Schemes Involving Physicians**

258.    Novo Nordisk engaged in several kickback schemes to promote its products at hospitals and health care institutions nationwide.  These schemes included hiring relatives of prominent physicians as sales representatives, as well as offering speaker positions and grant funding to physicians in exchange for prescribing Novo Nordisk drugs.

**1.     Sharukh Mehta and Dr. Adi Mehta**

259.    Dr. Adi Mehta is a well-known Cleveland Clinic endocrinologist.  His son, Sharukh Mehta, was a Novo Nordisk sales representative, covering the Columbus, Ohio and Zanesville, Ohio areas, located over 100 miles from Cleveland.  In April 2009, Dr. Mehta spoke at a Novo-sponsored meeting with Zanesville area physicians before Novo trained him as a speaker.  Dr. Mehta eventually was added to the speakers list and received up to $2500 for each talk or presentation he gave on Novo Nordisk's behalf.

260.    Sharukh Mehta was promoted to the position of Senior Endocrinology Diabetes Care Specialist in the Cleveland area in January 2010.  When his promotion was announced, Novo Nordisk hosted a party for all its Cleveland area sales representatives to celebrate at the Cleveland Marriott Downtown Club at Key Center, complete with speeches and a champagne toast.  No celebrations of the kind had previously been held for Cleveland area promotions.

261.    In his new position with Novo in Cleveland, Sharukh Mehta was responsible for calling on physicians at the Cleveland Clinic, where his father worked.  Sharukh Mehta, who lived with his father at the time, was in a position to benefit from prescriptions written by his own father, as well as his father's friends and colleagues.  After Victoza's release, Novo sales representatives received a $460 bonus for each Victoza prescription written.

262.    Sharukh Mehta was well-situated to promote his father as a speaker for Victoza and other drugs.  Company records show that in September 2010, Dr. Adi Mehta was approved to earn up to $56,300 as a Novo Nordisk speaker.  Relator Kelling reported her concerns to her direct supervisor, Shereen Gerrasch, and her regional manager, that Novo's arrangements with the Mehta family represented a conflict of interest and was otherwise inappropriate.

263.    Some Novo speaker programs for which Dr. Adi Mehta was compensated involved minimal duties.  For example, Sharukh Mehta set up a "Lunch and Learn" discussion for his father at a primary care office in January 2011.  The primary care sales representative warned Sharukh Mehta that this office was not appropriate for a lunch program because the doctors typically do not have much time during lunch.  Even though Dr. Mehta only spent approximately 15 minutes speaking with physicians, he was paid as if he had conducted a complete program.

### 2.    Novo Representative Williams and Dr. Williams

264.    The daughter of Dr. Williams was hired as a Diabetes Care Associate even though she had  no previous pharmaceutical sales experience.  Ms. Williams was promoted to a Diabetes Care Specialist in 2008.

265.    Ms. Williams's father, Dr.Williams, is an internal medicine physician at a large metropolitan medical center, but has no special medical credentials that would make him highly

appropriate as a paid speaker for Novo or other pharmaceutical companies.  Dr. Williams was

listed in the Novo Nordisk speakers bureau and was a high prescriber of Novo Nordisk products.

Novo's prescribing data about Dr. Williams showed that in September 2010 all of his long-

acting insulin prescriptions were for Levemir.  For about six months in 2010, Dr. Williams had 8

confirmed Victoza speaking engagements.

266.    Novo sales representatives discussed Ms. Williams' inexperience and

performance with managers, including Shereen Gerrasch.  Despite this, Ms. Williams was

retained because of her father's role as a Novo Nordisk speaker and high prescriber.

### 3.    Houston, Texas Sales Representative and Houston St. Luke's Episcopal Hospital Emergency Physician

267.    A Novo Nordisk Institutional Diabetes Care Specialist based in Houston, Texas is

married to an emergency room physician at St. Luke's Episcopal Hospital in Houston.

268.    At a Novo training with Relator Kelling in late August 2008, the Houston sales

representative said that she was hired because of her husband's influence with other physicians.

She claimed that she was able to obtain formulary status for Novo Nordisk drugs at Houston-

area hospitals due to her husband's connections.  She attributed her high sales performance to his

influence.

### 4.    Family: Cincinnati Sales Representative and Lancaster Surgeon

269.    A Novo Nordisk sales representative in the Cincinnati, Ohio, area has a brother

who is a surgeon in Lancaster, Ohio.  The Cincinnati sales representative used his familial

relationships to secure formulary status for Novo Nordisk diabetes drugs at the hospitals in the

Lancaster area even though Lancaster was not part of his sales territory.  He was able to gain

access to areas of hospitals that are off-limits to sales representatives in Cincinnati because his

father is a retired Cincinnati surgeon.

5.      **Distribution of Victoza Samples in Cleveland Clinic**

270.    In a team meeting on March 2, 2010, Sharukh Mehta told supervisor Shereen Gerrasch and sales representative Shelly Kelling that he shared a residence with his father, Dr. Adi Mehta.  According to Novo Nordisk policy, Sharukh Mehta was only allowed to store samples at his house if he did not distribute any samples to his father.  The Cleveland Clinic has an institutional policy banning the distribution of free pharmaceutical samples to doctors and patients and, thus, has no routine procedures in place to properly record the receipt and distribution of pharmaceutical samples as required by FDA law.

271.    To promote Victoza at the Cleveland Clinic, Sharukh Mehta devised a way to both evade Novo Nordisk and Cleveland Clinic policies and defy FDA law.  Sharukh Mehta had other physicians sign as receiving samples that would instead be delivered to his father and stored in a small refrigerator kept underneath the desk in Dr. Mehta's office.  The sample deliveries were entered into Novo Nordisk's "AdvantEDGE" computer system for tracking sales calls.  Physicians listed in Novo's computer records as signing for receipt of the samples confirmed that they were unaware of what was going on.  Relator Kelling reported this activity to her immediate supervisor, Shereen Gerrasch, and to one or more Cleveland Clinic personnel.

272.    Sharukh Mehta asked Relator Kelling to assist him in obtaining more samples to distribute throughout the Cleveland territory.  Because Institutional Disease Care Specialists such as Relator Kelling had the ability to issue sample orders, Sharukh Mehta asked Relator Kelling at a March 2, 2010 meeting to order the maximum quantity of Victoza samples and have his father sign for them.  Sharukh Mehta then planned to take the samples from his father and distribute them to other physicians at Cleveland Clinic and private practice physicians outside the Cleveland Clinic.  Relator Kelling refused.  This discussion took place in front of supervisor

Shereen Gerrasch, who did not report the occurrence nor inform Sharukh Mehta that these actions violated company policy.

### 6.    Use of Speakers Bureau to Increase Prescribing

273.    Novo used its speakers program to provide unlawful kickbacks to high-prescribing physicians.  Speakers were compensated up to $2500 per engagement, higher than typical speaker fees provided by other companies.

274.    In April 2009, Novo management created Metro Synergy meetings for 10 major cities in the continental United States that it considered to be "high potential," but were not meeting national market share goals.  The 10 Metro Synergy areas received unlimited money for speakers, donations, and event sponsorships to influence physicians to prescribe more Novo products.  Cleveland, Ohio was selected for Metro Synergy meetings.

275.    At Metro Synergy meetings, regional directors, district managers, and sales representatives from primary care, specialty, institutional, and managed market sales forces in the selected territories reviewed all speakers and "key opinion leaders" from that territory and their prescribing habits.  Representatives from Novo's medical affairs and managed care departments at the company's home office evaluated physician speakers at the Metro Synergy meetings, as did Novo's certified diabetes educators (CDEs).

276.    At a Cleveland, Ohio Metro Synergy meeting in April 2009, participants reviewed current and proposed speakers and "key opinion leaders" based on how capable each was of "moving the business" and whether they were high volume prescribers of all diabetes drugs, not just Novo products.  Novo evaluated speakers based not on how effective their presentations were to other physicians who attended the speaker programs, but by how much a particular speaker's own prescribing habits changed after being named a speaker and receiving

88

compensation.  In the Metro Synergy meetings, Novo focused on "loyalists," physicians who prescribed over 90% Novo products; "splitters," physicians who were currently prescribing between 30% and 60% market share for Novo drugs and needed to be "kept in the camp;" "high volume potentials," physicians who prescribed a lot of competing companies' diabetes drugs but who Novo believed could be "won over;" and "high influentials," physicians who were not necessarily high prescribers but were perceive as influential because they could influence the prescribing habits of residents and fellows or the decisions of formulary committees.  Novo perceived these physicians as likely to yield the largest increase in sales by offering them speaker programs, grants and other financial incentives.  Novo approached these physicians and asked them "What can we do for you?  What are your goals?" to find out what financial incentives would be most effective.

277.    At Metro Synergy meetings, Novo managers and sales representatives discussed selection of physicians for Novo's advisory boards and research grants.  In a Cleveland-area Metro Synergy meeting in January 2010, sales representatives and managers evaluated advisory board participants and research grant recipients to determine how this Novo compensation influenced physician prescribing.  Physicians who refused speaker programs or could not accept speaker programs were offered advisory boards opportunities and grants.  Those physicians who refused speaker programs either did not want to speak or were employed at institutions that had policies that did not allow them to accept speaker fees.  Novo used charitable donations and display fees at clinics and health fairs to influence physicians that declined speaker fees.

278.    The Cleveland Metro Synergy group had a goal of setting up 15 dinner meetings between Novo senior leadership and "key opinion leaders" and other influential physicians in the territories.  At these dinner meetings, Novo's Vice President of Sales asked influential

physicians what Novo could offer them, including paid speaking engagements, research grants, and program sponsorship.  At some dinner meetings with Cleveland Clinic physicians, Novo discussed donations and grants worth tens of thousands of dollars.

279.    In recruiting speakers to promote Victoza and other drugs in 2011, Novo Nordisk sales managers selected the speakers subject only to final approval by the Novo medical affairs department.  Speakers were considered primarily for their sales potential, as illustrated by an August 18, 2010 email from Novo Endocrinology Region Business Director David Fields: "Keep in mind that we must take a strategic approach on adding speakers.  Please consider whether the nominees impact a particular territory, the district, or the entire region."  An earlier August 16, 2010 email from this Novo Business Director to Regional Business Managers asked them to consider "what will be the impact to overall business if the speaker is not invited back and how will you manage it?"

280.    On August 16, 2010, Novo Associate Brand Director ("Market Shaping") Tim Schuh sent an email explaining the speaker nominations process, including a caution for Business Managers to "reach out 'off line' to their respective field forces to gain insights needed to align nominations to reflect the business needs across key customer groups."  Those email instructions noted that "Email communications about individual nominations are not appropriate.  Live discussions should be scheduled to reach alignment on nominations."  The following day, a Novo Regional Business Manager sent an email to the District Business Managers he supervised, emphasizing the influence of sales staff on speaker selection and the need to keep such discussions "off line."  That email said, "When I get his draft list, I will seek your input via live conversations and then provide any compelling feedback to Dave."

90

281.    Because Novo Nordisk hired speakers based on their past or potential prescribing of Novo drugs, several speakers lacked the usual criteria, such as extensive publications and research experience.  Some were not even endocrinologists, the specialists who usually treat diabetes, but primary care and internal medicine doctors.  One such example is Dr. Williams, who was approved to earn up to $108,850 speaking about Victoza and other Novo Nordisk drugs in 2010.  Dr. Williams was an internal medicine doctor who lacked the qualifications to speak as an expert due to his lack of a significant research background or specific expertise in endocrinology or diabetes.  In September 2010, Dr. Williams was Novo's highest prescribing physician for Levemir in the Novo territory where he lived.  He exclusively prescribed Levemir over all other long-acting insulin.  Because Dr. Williams was selected to be a speaker based on his prescribing volume of Novo Nordisk drugs, the speaker fees paid to him constituted an unlawful kickback.

282.    Novo's policy and practice continues to be to reward high-prescribing physicians and "thought leaders" with lucrative speaking engagements and travel.  As a result, many Novo frequent speakers prescribe Novo drugs exclusively and prescribe few, if any, competitor drugs.

### 7.    Use of Research Grants to Increase Prescribing

283.    Novo provided research grants to physicians as a means of increasing their prescription volume.  When Novo announced internally on August 18, 2010 that reduced funds would be available for 2011 speaker programs, Relators' Regional Business Manager suggested that more doctors could be involved in research.  His email stated: "With the current effort to REDUCE the number of speakers by ~30%, trust that we will have limited opportunity once given the opportunity to evaluate and perhaps add to the talent pool.  Instead of speakers, we will have to look to grant support, clinical trial participation, etc."

91

284.     One example of Novo Nordisk's strategy to use research grants to drive prescribing involved an internal medicine physician at a Cleveland-area private practice.  In an email dated May 6, 2009,  a Cleveland sales representative arranged a meeting between this Cleveland internist and a Novo Medical Science Liaison.  To emphasize the importance of obtaining a research grant for this Cleveland internist, she noted his high volume of Byetta prescriptions, a competitor of Victoza, and his influence within the community as  "one of the largest Byetta rxr's in Cleveland.  He is a driving force at St. Johns West Shore & Fairview Hospital...."  In a later email she again noted this Cleveland internist's high prescribing volume of competitor's products and the opportunity a research grant would represent to influence him, calling him

> the #1 Byetta Rx'r for Northern Ohio and a huge Lantus supporter,
> Novolog is #1 for him as well. . . . This opportunity would not only
> open the door for Novo with one important physician but possibly
> up to 80 physicians that would be updated with information in the
> Premier Physician Research site with ongoing clinical information
> & important future support for the association & our company.

The Cleveland internal medicine physician was added to the Novo Nordisk research database on July 30, 2010 and the company sent him a confirmation letter on August 16, 2010.

285.     Novo  company emails discuss research possibilities with an internal medicine physician at a large medical practice and a male Cleveland Clinic endocrinologist.  Both research inquiries were initiated by Novo sales representatives.

286.     Recent articles in the *British Medical Journal* criticized Novo's practice of using post-marketing observational clinical trials more for marketing purposes than to generate useful scientific data.  Edwin A.M. Gale, "Post-marketing Studies of New Insulins: Sales or Science," 344 *British Medical Journal* e3974 (June 12, 2012); John S. Yudkin, "Post-marketing Observational Trials and Catastrophic Health Expenditure," 344 *British Medical Journal* e3987

(June 12, 2012); Anonymous, "Post-marketing Observational Studies: My Experience in the

Drug Industry," 344 *British Medical Journal* e3990 (June 12, 2012).  Observational trials are not

randomized and do not separate patients into experimental and control groups, making it more

difficult to draw valid conclusions from the data.  Two of the three articles specifically

mentioned Novo's practices regarding observational trials.  The third article was written

anonymously and described the author's experience with the trials at an unnamed

pharmaceutical company.  Relators report that company practices in the anonymous article, such

as inviting influential physicians and "key opinion leaders" to receive high compensation for

recruiting study patients or serving on study advisory boards, were common at Novo.  The Gale

article notes that patients who are switched to a Novo drug as part of a clinical trial are likely to

remain on the drug after the study is completed, making clinical trials a valuable way for a

pharmaceutical company to convince patients to switch to the company's drug.

### 8. Use of Certified Diabetes Educators to Increase Prescribing

287.    Novo Nordisk provided Certified Diabetes Educators (CDEs) to work in

physicians' offices.  CDEs are health care professionals who instruct patients on self-care, such

as how to use diabetes medications and how to check their blood glucose levels.  CDEs are

valuable health care providers because patient education and compliance is very important in

managing diabetes and CDEs typically have more time available to spend with a patient than

does a physician in a high-volume primary care practice.  Providing diabetes education to

patients can be a significant expense for a medical practice and an expense that may not

otherwise be fully compensable under health insurance plans.

288.    Prior to 2011, Novo Nordisk provided Certified Diabetes Educators in doctors'

offices through a company called Practice Therapeutics.  Practice Therapeutics sent CDEs to

doctors' offices  to provide "teachable moments" to patients.  "Teachable moments" include

educating patients on how to use Novo Nordisk products such as Flexpens, education on

nutrition and diabetes, and explanation on how to use a carbohydrate counting book.  Any

educational interaction the CDE had with a patient or physician was counted as a "teachable

moment."

289.    The Practice Therapeutics website describes one of the company's goals as

"Enhanc[ing] the sales representatives' access to physicians and create a receptive audience for

their message."  In 2011, Novo Nordisk discontinued its relationship with Practice Therapeutics.

Novo then directly hired approximately 300 nurses, CDEs, and nutritionists as diabetes

educators and placed them within its marketing department.  The CDEs are supervised by

Novo's marketing management, not the Scientific Affairs Division management.  Novo's

diabetes educators receive a company car and a compensation plan similar to the Novo sales

force.  Diabetes educators working directly for Novo Nordisk receive generous compensation

and bonuses, based on the number of "teachable moments" they provide at doctors' offices.

290.    Novo diabetes educators were sent to physicians' offices based on the potential

for sales.  Physicians were selected if they were considered "high potential but limited access"

for sales representatives or because they were being rewarded with  a "value added" service for

physicians already prescribing a high rates  of Novo drugs.  The presence of the diabetes

educator provided an incentive for a doctor to either meet with a sales representative or prescribe

Novo Nordisk products.  For example, if a physician was hesitant to prescribe Flexpens because

there was not enough time to train patients on using the pen, the CDE would provide this training

to patients.

291.    Novo Nordisk used its staff of CDEs in physicians' offices to promote the use of Novo's more costly analog insulins (Levemir, Novolog, and Novolog Mix) for patients who were stable on human insulin.  Switching these stable patients provided little to no benefit for the patients and increased the expense for patients and for Federal and State health programs.

292.    Novo Nordisk used its staff of CDEs in physicians' offices to promote Victoza, particularly for weight loss for patients with or without diabetes.  Novo continued to use its CDE sales force to promote Victoza and other Novo drugs to patients and physicians within physicians' offices in 2013 and 2014 and thereafter.

293.    Novo's new dress code, instituted in the 2012 "Look Book," instructed sales representatives and CDEs to wear more casual clothes, such as khaki pants, polo shirts, and sweaters, and specifically instructs sales employees including CDEs, not to wear suits.  Novo sales staff, including CDEs, do not wear name tags that identify them as outside sales staff.  As a result, patients cannot readily distinguish between Novo sales staff and medical office staff.

294.    Novo CDEs have access to patient charts at many medical practices where they work.  Novo CDEs have access to employee-only areas at many medical practices and can sit in areas where practice employees, such as receptionists, normally sit.

295.    Novo Nordisk instructs its CDE sales force to identify patients who would benefit from Victoza in the primary care physicians' offices they visit.  Since the Victoza launch in 2010, CDEs are expected to identify overweight patients, with or without diabetes, as good candidates for Victoza based on Novo's weight loss marketing.  Novo CDEs recommend the use of Victoza and Levemir together for overweight patients with diabetes, based on Novo's false marketing of both drugs for weight loss or weight neutrality.

296.    Novo CDEs meet with patients individually in physicians' offices, as well as hosting "Diabetes Academy" sessions for groups of patients in a public meeting space.  These group sessions were advertised in doctors' office as a service provided for patients.

297.    By providing diabetes educators, through Practice Therapeutics and more directly as marketing employees, Novo Nordisk provided valuable services to physicians' offices to influence them to prescribe Novo Nordisk products. Relator Kelling spoke with a New York physician in a high-volume primary care office who said that the educational sessions from Novo CDEs encourage patients to remain at the practice and return for office visits.  Novo CDEs provide a valuable service that many practices did not otherwise provide.

298.    The presence of Novo CDEs was especially valuable for physicians treating New York State Medicaid patients.  Through its Quality Assurance Reporting Requirements (QARR), the New York State Medicaid program reviews certain health data measures for Medicaid participants, including HbA1c testing and control for diabetic patients.  Physicians participating in certain managed Medicaid plans are given a QARR "report card" comparing their patients' outcomes on health data measures with other physicians in the area or other physicians participating in the same Medicaid plan.  Participating physicians' report cards show their diabetic patients' HbA1c test results with those of other physicians.  Good results on report cards benefit physicians by allowing them to maintain their contract with a managed Medicaid plan and by allowing them to take on more Medicaid patients.  Many New York State Medicaid plans provide marketing services and small financial incentives to physicians who maintain good report card results.

299.    Many diabetes patients have difficulty controlling their blood sugar, but  may hesitate to begin injection drugs such as insulin or Victoza.  Because the Novo CDEs are

effective at convincing patients to initiate Victoza and Levemir treatment, the physician benefits

indirectly through improved "report card" figures and may receive financial or other incentives.

### 9. Use of Sales Representative to Submit Prior Authorizations

300.    In many private and public insurance plans, including Federal and State

government plans, Victoza is only available with prior authorization.  The prior authorization

requires a physician to certify that the patient needs a particular drug when a less expensive or

generic drug is available.  Many insurance plans require the completion of a form or other

administrative step before a patient can obtain authorization.

301.    Prior authorization takes valuable staff time to complete the form and

communicate with the insurance company.  Novo Nordisk sent sales representatives to complete

prior authorization forms and do related tasks for physicians whose patients required prior

authorization before receiving Victoza.  Novo provided administrative help at these practices at

no cost to the physicians to encourage physicians to prescribe Victoza.  Relator Kelling

witnessed Novo representatives completing prior authorization forms for Victoza in a New York

primary care practice  in early 2014.   At practices large enough to have a dedicated prior

authorization clerk, Novo sales representatives frequently brought in food and gift cards to the

clerk in charge of submitting prior authorizations to convince the clerk to prioritize submitting

Victoza prior authorization forms over those for competitors.

### 10. Other Kickback Schemes

302.    Novo Nordisk engaged in another kickback scheme to promote a business part-

owned by a physician in order to influence his prescribing habits. When the business first

opened, Novo Nordisk paid to hold a large citywide meeting at the business featuring a well-

known celebrity. Physicians' spouses and children attended and were photographed with the celebrity guest, a Novo speaker. Novo management knew of and approved these expenditures.

303.    Novo Nordisk sales representatives frequently ordered goods from a physician's business for certain events.  Some doctors insisted that goods come only from this business.  Novo Nordisk sales representatives complied with these demands. Novo management knew of and approved these expenditures.

304.    Novo Nordisk is a corporate sponsor of the Akron Marathon in Akron, Ohio.  Many Novo Nordisk employees volunteer at the marathon or participate as runners.  In 2010, Novo Nordisk paid the entry fee (approximately $100) for at least two physicians who were sales targets for Novo Nordisk products. Novo management knew of and approved these expenditures.

### G.    Submission of Fraudulent Prior Authorizations

305.    Express Scripts, the largest pharmacy benefit manager in the United States, announced in late 2013 that its 2014 formulary would no longer include Victoza and Levemir.  Express Scripts is the pharmacy benefit manager for TRICARE, the Department of Defense health plan for active-duty military personnel, dependents, and retirees.  Express Scripts is the pharmacy benefit manager for other Federal and State health plans, including a Medicare Part D prescription drug plan and teachers' and state employees' health plans in Georgia, Illinois, North Carolina, Ohio, and Texas.  Novo anticipated a decline in sales due to this decision and engaged in a scheme to submit fraudulent prior authorizations to Express Scripts prescription drug plans so that patients covered by these plans could continue to receive Victoza and Levemir.

306.    Removal of Victoza and Levemir from the Express Scripts formulary means that patients covered by Express Scripts prescription drug plans would have to personally pay for Victoza or Levemir.  The only exception is patients who cannot tolerate the covered drug or have

had an adverse reaction to it.  Those patients may receive a non-formulary drug if their physician completes a prior authorization form stating the reason why the patient cannot tolerate the formulary drug.

307.    To maintain sales volume, Novo sales representatives and certified diabetes educators (CDEs) visited physicians' offices and instructed staff on completion of prior authorization forms so that Express Scripts patients could continue on Victoza or Levemir.  For high-prescribing physicians, Novo sent sales representatives and CDEs to these offices to fill out the prior authorization forms themselves, relieving the physicians' offices of this paperwork. Novo employees provided copies of prior authorization forms for major insurance plans and examples of statements that were known to suffice for each plan.  Novo employees coached practice staff about how to fill out the prior authorization forms so they would be approved.

308.    Most prior authorizations that Novo caused to be submitted to Express Scripts stating that the patient could not take a competing drug and had to take Victoza or Levemir were false.  Novo's scheme to submit false prior authorization forms to Express Scripts pharmacy benefit plans, including Federal and State health plans, increased costs to these plans because the Novo drugs are more expensive than the Express Scripts formulary alternative drugs.

### H.    Dissemination of Unapproved Research Studies

309.    Novo Nordisk sales representatives held frequent phone conference calls known as "journal clubs" to discuss recent research studies related to diabetes.  Sales managers distributed copies of the articles and then managers and representatives discussed the article in a conference call.

310.    Emails announcing the journal clubs or distributing the articles often specified that the articles were not approved information or were not for distribution to physicians.

However, the expectation was clear that the sales representatives should use this information in sales promotion to physicians.  One email described the attached article as "Excellent information for you to understand and enrich your current value/talents!"

311.    Relator Kelling participated in many weekly journal club conference calls in which her supervisor, Shereen Gerrasch, asked sales representatives how they would use the information in the article or answer a doctor's question.  Gerrasch gave examples of how to use the information in a conversation with a physician and encouraged sales representatives to use the same "power verbiage."

312.    Novo sales representatives engaged in discussion of "pipeline" drugs not yet approved by the FDA.  On June 30, 2010, Relator Kelling and a Novo Medical Science Liaison met with a thyroid specialist at the Cleveland Clinic.  This Cleveland Clinic thyroid specialist told them that Sharukh Mehta was discussing Degludec, Novo's long-acting insulin that was still in the development process and not FDA-approved.  Relator Kelling reported this to her supervisor.  Another Cleveland Clinic endocrinologist similarly reported that Sharukh Mehta was promoting this unapproved drug.

313.    Cleveland area specialty District Manager Rod Schley often bragged about his collection of unapproved articles.  He required his sales team to read and review them on a regular basis and share "pearls" that they found from the materials that they could use in selling situations. On one such occasion, Relator Ferrara and her fellow specialty representatives in her District attended a Novo sales meeting in May 2009, called a "Mid-POA" meeting. Relator found that District Manager Rod Schley had posted all over the meeting room walls various unapproved journal articles related to Novo diabetes products and Novo competitor products. Throughout the May 2009 mid-POA meeting with the specialty sales force in the District, Mr.

Schley demonstrated to his sales team  how to incorporate these unapproved articles into sales calls with physicians.  Present during this instruction on off-label and unapproved articles was Novo upper management employee David Esposito, who is currently a Novo Regional Business Director.  A Novo Regional Support Manager at the time, now a Novo Senior Diabetes Care Specialist, was present at the meeting.  Mr. Esposito was so impressed by Manager Schley's "wall-papering" of unapproved articles that he took pictures to share the scheme with other sales force members as a Novo "best practice."

## VI.    CLAIMS FOR RELIEF

### COUNT I
### (False Claims Act - Presentation of False Claims)
### [31 U.S.C. § 3729(a)(1), 31 U.S.C. § 3729(a)(1)(A) as amended in 2009]

314.    The allegations of the preceding paragraphs are re-alleged as if fully set forth below.

315.    Through the acts described above, Novo Nordisk and its agents and employees knowingly presented and caused to be presented to an officer or employee of the United States Government a false and/or fraudulent claim for payment or approval in violation of 31 U.S.C. § 3729(a)(1), and, as amended 31 U.S.C. § 3729(a)(1)(A).

### COUNT II
### (False Claims Act - Making or Using False
### Record or Statement to Cause Claim to be Paid)
### [31 U.S.C. § 3729(a)(2), 31 U.S.C. § 3729(a)(1)(B) as amended in 2009]

316.    The allegations of the preceding paragraphs are re-alleged as if fully set forth below.

317.    Through the acts described above and otherwise, Novo Nordisk and its agents and employees knowingly made, used, and/or caused to be made or used false records and statements in violation of 3l U.S.C. §§ 3729(a)(2), and, as amended 31 U.S.C. § 3729(a)(1)(B) in order to get such false and fraudulent claims paid and approved by the United States Government.

## COUNT III
### (False Claims Act - Making or Using False Record or Statement to Conceal, Avoid and/or Decrease Obligation to Repay Money)
### [31 U.S.C. § 3729(a)(7), 31 U.S.C. § 3729(a)(1)(G) as amended in 2009]

318.    The allegations of the preceding paragraphs are re-alleged as if fully set forth below.

319.    Through the acts described above, in violation of 31 U.S.C. § 3729(a)(7) and as amended, 31 U.S.C. § 3729(a)(1)(G), Novo Nordisk and its agents and employees knowingly made, used, and caused to be made or used false records and statements to conceal, avoid, and/or decrease Novo Nordisk's obligation to repay money to the United States Government that Novo Nordisk improperly and/or fraudulently received. Novo Nordisk failed to disclose material facts that would have resulted in substantial repayments to the United States.

## COUNT IV
### California False Claims Act
### Cal. Gov't Code § 12651 *et seq.*

320.    The allegations of the preceding paragraphs are realleged as if fully set forth below.

321.    This is a claim for treble damages and civil penalties under the California False Claims Act. Cal. Gov't Code § 12651 *et seq*.

322.    By virtue of the kickbacks, off-label and false marketing, and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the California Medicaid Program (i.e., Medi-Cal) and publicly-funded health plans and health services, including, but not limited to, those for public employees, false or fraudulent claims for the improper payment or approval of prescriptions for Victoza, Levemir, Novolog, Novolog Mix 70/30, and Novo Nordisk insulin pens, and used false or fraudulent records to accomplish this purpose.

323.    The California Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, unaware of the falsity or

fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

324.    By reason of these payments, the California Medicaid and publicly-funded health plans and health services, including, but not limited to, those for public employees, have been damaged, and continue to be damaged in a substantial amount.

## COUNT V
### Colorado Medicaid False Claims Act
### Colo. Rev. Stat. § 25.5-4-303.5 *et seq.*

325.    The allegations of the preceding paragraphs are realleged as if fully set forth below.

326.    This is a claim for treble damages and civil penalties under the Colorado Medicaid False Claims Act. Colo. Rev. Stat. § 25.5-4-304 *et seq.*

327.    By virtue of the kickbacks, off-label and false marketing, and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Colorado Medicaid Program false or fraudulent claims for the improper payment or approval of prescriptions for and used false or fraudulent records to accomplish this purpose.

328.    The Colorado Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

329.    By reason of these payments, the Colorado Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT VI
### Connecticut False Claims Act
### Conn. Gen. Stat. § 17b-301a *et seq.*

330.    The allegations of the preceding paragraphs are realleged as if fully set forth below.

331.    This is a claim for treble damages and civil penalties under the Connecticut False Claims Act.  Conn. Gen. Stat. § 17b-301a *et seq.*

332.   By virtue of the kickbacks, off-label and false marketing, and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to an officer or employee of the State and the Connecticut Medicaid Program false or fraudulent claims for the improper payment or approval of prescriptions for Victoza, Levemir, Novolog, Novolog Mix 70/30, and Novo Nordisk insulin pens and used false or fraudulent records to accomplish this purpose.

333.   The Connecticut Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

334.   By reason of these payments, the Connecticut Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT VII**
**Delaware False Claims Act**
**Del. Code Ann. tit. 6, § 1201 *et seq.***

335.   The allegations of the preceding paragraphs are realleged as if fully set forth below.

336.   This is a claim for treble damages and civil penalties under the Delaware False Claims Act. Del Code Ann. tit. 6, § 1201 *et seq.*

337.   By virtue of the kickbacks, off-label and false marketing, and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Delaware Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, false or fraudulent claims for the improper payment or approval of prescriptions for Victoza, Levemir, Novolog, Novolog Mix 70/30, and Novo Nordisk insulin pens and used false or fraudulent records to accomplish this purpose.

104

338. The Delaware Medicaid and publicly-funded health plans and health services, including, but not limited to, those for public employees, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

339. By reason of these payments, the Delaware Medicaid and publicly-funded health plans and health services, including, but not limited to, those for public employees, have been damaged, and continue to be damaged in a substantial amount.

### COUNT VIII
### Florida False Claims Act
### Fla. Stat. Ann. § 68.081 *et seq.*

340. The allegations of the preceding paragraphs are realleged as if fully set forth below.

341. This is a claim for treble damages and civil penalties under the Florida False Claims Act. Fla. Stat. Ann. § 68.081 *et seq*.

342. By virtue of the kickbacks, off-label and false marketing, and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Florida Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, false or fraudulent claims for the improper payment or approval of prescriptions for Victoza, Levemir, Novolog, Novolog Mix 70/30, and Novo Nordisk insulin pens and used false or fraudulent records to accomplish this purpose.

343. The Florida Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

344.   By reason of these payments, the Florida Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, have been damaged, and continue to be damaged in a substantial amount.

**COUNT IX**
**Georgia False Medicaid Claims Act**
**Ga. Code Ann. § 49-4-168 *et seq.***

345.   The allegations of the preceding paragraphs are realleged as if fully set forth below.

346.   This is a claim for treble damages and civil penalties under the False Medicaid Claims Act.  Ga. Code Ann. § 49-4-168 *et seq*.

347.   By virtue of the kickbacks, off-label and false marketing, and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Georgia Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, false or fraudulent claims for the improper payment or approval of prescriptions for Victoza, Levemir, Novolog, Novolog Mix 70/30, and Novo Nordisk insulin pens and used false or fraudulent records to accomplish this purpose.

348.   The Georgia Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

349.   By reason of these payments, the Georgia Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, have been damaged, and continue to be damaged in a substantial amount.

## COUNT X
## Hawaii False Claims Act
## Haw. Rev. Stat. § 661-22 *et seq.*

350.   The allegations of the preceding paragraphs are realleged as if fully set forth below.

351.   This is a claim for treble damages and civil penalties under the Hawaii False Claims Act. Haw. Rev. Stat. § 661-22 *et seq*.

352.   By virtue of the kickbacks, off-label and false marketing, and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Hawaii Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, false or fraudulent claims for the improper payment or approval of prescriptions for Victoza, Levemir, Novolog, Novolog Mix 70/30, and Novo Nordisk insulin pens and used false or fraudulent records to accomplish this purpose.

353.   The Hawaii Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

354.   By reason of these payments, the Hawaii Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, have been damaged, and continue to be damaged in a substantial amount.

## COUNT XI
## Illinois Whistleblower Reward and Protection Act
## 740 Ill. Comp. Stat. 175/1 *et seq.*

355.   The allegations of the preceding paragraphs are realleged as if fully set forth below.

356.   This is a claim for treble damages and civil penalties under the Illinois Whistleblower Reward and Protection Act. 740 Ill. Comp. Stat. 175/1 *et seq.*

357.   By virtue of the kickbacks, off-label and false marketing, and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Illinois Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, false or fraudulent claims for the improper payment or approval of prescriptions for Victoza, Levemir, Novolog, Novolog Mix 70/30, and Novo Nordisk insulin pens and used false or fraudulent records to accomplish this purpose.

358.   The Illinois Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

359.   By reason of these payments, the Illinois Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, have been damaged, and continue to be damaged in a substantial amount.

**COUNT XII**
**Indiana False Claims and Whistleblower Protection**
**Burns Ind. Code Ann. § 5-11-5.5-1 *et seq.***

360.   The allegations of the preceding paragraphs are realleged as if fully set forth below.

361.   This is a claim for treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Law. Burns Ind. Code Ann. § 5-11-5.5-1 *et seq*.

362.   By virtue of the kickbacks, off-label and false marketing, and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Indiana Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, false or fraudulent claims for the improper payment

or approval of prescriptions for Victoza, Levemir, Novolog, Novolog Mix 70/30, and Novo

Nordisk insulin pens and used false or fraudulent records to accomplish this purpose.

363.   The Indiana Medicaid Program and publicly-funded health plans and health services,

including, but not limited to, those for public employees, unaware of the falsity or fraudulent

nature of the claims caused by the Defendants, paid for claims that otherwise would not have

been allowed.

364.   By reason of these payments, the Indiana Medicaid Program and publicly-funded

health plans and health services, including, but not limited to, those for public employees, have

been damaged, and continue to be damaged in a substantial amount.

## COUNT XIII
### Iowa False Claims Act
### Iowa Code § 685.1 *et seq.*

365.   The allegations of the preceding paragraphs are realleged as if fully set forth below.

366.   This is a claim for treble damages and civil penalties under the Iowa False Claims

Act. Iowa Code § 685.1 *et seq.*

367.   By virtue of the kickbacks, off-label and false marketing, and submissions of

non-reimbursable claims described above, Defendants knowingly caused to be presented to the

Iowa Medicaid Program and publicly-funded health plans and health services, including, but not

limited to, those for public employees, false or fraudulent claims for the improper payment or

approval of prescriptions for Victoza, Levemir, Novolog, Novolog Mix 70/30, and Novo

Nordisk insulin pens and used false or fraudulent records to accomplish this purpose.

368.   The Iowa Medicaid Program and publicly-funded health plans and health services,

including, but not limited to, those for public employees, unaware of the falsity or fraudulent

nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

369.  By reason of these payments, the Iowa Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, have been damaged, and continue to be damaged in a substantial amount.

**COUNT XIV**
**Louisiana Medical Assistance Programs Integrity Law**
**La. Rev. Stat. Ann. § 46:437.1 *et seq.***

370.  The allegations of the preceding paragraphs are realleged as if fully set forth below.

371.  This is a claim for treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law. La. Rev. Stat. Ann. § 46:439.1 *et seq*.

372.  By virtue of the kickbacks, off-label and false marketing, and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Louisiana Medicaid Program false or fraudulent claims for the improper payment or approval of prescriptions for Victoza, Levemir, Novolog, Novolog Mix 70/30, and Novo Nordisk insulin pens and knowingly used false or fraudulent records to accomplish this purpose.

373.  The Louisiana Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

374.  By reason of these payments, the Louisiana Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT XV**
**Maryland False Health Claims Act**
**Md. Code Ann., Health-Gen. §2-601 *et seq.***

375.  The allegations of the preceding paragraphs are realleged as if fully set forth below.

110

376.   This is a claim for treble damages and civil penalties under the Maryland False Health Claims Act.  Md. Code Ann., Health-Gen. §2-601 *et seq.*

377.   By virtue of the kickbacks, off-label and false marketing, and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Maryland Medicaid Program false or fraudulent claims for the improper payment or approval of prescriptions for Victoza, Levemir, Novolog, Novolog Mix 70/30, and Novo Nordisk insulin pens and used false or fraudulent records to accomplish this purpose.

378.   The Maryland Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

379.   By reason of these payments, the Maryland Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT XVI**
**Massachusetts False Claims Act**
**Mass. Ann. Laws ch. 12, § 5(A) *et seq.***

380.   The allegations of the preceding paragraphs are realleged as if fully set forth below.

381.   This is a claim for treble damages and civil penalties under the Massachusetts False Claims Act. Mass. Ann. Laws ch. 12, § 5(A) *et seq.*

382.   By virtue of the kickbacks, off-label and false marketing, and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Massachusetts Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, false or fraudulent claims for the improper payment or approval of prescriptions for Victoza, Levemir, Novolog, Novolog Mix 70/30, and Novo Nordisk insulin pens and used false or fraudulent records to accomplish this purpose.

111

383.    The Massachusetts Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

384.    By reason of these payments, the Massachusetts Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, have been damaged, and continue to be damaged in a substantial amount.

**COUNT XVII**
**Michigan Medicaid False Claim Act**
**Mich. Comp. Laws §400.601 *et seq.***

385.    The allegations of the preceding paragraphs are realleged as if fully set forth below.

386.    This is a claim for treble damages and civil penalties under the Michigan Medicaid False Claim Act. Mich. Comp. Laws §400.601 *et seq*.

387.    By virtue of the kickbacks, off-label and false marketing, and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Michigan Medicaid Program false or fraudulent claims for the improper payment or approval of prescriptions for Victoza, Levemir, Novolog, Novolog Mix 70/30, and Novo Nordisk insulin pens and used false or fraudulent records to accomplish this purpose.

388.    The Michigan Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

389.    By reason of these payments, the Michigan Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT XVIII
## Minnesota False Claims Act
## Minn. Stat. § 15C.01 *et seq.*

390.    The allegations of the preceding paragraphs are realleged as if fully set forth below.

391.    This is a claim for treble damages and civil penalties under the Minnesota False Claims Act.  Minn. Stat. § 15C.01 *et seq.*

392.    By virtue of the kickbacks, off-label and false marketing, and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Minnesota Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, false or fraudulent claims for the improper payment or approval of prescriptions for Victoza, Levemir, Novolog, Novolog Mix 70/30, and Novo Nordisk insulin pens and used false or fraudulent records to accomplish this purpose.

393.    The Minnesota Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

394.    By reason of these payments, the Minnesota Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, have been damaged, and continue to be damaged in a substantial amount.

## COUNT XIX
## Montana False Claims Act
## Mont. Code Ann. §17-8-401 *et seq.*

395.    The allegations of the preceding paragraphs are realleged as if fully set forth below.

396.    This is a claim for treble damages and civil penalties under the Montana False Claims Act. Mont. Code Ann. § 17-8-401 *et seq.*

113

397.   By virtue of the kickbacks, off-label and false marketing, and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Montana Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, false or fraudulent claims for the improper payment or approval of prescriptions for Victoza, Levemir, Novolog, Novolog Mix 70/30, and Novo Nordisk insulin pens and used false or fraudulent records to accomplish this purpose.

398.   The Montana Medicaid  Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

399.   By reason of these payments, the Montana Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, have been damaged, and continue to be damaged in a substantial amount.

**COUNT XX**
**Nevada False Claims Act**
**Nev. Rev. Stat. § 357.010 *et seq*.**

400.   The allegations of the preceding paragraphs are realleged as if fully set forth below.

401.   This is a claim for treble damages and civil penalties under the Nevada False Claims Act. Nev. Rev. Stat. § 357.010 *et seq*.

402.   By virtue of the kickbacks, off-label and false marketing, and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Nevada Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, false or fraudulent claims for the improper payment

or approval of prescriptions for Victoza, Levemir, Novolog, Novolog Mix 70/30, and Novo

Nordisk insulin pens and used false or fraudulent records to accomplish this purpose.

403.   The Nevada Medicaid Program and publicly-funded health plans and health

services, including, but not limited to, those for public employees, unaware of the falsity or

fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would

not have been allowed.

404.   By reason of these payments, the Nevada Medicaid Program and publicly-funded

health plans and health services, including, but not limited to, those for public employees, have

been damaged, and continue to be damaged in a substantial amount.

**COUNT XXI**
**New Hampshire Medicaid Fraud and False Claims Law**
**N.H. Rev. Stat. Ann. § 167:61-b** *et seq.*

405.   The allegations of the preceding paragraphs are realleged as if fully set forth below.

406.   This is a claim for treble damages and civil penalties under the New Hampshire

Medicaid Fraud and False Claims Law. N.H. Rev. Stat. Ann. § 167:61-b *et seq.*

407.   By virtue of the kickbacks, off-label and false marketing, and submissions of

non-reimbursable claims described above, Defendants knowingly caused to be presented to the

New Hampshire Medicaid Program false or fraudulent claims for the improper payment or

approval of prescriptions for Victoza, Levemir, Novolog, Novolog Mix 70/30, and Novo

Nordisk insulin pens and used false or fraudulent records to accomplish this purpose.

408.   The New Hampshire Medicaid Program, unaware of the falsity or fraudulent nature

of the claims caused by the Defendants, paid for claims that otherwise would not have been

allowed.

409.   By reason of these payments, the New Hampshire Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT XXII
### New Jersey False Claims Act
### N.J. Stat. § 2A:32C-1 *et seq.*

410.   The allegations of the preceding paragraphs are realleged as if fully set forth below.

411.   This is a claim for treble damages and civil penalties under the New Jersey False Claims Act. N.J. Stat. § 2A:32C-1 *et seq.*

412.   By virtue of the kickbacks, off-label and false marketing, and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the New Jersey Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, false or fraudulent claims for the improper payment or approval of prescriptions for off-label uses and used false or fraudulent records to accomplish this purpose.

413.   The New Jersey Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

414.   By reason of these payments, the New Jersey Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, have been damaged, and continue to be damaged in a substantial amount.

## COUNT XXIII
### New Mexico Medicaid False Claims Act
### N.M. Stat. Ann. § 27-14-1 *et seq.*

415.   The allegations of the preceding paragraphs are realleged as if fully set forth below.

116

416. This is a claim for treble damages and civil penalties under the New Mexico Medicaid False Claims Act. N.M. Stat. Ann. § 27-14-1 *et seq.*

417. By virtue of the kickbacks, off-label and false marketing, and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the New Mexico Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, false or fraudulent claims for the improper payment or approval of prescriptions for Victoza, Levemir, Novolog, Novolog Mix 70/30, and Novo Nordisk insulin pens and used false or fraudulent records to accomplish this purpose.

418. The New Mexico Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

419. By reason of these payments, the New Mexico Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, have been damaged, and continue to be damaged in a substantial amount.

**COUNT XXIV**
**New York False Claims Act**
**N.Y. State Fin. Law § 187 *et seq.***

420. The allegations of the preceding paragraphs are realleged as if fully set forth below.

421. This is a claim for treble damages and civil penalties under the New York False Claims Act. N.Y. State Fin. Law § 187 *et seq.*

422. By virtue of the kickbacks, off-label and false marketing, and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the New York Medicaid Program and publicly-funded health plans and health services, including,

but not limited to, those for public employees, false or fraudulent claims for the improper

payment or approval of prescriptions for off-label uses and used false or fraudulent records

material to a false or fraudulent claim to accomplish this purpose.

423.   The New York Medicaid Program and publicly-funded health plans and health

services, including, but not limited to, those for public employees, unaware of the falsity or

fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would

not have been allowed.

424.   By reason of these payments, the New York Medicaid Program and publicly-funded

health plans and health services, including, but not limited to, those for public employees, have

been damaged, and continue to be damaged in a substantial amount.

**COUNT XXV**
**North Carolina False Claims Act**
**N.C. Gen. Stat. § 1-605 *et seq.***

425.   The allegations of the preceding paragraphs are realleged as if fully set forth below.

426.   This is a claim for treble damages and civil penalties under the North Carolina False

Claims Act.  N.C. Gen. Stat. § 1-605 *et seq.*

427.   By virtue of the kickbacks, off-label and false marketing, and submissions of

non-reimbursable claims described above, Defendants knowingly caused to be presented to the

North Carolina Medicaid Program and publicly-funded health plans and health services,

including, but not limited to, those for public employees, false or fraudulent claims for the

improper payment or approval of prescriptions for Victoza, Levemir, Novolog, Novolog Mix

70/30, and Novo Nordisk insulin pens and used false or fraudulent records to accomplish this

purpose.

118

428.    The North Carolina Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

429.    By reason of these payments, the North Carolina Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, have been damaged, and continue to be damaged in a substantial amount.

## COUNT XXVI
### Oklahoma Medicaid False Claims Act
### Okla. Stat. tit. 63 § 5053 *et seq.*

430.    The allegations of the preceding paragraphs are realleged as if fully set forth below.

431.    This is a claim for treble damages and civil penalties under the Oklahoma Medicaid False Claims Act.  Okla. Stat. tit. 63 § 5053 *et seq*.

432.    By virtue of the kickbacks, off-label and false marketing, and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Oklahoma Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, false or fraudulent claims for the improper payment or approval of prescriptions for Victoza, Levemir, Novolog, Novolog Mix 70/30, and Novo Nordisk insulin pens and used false or fraudulent records to accomplish this purpose.

433.    The Oklahoma Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

434.    By reason of these payments, the Oklahoma Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, have been damaged, and continue to be damaged in a substantial amount.

## COUNT XXVII
### Rhode Island False Claims Act
### R.I. Gen. Laws § 9-1.1-1 *et seq.*

435.    The allegations of the preceding paragraphs are realleged as if fully set forth below.

436.    This is a claim for treble damages and civil penalties under the Rhode Island False Claims Act. R.I. Gen. Laws § 9-1.1-1 *et seq.*

437.    By virtue of the kickbacks, off-label and false marketing, and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Rhode Island Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, false or fraudulent claims for the improper payment or approval of prescriptions for Victoza, Levemir, Novolog, Novolog Mix 70/30, and Novo Nordisk insulin pens and used false or fraudulent records to accomplish this purpose.

438.    The Rhode Island Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

439.    By reason of these payments, the Rhode Island Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, have been damaged, and continue to be damaged in a substantial amount.

120

**COUNT XXVIII**
**Tennessee Medicaid False Claims Act**
**Tenn. Code Ann. § 71-5-181** *et seq.*
**Tennessee False Claims Act**
**Tenn. Code Ann. § 4-18-101** *et seq.*

440.    The allegations of the preceding paragraphs are realleged as if fully set forth below.

441.    This is a claim for treble damages and civil penalties under the Tennessee Medicaid

False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*, and the Tennessee False Claims Act,

Tenn. Code Ann. § 4-18-101 *et seq.*

442.    By virtue of the kickbacks, off-label and false marketing, and submissions of

non-reimbursable claims described above, Defendants knowingly caused to be presented to the

Tennessee Medicaid Program (i.e. TennCare) and publicly-funded health plans and health

services, including, but not limited to, those for public employees, false or fraudulent claims for

the improper payment or approval of prescriptions for Victoza, Levemir, Novolog, Novolog Mix

70/30, and Novo Nordisk insulin pens and used false or fraudulent records to accomplish this

purpose.

443.    The Tennessee Medicaid Program and publicly-funded health plans and health

services, including, but not limited to, those for public employees, unaware of the falsity or

fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would

not have been allowed.

444.    By reason of these payments, the Tennessee Medicaid Program and publicly-funded

health plans and health services, including, but not limited to, those for public employees, have

been damaged, and continue to be damaged in a substantial amount.

**COUNT XXIX**
**Texas Medicaid Fraud Prevention Act**
**Tex. Hum. Res. Code Ann. § 36.001 *et seq*.**

445.    The allegations of the preceding paragraphs are realleged as if fully set forth below.

446.    This is a claim for treble damages and civil penalties under the Texas Medicaid

Fraud Prevention Act. Tex. Hum. Res. Code Ann. § 36.001 *et seq*.

447.    By virtue of the kickbacks, off-label and false marketing, and submissions of

non-reimbursable claims described above, Defendants knowingly made a claim to the Texas

Medicaid Program for a product that has been adulterated, debased, or mislabeled, or that is

otherwise inappropriate, and caused to be presented to the Texas Medicaid Program false or

fraudulent claims for the improper payment or approval of prescriptions for Victoza, Levemir,

Novolog, Novolog Mix 70/30, and Novo Nordisk insulin pens used false or fraudulent records to

accomplish this purpose.

448.    The Texas Medicaid Program, unaware of the falsity or fraudulent nature of the

claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

449.    By reason of these payments, the Texas Medicaid Program has been damaged, and

continues to be damaged in a substantial amount.

**COUNT XXX**
**Virginia Fraud Against Taxpayers Act**
**Va. Code Ann. § 8.01-216.1 *et seq*.**

450.    The allegations of the preceding paragraphs are realleged as if fully set forth below.

451.    This is a claim for treble damages and civil penalties under the Virginia Fraud

Against Taxpayers Act. Va. Code Ann. §8.01-216.1 *et seq*.

452.    By virtue of the kickbacks, off-label and false marketing, and submissions of

non-reimbursable claims described above, Defendants knowingly caused to be presented to the

122

Virginia Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, false or fraudulent claims for the improper payment or approval of prescriptions for Victoza, Levemir, Novolog, Novolog Mix 70/30, and Novo Nordisk insulin pens and used false or fraudulent records to accomplish this purpose.

453.   The Virginia Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

454.   By reason of these payments, the Virginia Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, have been damaged, and continue to be damaged in a substantial amount.

## COUNT XXXI
### Washington State Medicaid Fraud False Claims Act
### Wash. Rev. Code § 74.66.005 *et seq.*

455.   The allegations of the preceding paragraphs are realleged as if fully set forth below.

456.   This is a claim for treble damages and civil penalties under the Washington State Medicaid Fraud False Claims Act. Wash. Rev. Code § 74.66.005 *et seq.*

457.   By virtue of the kickbacks, off-label and false marketing, and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Washington State Medicaid Program false or fraudulent claims for the improper payment or approval of prescriptions for Victoza, Levemir, Novolog, Novolog Mix 70/30, and Novo Nordisk insulin pens and knowingly used false or fraudulent records to accomplish this purpose.

458.    The Washington State Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

459.    By reason of these payments, the Washington State Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT XXXII
### Wisconsin False Claims For Medical Assistance Law
### Wis. Stat. § 20.931 *et seq.*

460.    The allegations of the preceding paragraphs are realleged as if fully set forth below.

461.    This is a claim for treble damages and civil penalties under the Wisconsin False Claims for Medical Assistance Law. Wis. Stat. § 20.931 *et seq.*

462.    By virtue of the kickbacks, off-label and false marketing, and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Wisconsin Medicaid Program false or fraudulent claims for the improper payment or approval of prescriptions for Victoza, Levemir, Novolog, Novolog Mix 70/30, and Novo Nordisk insulin pens and used false or fraudulent records to accomplish this purpose.

463.    The Wisconsin Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

464.    By reason of these payments, the Wisconsin Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT XXXIII
### District of Columbia False Claims Act
### D.C. Code § 2-308.13 *et seq.*

465.    The allegations of the preceding paragraphs are realleged as if fully set forth below.

466. This is a claim for treble damages and civil penalties under the District of Columbia False Claims Act. D.C. Code § 2-308.13 *et seq*.

467. By virtue of the kickbacks, off-label and false marketing, and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the District of Columbia Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, false or fraudulent claims for the improper payment or approval of prescriptions for off-label uses of Victoza, Levemir, Novolog, Novolog Mix 70/30, and Novo Nordisk insulin pens and used false or fraudulent records to accomplish this purpose.

468. The District of Columbia Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

469. By reason of these payments, the District of Columbia Medicaid Program and publicly-funded health plans and health services, including, but not limited to, those for public employees, have been damaged, and continue to be damaged in a substantial amount.

## COUNT XXXIV
### The City of Chicago False Claims Act
### Chicago Municipal Code, § 1-22-010 *et seq.*

470. The allegations of the preceding paragraphs are realleged as if fully set forth below.

471. This is a claim for treble damages and civil penalties under the City of Chicago False Claims Act.  Chicago Municipal Code § 1-22-010 *et seq.*

472. By virtue of the kickbacks, off-label and false marketing, and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the

Chicago Department of Public Health false or fraudulent claims for the improper payment or approval of prescriptions for Victoza, Levemir, Novolog, Novolog Mix 70/30, and Novo Nordisk insulin pens, and used false or fraudulent records to accomplish this purpose.

473.   The City of Chicago Department of Public Health, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

474.   By reason of these payments, the City of Chicago has been damaged, and continues to be damaged in a substantial amount.

### COUNT XXXV
### New York City False Claims Act
### New York City Adm. Code, § 7-801 *et seq.*

475.   The allegations of the preceding paragraphs are realleged as if fully set forth below.

476.   This is a claim for treble damages and civil penalties under the New York False Claims Act, New York Adm. Code, § 7-801 *et seq.*

477.   By virtue of the kickbacks, off-label and false marketing, and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the New York City Health and Hospitals Corporation false or fraudulent claims for the improper payment or approval of prescriptions for Victoza, Levemir, Novolog, Novolog Mix 70/30, and Novo Nordisk insulin pens, and used false or fraudulent records to accomplish this purpose.

478.   The New York City Health and Hospitals Corporation, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

479.   By reason of these payments, the New York City Health and Hospitals Corporation has been damaged, and continues to be damaged in a significant amount.

## COUNT XXXVI
### False Claims Act Retaliation Violation and Civil Rights Retaliation
### 31 U.S.C. § 3730(h) and 42 U.S.C. § 1985
### (Relator Lesley Ferrara)

480.    The allegations of the preceding paragraphs are re-alleged as if fully set forth below.

481.    Relator Ferrara took lawful actions in furtherance of a False Claims Act action, including investigation for, testimony for, or assistance in an action filed under this section and, as such, engaged in protected activity under the False Claims Act and other laws.

482.    As a Senior Diabetes Care Specialist with Novo Nordisk, Ms. Ferrara engaged in sales and advised sales representatives on building relationships with current and potential clients. While at Novo Nordisk, Ms. Ferrara won 6 sales growth contests and increased her market share of Levemir by 50%, a very substantial achievement.  During her first two months at the company she achieved a sales ranking of #2 in the region for Levemir sales.

483.    Ms. Ferrara underwent extensive training in both sales and compliance while at Novo Nordisk.  Each time Ms. Ferrara learned of marketing or promotion efforts that did not comply with company policy or FDA regulations, she reported the activity first to her supervisor, Rod Schley.  Specifically, Ms. Ferrara reported to Mr. Schley that it was a conflict of interest to have the son of a well-known physician at Cleveland Clinic, Sharukh Mehta, make sales calls to Clinic physicians.  She expressed concerns to Mr. Schley that bringing doctors to restaurants for company-paid meals violated the ethical guidelines of the Pharmaceutical Research and Manufacturers of America (PhRMA).

484.    Notwithstanding Novo Nordisk's obligations under the False Claims Act to provide a non-retaliatory and harassment-free environment for employees reporting compliance violations,  Novo Nordisk retaliated against Ms. Ferrara by placing her on several different performance plans.  When Ms. Ferrara met the goals of one performance plan, Mr. Schley then

127

fabricated a pretextual reason to place her on another performance plan. The action items in the performance plans had no rational relationship to Ms. Ferrara's work and were, instead, part of a continuing program of unlawful conduct and retaliation.

485.   Relator Ferrara made internal reports of compliance problems in May 2009. Relator Ferrara was first put on a coaching plan in July 2009. Schley informed Relator Ferrara that she had successfully completed the coaching plan in August 2009 and that she would not be put on a more severe performance improvement plan. But, thereafter Mr. Schley put Relator on a 60-day performance improvement plan on October 5, 2009. The plan required sales targets and reports that were not required by other district members. The action items in both the coaching plan and performance improvement plan were created to harass Relator and had little relationship to actually improving her work. The action items of the plans, including an increase in the number of meals Relator had with physicians and additional reporting on her sales activity, were impossible to accomplish in a normal workweek. After she was notified of the performance improvement plan, Relator Ferrara reported internally that she believed the plan was retaliatory.

486.   Throughout her 2009 employment, Mr. Schley closely monitored her by riding along with her to sales calls at a much higher frequency than he did with other similarly situated employees, sitting in on her meetings with physicians, and calling physicians to confirm that Relator Ferrara had made sales calls, which greatly undermined her credibility with those physicians and, thus, impaired her ability to perform her job. Relator Ferrara reported this behavior to the company's human resources department, but the behavior did not change.

487.   While employed by Novo Nordisk and after her employment was illegally terminated, Relator Ferrara repeatedly questioned, investigated, and reported internally and subsequently to appropriate Government officials on Defendants' improper practices and billing

in connection with Federal and State-funded health care programs in furtherance of a False Claims Act action.

488. Defendants without good cause harassed, intimidated, and otherwise created a hostile work environment for Relator Ferrara in retaliation for her objections to, and reporting of, Defendants' wrongdoing. Defendants knew or should have known that Relator Ferrara's activities investigating and opposing their unlawful conduct, including investigation for, testimony for, or assistance in an action filed under this section, were in connection with the False Claims Act action.

489. Defendants retaliated against Relator Ferrara for her lawful actions taken in furtherance of a False Claims Act action and the DOJ investigation of Novo Nordisk, including, but not limited to, her investigation and assistance in an action alleging Defendants' violations of the False Claims Act and Relator Ferrara's efforts to prevent further False Claims Act violations by Defendants. Relator Ferrara reported, at various times, all of the above violations of law recited in this complaint to her superiors at Novo Nordisk prior to filing this action.

490. Defendants have a duty under the False Claims Act, 31 U.S.C. § 3730(h) and under 42 U.S.C. § 1985 to refrain from taking retaliatory actions against employees who take lawful actions in furtherance of a False Claims Act action, including investigation for, testimony for, or assistance in an action filed under this section and federal investigations.

491. Defendants' misconduct and illegal treatment of Relator Ferrara and those they derogatorily consider "whistleblowers" has the effect of stifling reports of off-label marketing, kickback schemes, and violations of Medicaid best-price requirements. This treatment effectively warned other Novo Nordisk employees that they should not engage in honest and open reporting of Defendants's conduct.

129

492.    The actions of Defendants damaged and continue to damage Relator Ferrara in

violation of 31 U.S.C. § 3730(h) and 42 U.S.C. § 1985, in an amount to be determined at trial.

**COUNT XXXVII**
**Violation of Civil Rights Act - Sex Discrimination, 42 U.S.C. § 2000e *et seq.* and**
**Violation of Ohio Rev. Code § 4112.02 *et seq.***
**(Relator Lesley Ferrara)**

493.    The allegations of the preceding paragraphs are re-alleged as if fully set forth below.

494.    Title VII of the Civil Rights Act of 1965, codified as 42 U.S.C. §§2000e et seq.,

prohibits employers from discriminating against employees on the basis of sex and from taking

retaliatory action against anyone who alleges illegal discrimination.

495.    On January 1, 2009, Rodney Schley became Relator Lesley Ferrara's supervisor.

Thereafter, she became the victim of sex discrimination and was eventually fired for

discriminatory and retaliatory reasons.

496.    A high-performing and well-regarded employee, in March 2009, Relator Ferrara's

prior supervisor rated her positively in her performance review with a "meeting expectations"

rating.  This was consistent with previous reviews from her supervisor, other management,

colleagues, and physicians. Despite her reputation and positive reviews, Mr. Schley treated

Relator Ferrara differently on account of her sex.

497.    Mr. Schley continually ridiculed Relator Ferrara and was verbally aggressive with

her.  On one occasion he told Relator Ferrara that he "leads with pain, not pleasure."  Despite

excellent past job performance, Schley unnecessarily and aggressively monitored Relator Ferrara

by regularly accompanying her on sales calls.  During these calls he would interrupt Relator

Ferrara and belittle her skills and knowledge in front of physicians, telling a doctor after one

presentation "Forget everything she just said and listen to me."  Mr. Schley did not treat

similarly-situated male employees in the same manner.  When Ms. Ferrara objected to Mr.

130

Schley's yelling and verbally abusive behavior, he told her she was too emotional, oversensitive and needed to "toughen up" to be successful in his district.

498.   Ms. Ferrara was subject to denigrating comments and behavior from Mr. Schley regarding her sex.  Ms. Ferrara first reported this behavior to Evelyn Rodriguez in Novo Nordisk's human resources department on May 29, 2009.  Relator Ferrara also reported to human resources that she suffered emotional distress because of Mr. Schley's treatment of her and experienced fear, anxiety, and chest pains, and felt unsafe when driving with Mr. Schley in the car during field rides.

499.   On October 9, 2009, Relator Ferrara objected to her supervisor's conduct by sending a letter complaining of discrimination, harassment, and retaliation to Human Resources.  The discriminatory action did not stop.  Instead, Novo Nordisk management made calls to physicians' offices to make sure Relator Ferrara made sales calls, when there was no need to do so and other male colleagues were not subject to the same oversight.  Relator Ferrara made an additional complaint about the performance improvement plan on October 23, 2009 during a phone call with Schley and Evelyn Rodriguez, who worked in Novo Nordisk's Human Resources department.

500.   On October 28, 2009, Ms. Ferrara was scheduled to go on a sales "field ride" at the Cleveland Clinic with a Novo Nordisk District Manager from Philadelphia.  When Ms. Ferrara arrived at the hotel that was her designated meeting place, she was instead met by her supervisor. Mr. Schley told Ms. Ferrara she was fired. She was terminated just 5 days after objecting to the discriminatory remedial work plans. The reason for her termination was that she allegedly failed to complete the performance improvement plan. However, her termination occurred less than halfway through the 60 day performance improvement plan period.

501.   Relator Ferrara's position was not advertised internally or externally after she was fired. Instead, a much younger male representative, Sharukh Mehta, was given her position. He had worked at Novo for less than a year, outside the Cleveland area. Mr. Mehta was less qualified than Ms. Ferrara and had not worked previously as a specialty care sales representative calling primarily upon endocrinologists with specialization in diabetic patient care. Instead, he had dealt primarily with general practitioners, internists, and family physicians who treated a wide variety of patients and illnesses.

502.   Novo management told Relator Ferrara that she was terminated for alleged failure to complete the Performance Improvement Plan, a plan created to retaliate against her.  Novo instructed Ms. Ferrara's replacement, Mr. Sharukh Mehta, to tell physician customers that Ms. Ferrara was fired for breaking company policy.  Mr. Mehta told Relator Ferrara, in the presence of several physicians, that he was instructed by Novo managers to give this explanation for Relator Ferrara's termination and he did so.  Ater Relator Ferrara's Novo employment ended, Novo sales managers and company human relations representatives held a conference call with district sales representatives and instructed them not to communicate with Relator Ferrara.

503.   After a federal investigation regarding Novo began at the Cleveland Clinic, Novo employees blamed Relator Ferrara for the Government's involvement.  Novo employees informed Cleveland Clinic physicians that Relator Ferrara was responsible for the investigation and spread false rumors regarding her involvement in the investigation.

504.   The dissemination of false information about Relator Ferrara's termination resulted in damage to Relator Ferrara's reputation within the pharmaceutical industry and among physician and nurse customers and targets for pharmaceutical sales in the Cleveland area.  As a result of Novo's illegal treatment of her, despite Relator Ferrara's long and successful career in

the pharmaceutical sales industry, she has been unable to find comparable work in medical

marketing.

505.   Novo Nordisk purposely harassed and discriminated against Relator Ferrara in order

to create pretext to terminate her so that the less-qualified, younger, male representative could

replace her.

506.   Relator Ferrara filed an EEOC complaint for sex discrimination against Novo

Nordisk on or around August 12, 2010.  Following an investigation, the agency issued a right to

sue letter on March 23, 2011.

## COUNT XXXVIII
### Violation of Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*
### and Ohio Rev. Code § 4112.02 *et seq.*
### (Relator Lesley Ferrara)

507.   The allegations of the preceding paragraphs are re-alleged as if fully set forth below.

508.   The Age Discrimination in Employment Act, codified as 29 U.S.C. § 621 *et seq*. and

Ohio law prohibit employers from discriminating against employees who are 40 years and older

on the basis of age, and from taking retaliatory action against anyone who alleges illegal

discrimination. At the time of her termination in October 2009, Relator Ferrara was over the age

of 40.

509.   Relator Ferrara's supervisor continually discriminated against her because of her

age. Mr. Schley continually made comments about her age.  He commonly referred to Relator as

a "mature" or "senior" sales representative. Mr. Schley talked about wanting to hire younger

"mini-me" versions of himself so that he could shape and mold them.

510.   After Relator's termination, she was replaced by a significantly younger male.

Another female colleague over the age of 40 was also replaced by a younger male at

approximately the  same time.

133

511.    Subsequent to the Relator's repeated complaints of age discrimination and in retaliation for those complaints, Relator was terminated.

512.    Relator Ferrara filed an EEOC complaint for age discrimination against Novo Nordisk on or around August 12, 2010.  Following an investigation, the agency issued a right to sue letter on March 23, 2011.

### COUNT XXXIX
### False Claims Act Retaliation Violation and Civil Rights Retaliation
### 31 U.S.C. § 3730(h) and 42 U.S.C. § 1985
### (Relator Shelly Kelling)

513.    The allegations of the preceding paragraphs are re-alleged as if fully set forth below.

514.    Relator Kelling took lawful actions in furtherance of a False Claims Act action, including investigation for, testimony for, or assistance in an action filed under this section and, as such, engaged in protected activity under the False Claims Act and other laws.

515.    During her time at Novo Nordisk, Ms. Kelling was recognized on multiple occasions for sales figures that were among the highest in her district and region.  She won two growth contests, exceeded her sales goals on several occasions, and was successful in getting the company's products added to the formulary at several Cleveland-area institutions.

516.    Ms. Kelling underwent extensive training in both sales and compliance while at Novo Nordisk.  Her experience afforded her a special familiarity with FDA regulations and compliance issues that made her especially alert to Novo Nordisk's persistent violations of those regulations.

517.    In January 2010, a female endocrinologist at the Cleveland Clinic who also served as a speaker for Novo Nordisk, mentioned to Ms. Kelling that Dr. Adi Mehta, a physician at the Cleveland Clinic and the father of Novo Nordisk sales representative Sharukh Mehta, was

attempting to convince other physicians at the Cleveland Clinic not to disclose their work with Novo Nordisk or the honoraria Novo paid to them.

518.   On March 2, 2010, Sharukh Mehta asked Ms. Kelling to put in an order for Victoza samples so that he could pass them on to his father, Dr. Adi Mehta, for distribution at the Cleveland Clinic.

519.   On April 26-27, 2010, Ms. Kelling called on a male endocrinologist at the Cleveland Clinic with a Novo Nordisk Medical Science Liaison.  The endocrinologists told them that Sharukh Mehta had been distributing a research study he had obtained from the internet that downplayed the risk of the black box warning for thyroid cancer that appears on the Victoza package insert.  Relator Kelling reported this incident to Novo management.

520.   On June 30, 2010, a European meta-analysis published in the journal *Diabetologia* was announced. The study found an increased incidence of breast and prostate cancer in patients using a competitor's long-acting insulin, Lantus.  That same day, Novo management emailed copies of the studies and related sales aids reflecting the study's results to their sales force, telling them to print the materials and distribute them to physicians.  There were also daily conference calls regarding what sales representatives should say to promote Levemir as superior to Lantus.  Relator Kelling expressed her discomfort with this strategy because the studies did not involve Levemir.

521.   After her employment ended with Novo Nordisk, in the fall of 2014 Relator Kelling requested a transfer from her current pharmaceutical company employer, where she worked marketing its products to specialists, so that she could return to the Cleveland, Ohio, area to be closer to her extended family.  Part of her job responsibilities after the transfer in January 2015

included calling on specialists, endocrinologists, and other physicians and staff at the Cleveland

Clinic main campus and at its Cleveland area offices and hospitals.

522.  When Relator Kelling returned to marketing pharmaceuticals at the Cleveland Clinic

for her pharmaceutical company employer in January 2015, several Cleveland Clinic physicians

and other staff members in the Endocrinology department refused to meet with her or return her

phone calls in January 2015.  Relator Kelling was told that Novo Nordisk sales representatives

calling upon the Cleveland Clinic blamed her for the execution of a federal search warrant and

for FBI interviews of Cleveland Clinic physicians and staff.

523.  In January 2015, Dr. Adi Mehta and another Cleveland Clinic endocrinologist called

Relator Kelling's supervisor and told him that Relator Kelling is "impeding" the  company's

ability to do business at the Cleveland Clinic and that the company will continue to have

problems as long as Relator Kelling is employed.

524.  In January 2015, Novo Nordisk sales representatives calling upon the Cleveland

Clinic made false statements to Relator Kelling's supervisor and pharmaceutical sales co-worker

that Relator Kelling "caused people to get fired" and told them that Novo Nordisk blamed

Relator Kelling for a federal investigation at the Cleveland Clinic.

525.  As a result of Novo Nordisk's actions to retaliate against Relator Kelling and impede

her access to Cleveland Clinic physicians and other staff members that would prevent her from

meeting her sales goals, Relator Kelling was demoted from her specialty position to a lower-paid

primary care sales representative position in a challenging Ohio sales territory that is neither

convenient to her home nor likely to produce the sales results that Relator wants to achieve.

526.  Relator Kelling repeatedly questioned, investigated, and reported internally to Novo

Nordisk and subsequently to appropriate Government officials on Defendants' improper

practices and billing in connection with Federal and State-funded health care programs in furtherance of a False Claims Act action.

527.    Defendants without good cause harassed, intimidated, and otherwise created a hostile work environment for Relator Kelling in retaliation for her objections to, and reporting of, Defendants' wrongdoing.  Defendants knew or should have known that Relator Kelling's activities investigating and opposing their unlawful conduct, including investigation for, testimony for, or assistance in an action filed under this section, were in connection with the False Claims Act action.

528.    Defendants retaliated against Relator Kelling for her lawful actions taken in furtherance of a False Claims Act action and the DOJ investigation of Novo Nordisk, including, but not limited to, her investigation and assistance in an action alleging Defendants' violations of the False Claims Act and Relator Kelling's efforts to prevent further False Claims Act violations by Defendants.  Relator Kelling reported, at various times, all of the above violations of law recited in this complaint to her superiors at Novo Nordisk prior to filing this action.

529.    Defendants have a duty under the False Claims Act, 31 U.S.C. § 3730(h) and under 42 U.S.C. § 1985 to refrain from taking retaliatory actions against employees who take lawful actions in furtherance of a False Claims Act action, including investigation for, testimony for, or assistance in an action filed under this section and federal investigations.

530.    Defendants' misconduct and illegal treatment of Relator Kelling and those they derogatorily consider "whistleblowers" has the effect of stifling reports of off-label marketing, kickback schemes, and violations of Medicaid best-price requirements.  This treatment effectively warned other Novo Nordisk employees that they should not engage in honest and open reporting of Defendants's conduct. Defendants' misconduct and their treatment of Relator

Kelling caused Relator Kelling to be constructively discharged in October 2010.  Defendants'

continuing misconduct, retaliation, and discrimination caused Relator Kelling to be

constructively discharged from her subsequent position in February 2015 and demoted to a lesser

position, offering a lower salary, lower benefits, and decreased possibility for advancement.

531.   The actions of Defendants damaged and continue to damage Relator Kelling in

violation of 31 U.S.C. § 3730(h) and 42 U.S.C. § 1985, in an amount to be determined at trial.

## COUNT XL
### Violation of Civil Rights Act - Religious Discrimination
### 42 U.S.C. § 2000e *et seq.* and Ohio Rev. Code § 4112.02 *et seq.*
### Violation of Americans with Disabilities Act, 42 § U.S.C. 12101 *et seq.*
### and Ohio Rev. Code § 4112.02 *et seq.*
### (Relator Shelly Kelling)

532.   The allegations of the preceding paragraphs are re-alleged as if fully set forth below.

533.   Ohio law at Ohio Rev. Code § 4112.02 *et seq.*, prohibits employers from

discriminating against employees who have a disability or are regarded as having a disability, or

discriminating against employees on the basis of religion, and from taking retaliatory action

against anyone who alleges illegal discrimination.

534.   Relator Kelling has been diagnosed with diabetes, which is a physical or mental

impairment that substantially limits a major life activity, namely the endocrine function of the

body.

535.   As a result of her diabetes, Relator Kelling experienced psoriasis, a skin condition

which causes the formation of scaly patches on the top layer of the skin, including the scalp.

536.   In March 2009, on a week-long company-sponsored cruise, Shereen Gerrasch told

Relator Kelling, Relator Ferrara, and another employee that they were going to be rated as

"approaching expectations" in their upcoming performance evaluations.  Relator Ferrara and Ms.

Ritchie were later able to change their performance evaluations to "meeting expectations" and

receive their annual raise while Relator Kelling was not able to do so.  In a subsequent field ride Relator Kelling told Ms. Gerrasch that she believed this treatment was unlawful discrimination on the basis of disability due to Relator Kelling's diabetes.

537.    In September 2009, Relator Kelling was experiencing side effects from her diabetes treatment, including psoriasis.  Ms. Gerrasch reported to Novo Nordisk's Human Resources department that Relator Kelling was "dirty" and "did not bathe" and confronted her about the issue in a public area of the Cleveland Clinic that was open to Relator Kelling's sales contacts. Relator Kelling became very upset and started crying.  She later reported this incident to Novo Nordisk's Human Resources Department and told them that her skin condition was related to diabetes treatment.

538.    Relator Kelling was a practicing Muslim and in accord with her religious beliefs, did not eat pork.  At various Novo Nordisk meetings, Relator Kelling's co-workers and supervisors repeatedly made comments to make her feel uncomfortable when she avoided foods with pork or ordered meals without pork products.  Novo supervisors heard or observed Ms. Kelling's co-workers' reactions and did nothing to stop or correct this behavior.

539.    In September 2008, Relator Kelling requested time off to celebrate the Muslim holiday of Eid, which marks the end of the fasting month of Ramadan. Ms. Gerrasch responded by monitoring Relator Kelling more closely and having a trainer accompany her on field rides.

540.    In December 2008, Shereen Gerrasch arranged a Christmas party for the team she supervised and their spouses.  The party involved attending the "Christmas Spectacular" with a performance by the Rockettes, followed by a dinner.  Relator Kelling told Ms. Gerrasch that her husband would not attend because he did not celebrate Christmas. Relator Kelling was told "you need to be there."  At the dinner following the show, Ms. Gerrasch's father-in-law dressed up as

Santa Claus. Novo representatives were directed to sit on Santa's lap and pose for a picture before receiving their Christmas gifts.  Relator Kelling said that she was uncomfortable with this and said she would rather not participate in this aspect of the evening. She was then pressured by Ms. Gerrasch to cooperate and have the photo taken.

541.   At a company meeting in Orlando, Florida, a Novo sales representative became drunk and began saying that a "huge fence" should be put around the United States and "everyone who is not Christian or not born in the United States needs to get out."  He looked directly at Relator Kelling while making this statement and then said that all the country's problems are "because of you people."  Both Relator Kelling's immediate supervisor, Shereen Gerrasch, and next-level supervisor, were present.  When Relator Kelling expressed concerns to Ms. Gerrasch over the representative's behavior, she responded that it was "OK" because he was drunk.

542.   In July 2009, Novo Nordisk sent a copy of the book *The Four Agreements* by Miguel Ruiz to its sales force.  Sales representatives were expected to read the book and then discuss it at a leadership development conference.  The book contains Christian themes and Biblical content. Relator Kelling told supervisor Shereen Gerrasch that she was not comfortable participating in the activity and asked to be excused. Ms. Gerrasch responded by telling Relator Kelling that she was "constantly complaining" and "constantly negative" and should be gotten rid of for that reason.

543.   Relator Kelling experienced emotional distress as a result of the discriminatory actions taken against her by Novo Nordisk based on her disability and religion and obtained treatment for her emotional distress.

544.   As a result of Novo Nordisk's treatment of her, Relator Kelling was constructively discharged.

545.   Relator Kelling filed an EEOC complaint for disability and religious discrimination against Novo Nordisk on or about April 13, 2011.  Following an investigation, the agency issued a right to sue letter on October 9, 2012.

**COUNT XLI**
**Ohio State Public Policy Tort: Greeley Claim**
**(Lesley Ferrara and Shelly Kelling)**

546.   The allegations of the preceding paragraphs are re-alleged as if fully set forth below.

547.   At all times pertinent hereto, Novo Nordisk was doing business in, and deriving substantial revenue from business in the State of Ohio. Relators Ferrara and Kelling were pharmaceutical sales representatives assigned to the territory in Ohio.

548.   From at least 1997 and continuing today, Ohio, by and through its Medicaid assistance to low income and disabled persons, has paid for Defendants' pharmaceutical products.

549.   It is the public policy of the State of Ohio that illegal conduct, including theft by deception and fraud, fraud against the Medicaid, Medicare, and public health care systems and publicly-funded health programs and insurance shall not be tolerated.

550.   It is the public policy of the state of Ohio that theft offenses, including theft by deception and fraud upon investors, shall not be tolerated.

551.   It is public policy of Ohio that witnesses to criminal activity shall not be intimidated or coerced, as evidenced by R.C. 2905.11, R.C. 2905.12, R.C. 2921.02 and R.C. 2921.03, among other statutes and regulations, such that the policy against theft through fraud may be furthered by the law enforcement and judicial systems.

552.   It is the public policy of Ohio that no one shall obstruct justice as evidenced by R.C. 2921.32 (A)(4) and (A)(5), nor obstruct official business as evidenced by R.C. 2923.31.

553.   It is the public policy of Ohio, as found in the constitutional, statutory and regulatory provisions, that persons shall be free to express themselves on matters of public interest.

554.   Relators reasonably believed that Defendants were defrauding the government when they marketed Victoza, Levemir, Novolog, Novolog Mix 70/30, and Novo Nordisk insulin pens in violation of and for purposes other than those approved and indicated by the FDA.

555.   Relators repeatedly protested Defendants' actions internally and were eventually terminated as a result of their opposition to Defendants' illegal activities.

556.   Adverse employment actions taken against one opposing such activities jeopardize the public policies identified above.

557.   As a direct and proximate result of the retaliation against them for opposing illegal conduct, Relators have suffered extreme emotional and mental anguish, have lost self-esteem, suffered humiliation, lost income and benefits, and will suffer further such injuries and losses in the future. As a direct and proximate result of the retaliation, Relators were harmed and suffered professional harm to their reputations and earning capacity.

**COUNT XLII**
**Violation of Ohio Rev. Code § 4113.52, Ohio Whistleblower Act**
**(Lesley Ferrara and Shelly Kelling)**

558.   The allegations of the preceding paragraphs are realleged as if fully set forth.

559.   Relators complied with the notice requirements of Ohio R.C. 4113.52 *et seq*. in reporting what they reasonably believed to be criminal activity constituting felonies;

560.   Novo Nordisk failed to comply with the requirements of the statute that provide for investigation and written report to the employee within 24 hours of the report;

561. Novo Nordisk retaliated against Relators for having made the reports;

562. As a direct and proximate result of Defendants' actions, Relators have been injured to their detriment.

## PRAYER FOR RELIEF

WHEREFORE, Relators Ferrara and Kelling request that judgment be entered against the Defendants, ordering that:

1. Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729, *et seq.*;

2. Defendants pay not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729, plus three times the amount of damages the United States has sustained because of the Defendants' actions;

3. Relators be awarded the maximum "relators' share" allowed pursuant to 31 U.S.C. § 3730(d) and similar provisions of the state false claims acts;

4. Relators be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d) and similar provisions of the State False Claims Acts;

5. Relators be provided with injunctive or equitable relief, as may be appropriate, to prevent further harm to themselves and to prevent the harm to others and the public caused by Defendants' retaliation against whistleblowers;

6. Relators be awarded all litigation costs, expert fees, and reasonable attorneys' fees incurred as provided pursuant to 31 U.S.C. § 3730(h) and other applicable law;

7. Defendants be enjoined from concealing, removing, encumbering or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

8. Defendants disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

9. Relators be awarded compensation for pay lost, including backpay and frontpay, as a result of discrimination by Defendants based on sex, age, disability, and religion;

10. Relators be awarded compensation for emotional damages caused to Relators as a result of the discriminatory and retaliatory actions taken by Defendants in violation

of Title VII, the Age Discrimination in Employment Act, and Ohio state discrimination law;

11.     Damages be awarded to Relators for Defendants' violation of Ohio Public Policy;

12.     Relators be awarded all other damages to which they are entitled, including compensatory and punitive damages; and

13.     The United States, the Individual States, and Relators recover such other relief as the Court deems just and proper.

Respectfully submitted,

Mark Hanna (DC Bar 471960)
Lorrie E. Bradley (DC Bar 996379)
Murphy Anderson PLLC
1701 K Street NW, Suite 210
Washington, DC 20006
Phone: (202) 223-2620
Fax: (202) 296-9600
*mhanna@murphypllc.com*
*lbradley@murphypllc.com*

Ann Lugbill (DC Bar 462850)
Murphy Anderson PLLC
2406 Auburn Avenue
Cincinnati, OH 45219
Phone: (513) 784-1280
Fax: (877) 784-1449
*alugbill@murphypllc.com*

**Attorneys for Relators Ferrara and Kelling**

**REQUEST FOR TRIAL BY JURY**

Relators hereby demand a trial by jury.

Mark Hanna (DC Bar 471960)

144